# EXHIBIT 6 (Part 3 of 3)

Page 61 – 87

estimated settlements for known claims, as well as accruals of actuarial estimates of incurred but not reported claims.

*Note 12—Litigation*

We are involved in various inquiries, administrative proceedings and litigation relating to contracts, acquisitions and sales of property and other matters arising in the normal course of business. While any proceeding or litigation has an element of uncertainty, management believes that the final outcome of these matters will not have a material adverse effect on our consolidated financial position or our results of operations.

*Note 13—Employee Benefit Plans*

We have established a number of employee benefit programs for purposes of attracting, retaining and motivating our employees. The following is a description of the basic components of these programs.

**STOCK OPTION PLANS.** Our employees may be granted options to purchase shares of common stock under the Harrah's Entertainment 2001 Executive Stock Incentive Plan or the 2001 Broad-based Incentive Plan (collectively, "SOP"). Grants typically vest in equal installments over a three-year period and allow the option holder to purchase stock over specified periods of time, generally seven to ten years from the date of grant, at a fixed price equal to the market value at the date of grant. No options may be granted under the SOP after May 2011.

**HARRAH'S ENTERTAINMENT, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, unless otherwise stated) (Continued)**

A summary of activity of the 2001 Executive Stock Incentive Plan and Harrah's former plans, which are equity compensation plans approved by our stockholders, for 2001, 2002 and 2003 is as follows:

| | Weighted Avg. Exercise Price (Per Share) | Number of Common Shares | |
| --- | --- | --- | --- |
| | | Options Outstanding | Available For Grant |
| Balance—December 31, 2000 | $21.08 | 12,755,798 | 1,441,747 |
| Additional shares authorized | N/A | – | 3,900,000 |
| Restricted shares issued | N/A | – | (40,521) |
| Restricted shares transferred from Harrah's former plans | N/A | – | 766,509 |
| Restricted shares canceled | N/A | – | 328,685 |
| Granted | 26.39 | 774,075 | (774,075) |
| Exercised | 17.07 | (3,240,426) | – |
| Canceled | 23.29 | (1,596,869) | 1,596,869 |
| Rio plans cancellations | 17.16 | (8,800) | – |
| Balance—December 31, 2001 | 22.65 | 8,683,778 | 7,219,214 |
| Restricted shares issued | N/A | – | (221,931) |
| Restricted shares canceled | N/A | – | 78,091 |
| Granted | 46.80 | 2,910,560 | (2,910,560) |
| Exercised | 19.40 | (2,510,678) | – |
| Canceled | 30.96 | (267,063) | 267,063 |
| Rio plans cancellations | 18.88 | (2,000) | – |
| Balance—December 31, 2002 | 31.30 | 8,814,597 | 4,431,877 |
| Restricted shares issued | N/A | – | (60,061) |
| Restricted shares canceled | N/A | – | 101,934 |
| Granted | 43.18 | 2,968,175 | (2,968,175) |
| Exercised | 20.65 | (1,754,901) | – |
| Canceled | 40.06 | (409,309) | 409,309 |
| Rio plans cancellations | 12.44 | (3,400) | – |
| Balance—December 31, 2003 | 36.54 | 9,615,162 | 1,914,884 |

Of the 1,914,884 shares available for grant at December 31, 2003, up to 7,487 of these shares are available for grant as awards other than as stock options.

The following tables summarize additional information regarding the options outstanding at December 31:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Options exercisable at December 31 . . . . . . . . . . | 2,910,617 | 2,344,106 | 2,955,787 |
| Weighted average fair value per share of options granted per year . . . . . . . . . . . . . . . . . . . . . . . | $28.63 | $17.34 | $12.33 |

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding | Weighted Average Remaining Contract Life | Weighted Average Exercise Price | Number Exercisable | Weighted Average Exercise Price |
| $13.84–$28.90 | 4,075,483 | 6.0 years | $25.27 | 2,234,272 | $23.19 |
| 31.22– 43.50 | 2,773,971 | 6.3 years | 42.91 | 24,070 | 35.14 |
| 45.44– 49.32 | 2,765,708 | 5.5 years | 46.77 | 652,275 | 47.04 |
| | 9,615,162 | | | 2,910,617 | |

150,000 shares were authorized under the 1996 Non-Management Directors Stock Incentive Plan, whereby the director can receive either 50% or 100% of his or her director fees in stock. As of December 31, 2003, 17,417 shares were available for grant under this plan.

200,000 shares were authorized for issuance under the 2001 Broad-based Incentive Plan, which was established in 2001 and is an equity compensation plan not approved by stockholders. No additional shares will be authorized under the 2001 Broad-based Incentive Plan. A summary of activity of this plan is as follows:

| | Weighted Average Exercise Price (Per Share) | Number of Common Shares | |
|---|---|---|---|
| | | Options Outstanding | Available For Grant |
| Balance—December 31, 2001 . . . . . . . . . . . . | N/A | – | 200,000 |
| Granted . . . . . . . . . . . . . . . . . . . . . . . . . . | $47.03 | 196,775 | (196,775) |
| Canceled . . . . . . . . . . . . . . . . . . . . . . . . . | 47.03 | (7,100) | 7,100 |
| Balance—December 31, 2002 . . . . . . . . . . . . | 47.03 | 189,675 | 10,325 |
| Granted . . . . . . . . . . . . . . . . . . . . . . . . . . | 43.50 | 22,367 | (22,367) |
| Canceled . . . . . . . . . . . . . . . . . . . . . . . . . | 46.73 | (35,814) | 35,814 |
| Balance—December 31, 2003 . . . . . . . . . . . . | 46.64 | 176,228 | 23,772 |

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding | Weighted Average Remaining Contract Life | Weighted Average Exercise Price | Number Exercisable | Weighted Average Exercise Price |
| $37.41–$44.89 | 19,336 | 6.0 years | $43.50 | – | $  – |
| 44.89– 52.37 | 156,892 | 5.2 years | 47.03 | 54,918 | 47.03 |
| | 176,228 | | | 54,918 | |

HARRAH'S ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Dollars in thousands, unless otherwise stated) (Continued)

**RESTRICTED STOCK.** Employees may be granted shares of common stock under the SOP. Restricted shares granted under the SOP are restricted as to transfer and subject to forfeiture during a specified period or periods prior to vesting. The shares generally vest in equal installments over a period of three years. No awards of restricted shares may be made under the current plan after May 2011. The compensation arising from a restricted stock grant is based upon the market price at the grant date. Such expense is deferred and amortized to expense over the vesting period.

The Company has issued Time Accelerated Restricted Stock Award Plan ("TARSAP") awards to certain key executives. The initial TARSAP program was completed in January 2002. During 2001, 2002 and 2003, additional TARSAP awards were issued to certain key executives, which will vest on January 1, 2007, if the executive continues in active employment until that date. These shares are eligible for earlier annual vesting beginning in 2003 over four years (three years for shares awarded in 2002) based on the Company's financial performance in each of the years 2002 through 2005, and the remaining unvested shares will vest on January 1, 2007. The expense arising from TARSAP awards is being amortized to expense over the periods in which the restrictions lapse.

The number and weighted average grant-date fair value of restricted shares granted, and the amortization expense recognized, during 2003, 2002 and 2001, including the TARSAP awards, were as follows:

|                                            | 2003      | 2002      | 2001      |
|--------------------------------------------|-----------|-----------|-----------|
| Number of shares granted ................. | 60,061    | 221,931   | 72,876    |
| Weighted average grant price per share ..... | $ 45.29 | $ 43.77 | $ 31.00 |
| Amortization expense (in millions) ......... | $ 8.0   | $ 7.8   | $ 8.2   |
| Unvested shares as of December 31 ........  | 1,021,720 | 1,458,617 | 1,783,535 |

**SAVINGS AND RETIREMENT PLAN.** We maintain a defined contribution savings and retirement plan, which, among other things, allows pretax and after-tax contributions to be made by employees to the plan. Under the plan, participating employees may elect to contribute up to 20% of their eligible earnings. Through 2003, the Company fully matched the first six percent of employees' contributions; however, effective January 1, 2004, the Company match will be 50% for the first six percent of employees' contributions. Amounts contributed to the plan are invested, at the participant's direction, in up to fourteen separate funds, including a Harrah's company stock fund. Participants become vested in the matching contribution over five years of credited service. Our contribution expense for this plan was $30.1 million, $29.2 million and $26.6 million in 2003, 2002 and 2001, respectively.

**DEFERRED COMPENSATION PLANS.** Harrah's maintains deferred compensation plans, (collectively, "DCP") and an Executive Supplemental Savings Plan ("ESSP") under which certain employees may defer a portion of their compensation. Amounts deposited into these plans are unsecured liabilities of the Company. Amounts deposited into DCP earn interest at rates approved by the Human Resources Committee of the Board of Directors. The ESSP is a variable investment plan, which allows employees to direct their investments by choosing from several investment alternatives. The total liability included in Deferred credits and other for these plans at December 31, 2003 and 2002 was $104.3 million and $86.4 million, respectively. In connection with the administration of one of these plans, we have purchased company-owned life insurance policies insuring the lives of certain directors, officers and key employees.

**MULTI-EMPLOYER PENSION PLAN.**  We have approximately 6,850 employees covered under collective bargaining agreements, and the majority of those employees are covered by union sponsored, collectively bargained multi-employer pension plans. We contributed and charged to expense $7.2 million, $4.7 million and $4.5 million in 2003, 2002 and 2001, respectively, for such plans. The plans' administrators do not provide sufficient information to enable us to determine our share, if any, of unfunded vested benefits.

*Note 14—Nonconsolidated Affiliates*

As of December 31, 2003, our investments in nonconsolidated affiliates consisted primarily of interests in a golf course near one of our properties, in a horse-racing facility and in our joint ventures that are pursuing development of casinos in the United Kingdom. In 2003, we contributed $4.3 million to the United Kingdom ventures.

Previously, we held investments in JCC and National Airlines, Inc. ("NAI"), and these nonconsolidated affiliates are discussed below.

**JCC.**  On June 7, 2002, we acquired additional shares of the common stock of JCC, which increased our ownership in JCC to 63% and required a change of our accounting treatment for our investment in JCC from the equity method to consolidation of JCC in our financial statements. On December 10, 2002, we acquired all remaining shares of JCC's stock to increase our ownership to 100%. Prior to June 7, 2002, the Company had a minority ownership interest (and noncontrolling board representation) in JCC, and a subsidiary of the Company managed the casino.

The Company has guaranteed an annual payment obligation of JCC owed to the State of Louisiana of $60 million for the twelve-month period ending March 31, 2004, and for each of the subsequent two twelve-month periods. We expect to extend this guarantee for an additional year to end March 31, 2007.

As a result of JCC's filing for bankruptcy on January 4, 2001, we assessed the recoverability of our investment in and advances to JCC, determined that our investment and advances were impaired and recorded a charge of $220 million to recognize the impairment in fourth quarter 2000. We did not record our share of JCC's operating results in first quarter 2001 since we did not have any contractual obligation to fund JCC's operating losses from December 31, 2000, until the bankruptcy reorganization plan was consummated effective March 29, 2001. JCC reported income during the period in which we did not record any equity pick-up, primarily as a result of the forgiveness of debt arising from the bankruptcy plan, and the charge that we recorded in fourth quarter 2000 included the write-off of receivables that we held from JCC that were forgiven in the reorganization plan. In the bankruptcy reorganization, we received ownership of 49 percent of the equity of the reorganization entity and resumed recording our share of JCC's results in second quarter 2001 and continued until we began consolidating JCC's results in June 2002.

**NATIONAL AIRLINES, INC.**  Until June 2001, we had an approximate 48% ownership interest in NAI, which filed a voluntary petition for reorganization relief under Chapter 11 of the U.S. Bankruptcy Code in December 2000. In June 2001, we abandoned all rights to our shares of NAI stock and stock purchase warrants.

65

HARRAH'S ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Dollars in thousands, unless otherwise stated) (Continued)

NAI ceased operations in November 2002, after unsuccessfully attempting to restructure in bankruptcy court. We had provided a letter of credit on behalf of NAI, which we were required to fund in January 2003. We had an agreement with another investor of NAI whereby that investor was obligated to reimburse us for approximately 56% of amounts that we funded under the letter of credit and that we had previously funded under another letter of credit. During second quarter 2001, a subsidiary of the Company filed a lawsuit against the other investor for breach of contract due to the investor's failure to reimburse the Company for his share of the $8.6 million we paid against the first letter of credit. A judgment was entered in our favor but was appealed by the investor. In fourth quarter 2002, we reached a settlement with the investor that also included the extinguishment of the investor's potential liability on the letter of credit that was funded in January 2003, as well as the judgment. As a result of our settlement with the investor and our funding of the letter of credit following NAI's cessation of operations, we recorded a charge of $6.1 million in fourth quarter 2002.

**COMBINED FINANCIAL INFORMATION.** The following summarized balance sheet and statement of operations information has been compiled from financial reports for the periods and dates indicated submitted to us by our nonconsolidated affiliates which we accounted for using the equity method.

|  | 2003 | 2002 | 2001(a) |
|---|---|---|---|
| Combined Summarized Balance Sheet Information |  |  |  |
| Current assets | $11,455 | $ 1,865 | $ 50,273 |
| Land, buildings and equipment, net | 32,648 | 33,002 | 167,617 |
| Other assets | 554 | 2,005 | 50,022 |
| Total assets | 44,657 | 36,872 | 267,912 |
| Current liabilities | 8,645 | 6,769 | 34,224 |
| Long-term debt | 16,890 | 17,514 | 122,896 |
| Other liabilities | – | – | 3,607 |
| Total liabilities | 25,535 | 24,283 | 160,727 |
| Net assets | $19,122 | $ 12,589 | $107,185 |
| Combined Summarized Statement of Operations Information |  |  |  |
| Revenues | $14,330 | $135,648 | $270,229 |
| Operating (loss)/income | (265) | 23,517 | (15,403) |
| Extraordinary items | – | – | 213,448 |
| Net (loss)/income | (2,309) | 9,390 | 90,640 |

(a) 2001 is comprised primarily of JCC.

Our Investments in and advances to nonconsolidated affiliates are reflected in our accompanying Consolidated Balance Sheets as follows:

|  | 2003 | 2002 |
|---|---|---|
| Investments in and advances to nonconsolidated affiliates |  |  |
| Accounted for under the equity method | $7,824 | $4,331 |
| Accounted for at historical cost | 177 | 177 |
| Available-for-sale and recorded at market value | – | 386 |
|  | $8,001 | $4,894 |

In accordance with the provisions of SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities," we adjust the carrying value of our available-for-sale equity investments to

include unrealized gains or losses. A corresponding adjustment is recorded in the combination of our stockholders' equity and deferred income tax accounts.

*Note 15—Dispositions*

The following properties were sold during 2003. The operating results of these properties and the losses recorded on these sales are presented in our Consolidated Statements of Income as Discontinued operations and prior year results have been reclassified to conform to the 2003 presentation.

**HARVEYS COLORADO.**  On May 22, 2003, we sold Harveys Colorado, which we had concluded was a nonstrategic asset for us. The assets sold consisted primarily of inventories, property and equipment. The buyer also assumed certain accrued liabilities. We received cash proceeds of $17.6 million and recorded a pretax loss of $1.0 million on this sale.

Revenues at Harveys Colorado, reported in Discontinued operations for December 31, 2003, 2002 and 2001 were $12.2 million, $35.7 million and $19.3 million respectively. Harveys Colorado's pretax loss, including the loss on the sale, for the year ended December 31, 2003, was $1.4 million and its pretax income for the years ended December 31, 2002 and 2001, was $2.4 million and $1.0 million, respectively.

**HARRAH'S VICKSBURG.**  On June 30, 2003, we announced an agreement to sell Harrah's Vicksburg, and that sale was completed on October 27, 2003. The assets sold consisted primarily of land, buildings, equipment and inventories. We received cash proceeds of $28.6 million and recorded a pretax loss of $0.7 million on this sale.

Revenues at Harrah's Vicksburg, which are reported in Discontinued operations, were $29.0 million for the year ended December 31, 2003, $37.9 million for the year ended December 31, 2002 and $41.3 million for the year ended December 31, 2001. Harrah's Vicksburg's pretax income, after consideration of the loss on the sale, was $2.4 million for the year ended December 31, 2003, $2.2 million for the year ended December 31, 2002 and $1.7 million for the year ended December 31, 2001.

In addition to these completed sales, we also have announced the following planned sale.

**HARRAH'S SHREVEPORT.**  In conjunction with our plans to acquire Horseshoe Gaming, we announced plans to sell our Harrah's brand casino in Shreveport to avoid overexposure in that market, and in January 2004, we announced that we have an agreement, subject to regulatory approvals, to sell that property to another gaming company. The sale is subject to regulatory approvals and is expected to close in second quarter 2004. We have classified this property in Assets held for sale on our Consolidated Balance Sheets and have ceased depreciating its assets. Shreveport's assets consist primarily of land improvements, buildings, riverboat and equipment with a carrying value of approximately $165 million. Since the Horseshoe Gaming acquisition will give us a continued presence in the Shreveport-Bossier City market, Harrah's Shreveport's operating results have not been classified as discontinued operations. We do not anticipate a material gain or loss on this sale.

HARRAH'S ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Dollars in thousands, unless otherwise stated) (Continued)

*Note 16—Quarterly Results of Operations (Unaudited)*

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Year |
|---|---|---|---|---|---|
| | (In thousands, except per share amounts) | | | | |
| **2003**(1) | | | | | |
| Revenues | $1,058,929 | $1,080,220 | $1,139,280 | $1,044,293 | $4,322,722 |
| Income from operations | 190,426 | 183,312 | 217,717 | 134,843 | 726,298 |
| Income from continuing operations | 80,263 | 77,934 | 98,446 | 35,311 | 291,954 |
| Net income | 81,080 | 76,684 | 99,483 | 35,376 | 292,623 |
| Earnings per share—basic(3) | | | | | |
| From continuing operations | 0.74 | 0.72 | 0.90 | 0.32 | 2.68 |
| Net income | 0.75 | 0.71 | 0.91 | 0.32 | 2.69 |
| Earnings per share—diluted(3) | | | | | |
| From continuing operations | 0.73 | 0.70 | 0.89 | 0.32 | 2.64 |
| Net income | 0.74 | 0.69 | 0.90 | 0.32 | 2.65 |
| **2002**(2) | | | | | |
| Revenues | $ 964,260 | $1,011,944 | $1,114,629 | $1,007,694 | $4,098,527 |
| Income from operations | 197,074 | 201,709 | 227,666 | 145,368 | 771,817 |
| Income from continuing operations | 84,378 | 84,852 | 100,303 | 53,702 | 323,235 |
| Net income/(loss) | (6,008) | 86,116 | 101,042 | 53,879 | 235,029 |
| Earnings per share—basic(3) | | | | | |
| From continuing operations | 0.75 | 0.75 | 0.91 | 0.49 | 2.91 |
| Net income/(loss) | (0.05) | 0.76 | 0.91 | 0.49 | 2.11 |
| Earnings per share—diluted(3) | | | | | |
| From continuing operations | 0.74 | 0.74 | 0.89 | 0.48 | 2.85 |
| Net income/(loss) | (0.05) | 0.75 | 0.89 | 0.48 | 2.07 |

(1)  2003 Second Quarter includes $4.1 million in pretax charges for project opening costs and $2.1 million pretax charges for early retirement of debt; Third Quarter reflects a reclass of a $0.1 million charge for loss on sale of ownership interests in a nonconsolidated affiliate to Income from operations; and Fourth Quarter includes $15.9 million pretax charges for early retirement of a portion of the 7⅞% Senior Subordinated Notes and $6.3 million pretax charge for goodwill impairment at our Reno property. 2003 results reflect Harrah's Vicksburg and Harveys Colorado as discontinued operations.

(2)  2002 First Quarter includes a charge of $91.2 million, net of tax benefit of $2.8 million, related to a change in accounting principle; Second Quarter includes the financial results of Jazz Casino Company LLC from the date of our acquisition of a majority ownership interest on June 4, 2002; and Fourth Quarter includes $5.0 million in pretax charges for write-downs, reserves and recoveries and a reclass of a $6.1 million pretax charge for our exposure under a letter of credit issued on behalf of National Airlines, Inc. to Income from operations. 2002 results have been reclassified to reflect Harrah's Vicksburg as a discontinued operations.

(3)  The sum of the quarterly per share amounts may not equal the annual amount reported, as per share amounts are computed independently for each quarter and for the full year.

**ITEM 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

See our Current Reports on Form 8-K filed with the Securities and Exchange Commission on May 3, 2002, and February 4, 2003.

**ITEM 9A. Controls and Procedures.**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As of December 31, 2003, we carried out an evaluation, under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based on the foregoing, our chief executive officer and chief financial officer concluded that the Company's disclosure controls and procedures were effective.

There have not been any significant changes in our internal controls or in other factors that could significantly affect these controls subsequent to the date of the evaluation described above. We determined that there were no significant deficiencies or material weaknesses, and therefore no corrective actions were taken.

# PART III

**ITEM 10. Directors and Executive Officers.**

**Directors**

See the information regarding the names, ages, positions and business experience of our directors set forth in the section entitled "Board of Directors" of the Proxy Statement, which information is incorporated herein by reference.

**Executive Officers**

| Name and Age | Positions and Offices Held and Principal Occupations or Employment During Past 5 Years |
|---|---|
| Philip G. Satre (54) | Director since 1990; Chairman of the Board since January 1997; Chief Executive Officer from April 1994 to December 2002; Member of the former three-executive Office of the President from 1999 to 2001, and President from 1991 to 1999; Director of TABCORP Holdings Limited, an Australian leisure and entertainment company traded on the Australian Stock Exchange. |
| Gary W. Loveman (43) | Director since 2000; Chief Executive Officer since January 2003; President since April 2001; Chief Operating Officer from May 1998 to January 2003; member of the three-executive Office of the President from May 1999 to April 2001; Executive Vice President from May 1998 to May 1999; Associate Professor of Business Administration, Harvard University Graduate School of Business Administration from 1994 to 1998; Director of Coach, Inc., a designer and marketer of high-quality handbags and women's and men's accessories traded on the New York Stock Exchange. |
| Charles L. Atwood (55) | Senior Vice President and Chief Financial Officer since April 2001; Treasurer from October 1996 to November 2003; Vice President from October 1996 to April 2001; Director, Equity Residential, an owner and operator of multi-family properties traded on the New York Stock Exchange, since July 2003. |
| Jerry L. Boone (49) | Senior Vice President, Human Resources since February 2004; Vice President, Human Resources, Harrah's New Orleans from April 2000 to February 2004; Vice President, Gaming Operations, Harrah's New Orleans from September 1998 to April 2000. |
| John M. Boushy (49) | Senior Vice President, Operations Products & Services since February 2001; Senior Vice President, Information Technology from February 2001 to February 2004; Chief Information Officer from February 2001 to January 2003; Senior Vice President Brand Operations and Information Technology from 1999 to 2001; Senior Vice President Information Technology and Marketing Services from 1993 to 1999. |
| Stephen H. Brammell (46) | Senior Vice President and General Counsel since July 1999; Secretary from November 2002 to July 2003 and from May 2000 to February 2001; Vice President and Associate General Counsel from 1997 to 1999; Associate General Counsel from 1993 to 1997. |

70

| Name and Age | Positions and Offices Held and Principal Occupations or Employment During Past 5 Years |
| --- | --- |
| Janis L. Jones (54) . . . . . . . . . . . | Senior Vice President, Communications/Government Relations since November 1999; Mayor of Las Vegas, Nevada, from 1991 to 1999. |
| Anthony D. McDuffie (43) . . . . . | Vice President since November 1999; Controller and Chief Accounting Officer since November 2001; Assistant Controller from 1994 to 2001. |
| Richard E. Mirman (37) . . . . . . . | Senior Vice President, New Business Development since April 2003; Senior Vice President, New Business Development and Chief Marketing Officer from January 2003 to April 2003; Senior Vice President, Marketing from April 2000 to January 2003; Vice President, Relationship Marketing from 1998 to 2000. |
| David W. Norton (35) . . . . . . . . . | Senior Vice President—Retention Marketing since November 2003; Senior Vice President—Relationship Marketing from January 2003 to November 2003; Vice President—Loyalty Marketing from October 1998 to January 2003. |
| Virginia E. Shanks (43) . . . . . . . . | Senior Vice President—Acquisition Marketing since November 2003; Western Division Senior Vice President—Marketing from January 2003 to November 2003; Western Division Vice President—Marketing from July 1998 to January 2003. |
| Timothy S. Stanley (38) . . . . . . . . | Senior Vice President—Information Technology and Chief Information Officer since February 2004; Vice President—Information Technology and Chief Information Officer from January 2003 to February 2004; Vice President—Information Technology from February 2001 to January 2003; Managing Partner, Las Vegas, for USWeb Corporation, an e-Business consulting firm since acquired by marchFIRST, Inc., from December 1999 to February 2001; Vice President—Information Technology, National Airlines, Inc., from August 1998 to January 2000. National Airlines, Inc. filed a voluntary petition under Chapter 11 of the U.S. Bankruptcy Code in December 2000 and ceased operations in November 2002. |
| Timothy J. Wilmott (45) . . . . . . . | Chief Operating Officer since January 2003; Eastern Division President from 1997 to January 2003. |

## Code of Ethics

In February 2003, our Board adopted a Code of Business Conduct and Ethics that applies to our Chief Executive Officer and President, Chief Operating Officer, Chief Financial Officer and Chief Accounting Officer and is intended to qualify as a "code of ethics" as defined by rules recently adopted by the Securities and Exchange Commission. The Code is designed to deter wrongdoing and to promote:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely, and understandable disclosure in reports and documents that we file with, or submit to, the SEC and in other public communications made by us;

- compliance with applicable governmental laws, rules and regulations;
- prompt internal reporting to an appropriate person or persons identified in the Code of violations of the Code; and
- accountability for adherence to the Code.

**ITEM 11. Executive Compensation.**

See the information set forth in the sections of the Proxy Statement entitled "Compensation of Directors," "Summary Compensation Table," "Option Grants in the Last Fiscal Year," "Aggregated Option Exercises in 2003 and December 31, 2003 Option Values" and "Certain Employment Arrangements," which sections are incorporated herein by reference.

**ITEM 12. Security Ownership of Certain Beneficial Owners and Management.**

See the information set forth in the sections of the Proxy Statement entitled "Ownership of Harrah's Entertainment Securities" and "Certain Stockholders," which sections are incorporated herein by reference.

**Equity Compensation Plan Information**

| Plan Category | (a)<br>Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b)<br>Weighted-average exercise price of outstanding options, warrants and rights | (c)<br>Number of securities remaining available for future issuance under equity compensation plans(1) |
|---|---|---|---|
| Equity compensation plans approved by stockholders(2) | 9,615,162 | $36.54 | 1,932,301 |
| Equity compensation plans not approved by stockholders(3) | 176,228 | 46.64 | 23,772 |
| Total | 9,791,390 | 36.72 | 1,956,073 |

(1) Excluding securities reflected in column (a).

(2) Includes the Harrah's Entertainment, Inc. 2001 Executive Stock Incentive Plan, the Harrah's Entertainment, Inc. 1996 Non-Management Directors Stock Incentive Plan, the Promus Companies Incorporated 1990 Restricted Stock Plan, and the Promus Companies Incorporated 1990 Stock Option Plan.

(3) Includes the Harrah's Entertainment, Inc. 2001 Broad-Based Stock Incentive Plan, a description of which is set forth in Note 13 to the consolidated financial statements set forth elsewhere in this Annual Report on Form 10-K in Part II, Item 8, Financial Statements and Supplementary Data. The 2001 Broad-Based Stock Incentive Plan is intended to qualify as a "broadly-based" plan under Section 312.03 of the New York Stock Exchange Listed Company Manual.

**ITEM 13. Certain Relationships and Related Transactions.**

See the information set forth in the section of the Proxy Statement entitled "Certain Relationships and Related Transactions," which section is incorporated herein by reference.

**ITEM 14. Principal Accountant Fees and Services.**

See the information set forth in the section of the Proxy Statement entitled "Fees Paid to Deloitte & Touche LLP," which section is incorporated herein by reference.

## PART IV

**ITEM 15. Exhibits, Financial Statement Schedules and Reports on Form 8-K.**

(a)  1. Financial statements of the Company (including related notes to consolidated financial statements) filed as part of this report are listed below:

Independent Auditors' Report.

Consolidated Balance Sheets as of December 31, 2003 and 2002.

Consolidated Statements of Income for the Years Ended December 31, 2003, 2002 and 2001.

Consolidated Statements of Stockholders' Equity and Comprehensive Income for the Years Ended December 31, 2003, 2002 and 2001.

Consolidated Statements of Cash Flows for the Years Ended December 31, 2003, 2002 and 2001.

2. Schedules for the years ended December 31, 2003, 2002 and 2001, are as follows:

Schedule II—Consolidated valuation and qualifying accounts.

Schedules I, III, IV, and V are not applicable and have therefore been omitted.

3. Exhibits

**No.**

2(1)  Stock Purchase Agreement dated as of April 24, 2001 by and among Harrah's Entertainment, Inc., Colony HCR Voteco, LLC, Colony Investors III, L.P., and Harveys Casino Resorts. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed August 13, 2001, File No. 1-10410.)

2(2)  Agreement and Plan of Merger dated July 30, 2002 among Harrah's Operating Company, Inc., Satchmo Acquisition, Inc. and JCC Holding Company. (Incorporated by reference from the Company's Schedule 13D/A filed August 2, 2002, File No. 5-54911.)

2(3)  Stock Purchase Agreement, dated as of September 10, 2003, by and among Harrah's Entertainment, Inc., Horseshoe Gaming Holding Corp., and each of the stockholders of Horseshoe Gaming Holding Corp. (Incorporated by reference from the Company's Current Report on Form 8-K, filed September 17, 2003, File No. 1-10410.)

2(4)  Partnership Interest Purchase Agreement dated as of January 20, 2004 by and among Harrah's Shreveport/Bossier City Investment Company, LLC, Harrah's Bossier City Investment Company, LLC Red River Entertainment of Shreveport Partnership in Commendam, Boyd Shreveport, L.L.C., Boyd Red River, L.L.C., and Boyd Gaming Corporation. (Incorporated by reference from the Company's Current Report on Form 8-K, filed January 23, 2004, File No. 1-10410.)

3(1)  Certificate of Incorporation of The Promus Companies Incorporated; Certificate of Amendment of Certificate of Incorporation of The Promus Companies Incorporated dated April 29, 1994; Certificate of Amendment of Certificate of Incorporation of The Promus Companies Incorporated dated May 26, 1995; and Certificate of Amendment of Certificate of Incorporation of The Promus Companies Incorporated dated June 30, 1995, changing its name to Harrah's Entertainment, Inc. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 1995, filed March 6, 1996, File No. 1-10410.)

73

No.

3(2)  Bylaws of Harrah's Entertainment, Inc., as amended November 12, 2002. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2002, filed March 7, 2003, File No. 1-10410.)

4(1)  Rights Agreement dated as of October 5, 1996, between Harrah's Entertainment, Inc. and The Bank of New York, which includes the form of Certificate of Designations of Series A Special Stock of Harrah's Entertainment, Inc. as Exhibit A, the form of Right Certificate as Exhibit B and the Summary of Rights to Purchase Special Shares as Exhibit C. (Incorporated by reference from the Company's Current Report on Form 8-K, filed August 9, 1996, File No. 1-10410.)

4(2)  First Amendment, dated as of February 21, 1997, to Rights Agreement between Harrah's Entertainment, Inc. and The Bank of New York. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 1996, filed March 11, 1997, File No. 1-10410.)

4(3)  Second Amendment, dated as of April 25, 1997, to Rights Agreement, dated as of October 25, 1996, between Harrah's Entertainment, Inc. and The Bank of New York. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 1997, filed May 13, 1997, File No. 1-10410.)

4(4)  Letter to Stockholders dated July 23, 1997 regarding Summary of Rights To Purchase Special Shares As Amended Through April 25, 1997. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 1997, filed August 13, 1997, File No. 1-10410.)

4(5)  Certificate of Elimination of Series B Special Stock of Harrah's Entertainment, Inc., dated February 21, 1997. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 1996, filed March 11, 1997, File No. 1-10410.)

4(6)  Certificate of Designations of Series A Special Stock of Harrah's Entertainment, Inc., dated February 21, 1997. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 1996, filed March 11, 1997, File No. 1-10410.)

10(1)  Credit Agreement dated as of April 23, 2003, among Harrah's Entertainment, Inc., as Guarantor, Harrah's Operating Company, Inc., as Borrower, The Lenders, Syndication Agent, Documentation Agents and Co-Documentation Agents named therein, and Bank of America, N.A., as Administrative Agent, Banc of America Securities LLC and Wells Fargo Bank, N.A., Joint Lead Arrangers and Joint Book Managers. (Incorporated by reference from the Company's Current Report on Form 8-K, filed May 2, 2003, File No. 1-10410.)

10(2)  Indenture, dated as of December 9, 1998, among Harrah's Operating Company, Inc. as Issuer, Harrah's Entertainment, Inc., as Guarantor and IBJ Schroder Bank & Trust Company, as Trustee relating to the 7⅞% Senior Subordinated Notes Due 2005. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 1998, filed March 19, 1999, File No. 1-10410.)

10(3)  Indenture, dated as of December 18, 1998, among Harrah's Operating Company, Inc. as obligor, Harrah's Entertainment, Inc., as Guarantor, and IBJ Schroder Bank & Trust Company, as Trustee relating to the 7½% Senior Notes Due 2009. (Incorporated by reference from the Company's Registration Statement on Form S-3 of Harrah's Entertainment, Inc. and Harrah's Operating Company, Inc., File No. 333-69263, filed December 18, 1998.)

No.

10(4)   Indenture, dated as of January 29, 2001, between Harrah's Operating Company, Inc., as Issuer, Harrah's Entertainment, Inc., as Guarantor, and Bank One Trust Company, N.A., as Trustee, relating to the 8.0% Senior Notes Due 2011. (Incorporated by reference from the Company's Annual Report on Form 10-K filed on March 28, 2001, File No. 1-10410.)

10(5)   Indenture, dated as of June 14, 2001, between Harrah's Operating Company, Inc., as Issuer, Harrah's Entertainment, Inc., as Guarantor, and Firstar Bank, N.A., as Trustee, relating to the 7⅛% Senior Notes due 2007. (Incorporated by reference from the Company's Registration Statement on Form S-4 of Harrah's Entertainment, Inc. and Harrah's Operating Company, Inc., File No. 333-68360, filed August 24, 2001.)

**10(6)   Indenture, dated as of December 11, 2003, between Harrah's Operating Company, Inc., as Issuer, Harrah's Entertainment, Inc., as Guarantor, and U.S. Bank National Association, as Trustee, relating to the 5/375% Senior Notes due 2013.

**10(7)   Registration Rights Agreement dated December 11, 2003 among Harrah's Operating Company, Inc., Harrah's Entertainment, Inc., as Guarantor, and Citigroup Global Markets Inc., as Initial Purchasers, relating to the 5.375% Senior Notes due 2013.

**10(8)   Purchase Agreement, dated December 8, 2003, among Harrah's Operating Company, Inc., Harrah's Entertainment, Inc., as Guarantor, and Citigroup Global Markets Inc., as initial purchaser relating to the 5.375% Senior Notes due 2013.

10(9)   Issuing and Paying Agent Agreement, dated as of May 19, 2000, among Harrah's Operating Company, Inc., as Issuer, Harrah's Entertainment, Inc., as Guarantor, and Bank One, National Association, as issuing and paying agent; Corporate Commercial Paper Master Note in favor of Cede & Co., as nominee of The Depository Trust Company, by Harrah's Operating Company, Inc., as Issuer, and Bank One, N.A., as Paying Agent. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed August 14, 2000, File No. 1-10410.)

10(10)   Commercial Paper Dealer Agreement, dated as of May 3, 2000, among Harrah's Operating Company, Inc., as Issuer, Harrah's Entertainment, Inc., as Guarantor, and Banc of America Securities LLC, as Dealer. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed August 14, 2000, File No. 1-10410.)

10(11)   Commercial Paper Dealer Agreement, dated as of May 3, 2000, among Harrah's Operating Company, Inc., as Issuer, Harrah's Entertainment, Inc., as Guarantor, and Credit Suisse First Boston Corporation, as Dealer. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed August 14, 2000, File No. 1-10410.)

10(12)   Tax Sharing Agreement, dated June 30, 1995, between The Promus Companies Incorporated and Promus Hotel Corporation. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 1995, filed August 14, 1995, File No. 1-10410.)

†10(13)   Form of Indemnification Agreement entered into by The Promus Companies Incorporated and each of its directors and executive officers. (Incorporated by reference from the Company's Registration Statement on Form 10, File No. 1-10410, filed on December 13, 1989.)

†10(14)   Financial Counseling Plan of Harrah's Entertainment, Inc. as amended January 1996. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 1995, filed March 6, 1996, File No. 1-10410.)

No.

†10(15)  The Promus Companies Incorporated 1996 Non-Management Director's Stock Incentive Plan dated April 5, 1995. (Incorporated by reference from the Company's Proxy Statement for the May 26, 1995 Annual Meeting of Stockholders, filed April 25, 1995.)

†10(16)  Amendment dated February 20, 1997 to 1996 Non-Management Director's Stock Incentive Plan. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 1997, filed May 13, 1997, File No. 1-10410.)

†10(17)  Amendment dated as of November 15, 2000 to the Harrah's Entertainment, Inc. Non-Management Directors Stock Incentive Plan. (Incorporated by reference from the Company's Annual Report on Form 10-K filed on March 28, 2001, File No. 1-10410.)

  10(18)  Summary Plan Description of Executive Term Life Insurance Plan. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 1996, filed March 11, 1997, File No. 1-10410.)

†10(19)  Executive Supplemental Savings Plan dated February 21, 2001. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed May 11, 2001, File No. 1-10410.)

†10(20)  FirstAmendment, dated May 2, 2001, to the Executive Supplemental Savings Plan. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed August 13, 2001, File No. 1-10410.)

†10(21)  2001 Restatement of the Harrah's Entertainment, Inc. Executive Supplemental Savings Plan, amended and restated effective April 1, 2001. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed November 9, 2001, File No. 1-10410.)

†10(22)  Second Amendment to the 2001 Restatement of the Harrah's Entertainment, Inc. Executive Supplemental Savings Plan approved November 13, 2001. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2001 filed March 8, 2002, File No. 1-10410.)

†10(23)  Third Amendment dated January 1, 2003 to the 2001 Restatement of the Harrah's Entertainment, Inc. Executive Supplemental Savings Plan. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2002, filed March 7, 2003, File No. 1-10410.)

†10(24)  Employment Agreement dated as of September 4, 2002, between Harrah's Entertainment, Inc. and Philip G. Satre. (Incorporated by reference from the Company's Annual Report on Form 10-Q filed November 12, 2002, File No. 1-10410.)

†10(25)  Severance Agreement dated January 1, 2003, entered into with Philip G. Satre. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2002, filed March 7, 2003, File No. 1-10410.)

†10(26)  Amendment, dated as of May 9, 2001, to Deferred Compensation Agreement dated October 1, 1986, between Philip G. Satre and Harrah's Operating Company, Inc. successor to Harrah's Club, as amended January 1, 1987 and December 13, 1993. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed August 13, 2001, File No. 1-10410.)

†10(27)  Employment Agreement dated as of September 4, 2002, between Harrah's Entertainment, Inc. and Gary W. Loveman. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed November 12, 2002, File No. 1-10410.)

No.

†10(28)  Severance Agreement dated January 1, 2003 entered into with Gary W. Loveman (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2002, filed March 7, 2003, File No. 1-10410.)

**†10(29)  Form of Employment Agreement between Harrah's Operating Company, Inc. and Charles L. Atwood, Stephen H. Brammell, Jerry Boone, John M. Boushy, Janis L. Jones, Anthony D. McDuffie, Richard E. Mirman, David W. Norton, Virginia E. Shanks, Timothy S. Stanley, and Timothy J. Wilmott.

**†10(30)  Form of Severance Agreement entered into with Charles L. Atwood, Jerry Boone, John M. Boushy, Stephen H. Brammell, Janis L. Jones, Anthony D. McDuffie, Richard E. Mirman, David W. Norton, Virginia E. Shanks, Timothy S. Stanley, and Timothy J. Wilmott.

†10(31)  The Promus Companies Incorporated 1990 Stock Option Plan, as amended July 29, 1994. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 1994, filed August 11, 1994, File No. 1-10410.)

†10(32)  Amendment, dated April 5, 1995, to The Promus Companies Incorporated 1990 Stock Option Plan as adjusted on December 12, 1996. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 1996, filed March 11, 1997, File No. 1-10410.)

†10(33)  Amendment, dated February 26, 1998, to the Harrah's Entertainment, Inc. 1990 Stock Option Plan. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q for the quarter ended March 30, 1998, filed May 14, 1998, File No. 1-10410.)

†10(34)  Amendment, dated April 30, 1998, to the Harrah's Entertainment, Inc. 1990 Stock Option Plan. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 1998, filed August 7, 1998, File No. 1-10410.)

†10(35)  Amendment, dated October 29, 1998, to the Harrah's Entertainment, Inc. 1990 Stock Option Plan. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 1998, filed March 19, 1999, File No. 1-10410.)

†10(36)  The Promus Companies Incorporated 1990 Restricted Stock Plan. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 29, 1989, filed March 28, 1990, File No. 1-10410.)

†10(37)  Amendment, dated April 5, 1995, to The Promus Companies Incorporated 1990 Restricted Stock Plan. (Incorporated by reference from the Company's Proxy Statement for the May 26, 1995 Annual Meeting of Stockholders, filed April 25, 1995.)

†10(38)  Amendment, dated February 26, 1998, to the Harrah's Entertainment, Inc. 1990 Restricted Stock Plan. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q for the quarter ended March 30, 1998, filed May 14, 1998, File No. 1-10410.)

†10(39)  Amendment, dated April 30, 1998, to the Harrah's Entertainment, Inc. 1990 Restricted Stock Plan. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 1998, filed August 7, 1998, File No. 1-10410.)

†10(40)  Amendment, dated October 29, 1998, to the Harrah's Entertainment, Inc. 1990 Restricted Stock Plan. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 1998, filed March 19, 1999, File No. 1-10410.)

†10(41)  Deferred Compensation Plan dated October 16, 1991. (Incorporated by reference from Amendment No. 2 to the Company's and Embassy's Registration Statement on Form S-1, File No. 33-43748, filed March 18, 1992.)

No.

†10(42)  Amendment, dated May 26, 1995, to The Promus Companies Incorporated Deferred Compensation Plan. (Incorporated by reference from the Company's Current Report on Form 8-K, filed June 15, 1995, File No. 1-10410.)

†10(43)  Amendment dated April 24, 1997, to Harrah's Entertainment, Inc.'s Deferred Compensation Plan. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 1997, filed August 13, 1997, File No. 1-10410.)

†10(44)  Amendment dated as of November 15, 2000 to the Harrah's Entertainment, Inc. Deferred Compensation Plan. (Incorporated by reference from the Company's Annual Report on Form 10-K filed on March 28, 2001, File No. 1-10410.)

†10(45)  Amendment dated as of February 26, 2003 to the Harrah's Entertainment, Inc. Deferred Compensation Plan. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2002, filed March 7, 2003, File No. 1-10410.)

†10(46)  Amended and Restated Executive Deferred Compensation Plan dated as of October 27, 1995. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 1995, filed March 6, 1996, File No. 1-10410.)

†10(47)  Amendment dated April 24, 1997 to Harrah's Entertainment, Inc.'s Executive Deferred Compensation Plan. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 1997, filed August 13, 1997, File No. 1-10410.)

†10(48)  Amendment dated April 30, 1998 to the Harrah's Entertainment, Inc. Executive Deferred Compensation Plan. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 1998, filed August 7, 1998, File No. 1-10410.)

†10(49)  Amendment dated October 29, 1998 to the Harrah's Entertainment, Inc. Executive Deferred Compensation Plan. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 1998, filed March 19, 1999, File No. 1-10410.)

†10(50)  Restated Amendment, dated July 18, 1996, to Harrah's Entertainment, Inc. Executive Deferred Compensation Plan. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 1996, filed March 11, 1997, File No. 1-10410.)

†10(51)  Amendment dated as of November 15, 2000 to the Harrah's Entertainment, Inc. Executive Deferred Compensation Plan. (Incorporated by reference from the Company's Annual Report on Form 10-K filed on March 28, 2001, File No. 1-10410.)

†10(52)  Amendment dated as of February 21, 2001 to the Harrah's Entertainment, Inc. Executive Deferred Compensation Plan. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed May 11, 2001, File No. 1-10410.)

†10(53)  Amendment dated as of January 1, 2003 to the Harrah's Entertainment, Inc. Executive Deferred Compensation Plan. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2002, filed March 7, 2003, File No. 1-10410.)

†10(54)  Letter Agreement with Wells Fargo Bank Minnesota, N.A., dated August 31, 2000, concerning appointment as Escrow Agent under Escrow Agreement for deferred compensation plans. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed November 13, 2000, File No. 1-10410.)

No.

†10(55) Amendment to Escrow Agreement, dated April 26, 2000, between Harrah's Entertainment, Inc. and Wells Fargo Bank Minnesota, N.A., Successor to Bank of America, N.A. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed November 13, 2000, File No. 1-10410.)

10(56) Trust Agreement dated June 20, 2001 by and between Harrah's Entertainment, Inc. (the "Company") and Wells Fargo Bank Minnesota, N.A. (the "Trustee"). (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed November 9, 2001, File No. 1-10410.)

†10(57) Time Accelerated Restricted Stock Award Plan ("TARSAP") program dated December 12, 1996. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 1996, filed March 11, 1997, File No. 1-10410.)

†10(58) Amendment to Harrah's Entertainment, Inc. 1990 Stock Option Plan. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed August 12, 1999, File No. 1-10410.)

†10(59) Amendment to Harrah's Entertainment, Inc. 1990 Stock Option Plan, dated as of February 23, 2000. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed August 14, 2000, File No. 1-10410.)

†10(60) Harrah's Entertainment, Inc. 2000 Senior Executive Incentive Plan.. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed August 14, 2000, File No. 1-10410.)

†10(61) TARSAP Deferral Plan dated July 28, 1999. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed November 12, 1999, Filed No. 1-10410.)

†10(62) Time Accelerated Restricted Stock Award Plan II (TARSAP II) dated April 26, 2000. (Incorporated by reference from the Company's Quarterly Report on Form 10-Q filed August 14, 2000, File No. 1-10410.)

†10(63) Harrah's Entertainment, Inc. 2001 Executive Stock Incentive Plan. (Incorporated by reference from the Company's Registration Statement on Form S-8 of Harrah's Entertainment, Inc., File No. 333-63856, filed June 26, 2001.)

†10(64) Amendment dated as of January 1, 2003 to the Harrah's Entertainment, Inc. 2001 Executive Stock Incentive Plan. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2002, filed March 7, 2003, File No. 1-10410.)

**12 Computations of ratios.

14 Harrah's Entertainment, Inc. Code of Business Conduct and Ethics for Principal Officers, adopted February 26, 2003. (Incorporated by reference from the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2002, filed March 7, 2003, File No. 1-10410.)

**21 List of subsidiaries of Harrah's Entertainment, Inc.

**23 Independent Auditors' Consent.

**31(1) Certification of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, dated March 4, 2004.

**31(2) Certification of Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, dated March 4, 2004.

No.

**32(1)   Certification of Chief Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, dated March 4, 2004.

**32(2)   Certification of Chief Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, dated March 4, 2004.

**99     Description of Governmental Regulation.

---

** Filed herewith.

† Management contract or compensatory plan or arrangement required to be filed as an exhibit to this Form pursuant to Item 14(c) of Form 10-K.

(b) The following reports on Form 8-K were filed by the Company during the fourth quarter of 2003 and thereafter through March 4, 2004:

(i) Form 8-K filed October 22, 2003, furnishing our press release reporting third quarter earnings.

(ii) Form 8-K filed November 4, 2003, reporting the declaration of a cash dividend.

(iii) Form 8-K filed November 7, 2003, regarding a request from the Federal Trade Commission for additional information in connection with the acquisition of Horseshoe Gaming Holding Corp.

(iv) Form 8-K filed December 12, 2003, regarding the sale of $500 million of 5.375% Senior Notes due 2013.

(v) Form 8-K filed January 23, 2004, (i) regarding the entering into a definitive agreement whereby Boyd Gaming Corporation will acquire all of the outstanding limited and general partnership interests of Red River Entertainment of Shreveport Partnership in Commendam (the "Partnership"), subject to regulatory approval, and (ii) announcing the entering into a definitive agreement to purchase Binion's Horseshoe Hotel & Casino, subject to regulatory approval.

(vi) Form 8-K filed February 4, 2004, reporting the declaration of a cash dividend.

(vii) Form 8-K filed February 4, 2004, furnishing our press release regarding fourth quarter and full year results for 2003.

## SIGNATURES

**Pursuant to the requirements of Section 13 of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.**

HARRAH'S ENTERTAINMENT, INC.

Dated: March 4, 2004                    By:    /s/ GARY W. LOVEMAN
                                        Gary W. Loveman,
                                        *Chief Executive Officer and President*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ BARBARA T. ALEXANDER<br>Barbara T. Alexander | Director | March 4, 2004 |
| /s/ FRANK J. BIONDI, JR.<br>Frank J. Biondi, Jr. | Director | March 4, 2004 |
| /s/ JOE M. HENSON<br>Joe M. Henson | Director | March 4, 2004 |
| /s/ RALPH HORN<br>Ralph Horn | Director | March 4, 2004 |
| /s/ GARY W. LOVEMAN<br>Gary W. Loveman | Director, Chief Executive Officer and President | March 4, 2004 |
| /s/ R. BRAD MARTIN<br>R. Brad Martin | Director | March 4, 2004 |
| /s/ GARY G. MICHAEL<br>Gary G. Michael | Director | March 4, 2004 |
| /s/ ROBERT G. MILLER<br>Robert G. Miller | Director | March 4, 2004 |

81

| Signature | Title | Date |
|---|---|---|
| /s/ PHILIP G. SATRE<br>Philip G. Satre | Director and Chairman of the Board | March 4, 2004 |
| /s/ BOAKE A. SELLS<br>Boake A. Sells | Director | March 4, 2004 |
| /s/ CHRISTOPHER J. WILLIAMS<br>Christopher J. Williams | Director | March 4, 2004 |
| /s/ CHARLES L. ATWOOD<br>Charles L. Atwood | Senior Vice President and Chief Financial Officer | March 4, 2004 |
| /s/ ANTHONY D. MCDUFFIE<br>Anthony D. McDuffie | Vice President, Controller and Chief Accounting Officer | March 4, 2004 |

82

Schedule II

## HARRAH'S ENTERTAINMENT, INC.
## CONSOLIDATED VALUATION AND QUALIFYING ACCOUNTS
### (In thousands)

| Description | Balance at Beginning of Period | Additions — Charged to Costs and Expenses | Additions — Charged to Other Accounts | Deductions from Reserves | Balance at End of Period |
|---|---|---|---|---|---|
| **YEAR ENDED DECEMBER 31, 2003** | | | | | |
| Allowance for doubtful accounts | | | | | |
| Current | $ 55,860 | $ 4,950 | $    81 | $  (9,425)(a) | $51,466 |
| Long-term | $   155 | $    – | $    – | $    (75) | $    80 |
| Liability to sellers under acquisition agreement(b) | $ 25,641 | $    – | $    – | $  (1,147) | $24,494 |
| Reserve for structural repairs(c) | $  5,000 | $    – | $   147 | $  (2,064) | $ 3,083 |
| **YEAR ENDED DECEMBER 31, 2002** | | | | | |
| Allowance for doubtful accounts | | | | | |
| Current(d) | $ 60,149 | $(2,521) | $  8,225 (e) | $  (9,993)(a) | $55,860 |
| Long-term | $ 24,989 | $    – | $    – | $ (24,834)(f) | $   155 |
| Liability to sellers under acquisition agreement(b) | $ 26,220 | $    – | $    – | $    (579) | $25,641 |
| Reserve for structural repairs(c) | $    – | $ 5,000 | $    – | $    – | $ 5,000 |
| **YEAR ENDED DECEMBER 31, 2001** | | | | | |
| Allowance for doubtful accounts | | | | | |
| Current(d) | $ 48,435 | $ 4,999 | $ 10,937 (g) | $  (4,222)(a) | $60,149 |
| Long-term | $   156 | $    – | $ 24,833 (f) | $    – | $24,989 |
| Reserve against investments in and advances to nonconsolidated affiliates(h) | $249,850 | $    – | $(24,833)(f) | $(225,017) | $    – |
| Liability to sellers under acquisition agreement(b) | $ 25,925 | $    – | $   295 (i) | $    – | $26,220 |

(a) Uncollectible accounts written off, net of amounts recovered.

(b) We acquired Players International, Inc., ("Players") in March 2000. In 1995, Players acquired a hotel and land adjacent to its riverboat gaming facility in Lake Charles, Louisiana, for cash plus future payments to the seller based on the number of passengers boarding the riverboat casinos during a defined term. In accordance with the guidance provided by APB 16 regarding the recognition of liabilities assumed in a business combination accounted for as a purchase, Players estimated the net present value of the future payments to be made to the sellers and recorded that amount as a component of the total consideration paid to acquire these assets. Our recording of this liability in connection with the purchase price allocation process following the Players acquisition was originally reported in 2000. The long-term portion of this liability is included in Deferred credits and other on our Consolidated Balance Sheets; the current portion of this obligation is included in Accrued expenses on our Consolidated Balance Sheets.

(c) During 2002, we discovered that water leaks had caused considerable damage to a hotel tower at our property in Reno, Nevada. Following an initial assessment of the extent of the damage, our design and construction department (assisted by third-party experts), estimated that the costs to repair the damage would total approximately $5 million.

(d) 2001 and 2002 amounts have been restated to reflect Harrah's Vicksburg and Harrah's Shreveport as assets held for sale. See Note 15 to our Consolidated Financial Statements.

(e) 2002 Charged to Other Accounts consists primarily of the balance acquired from our acquisition and consolidation of JCC Holding Company in our financial statements. 2002 Charged to Other Accounts also includes re-established accounts that had been previously deemed uncollectible.

(f) In 2000, National Airlines, Inc. ("NAI") filed for Chapter 11 Bankruptcy, and we recorded write-offs and reserves for our investment in and loans to NAI and our estimated net exposure under letters of credit issued on behalf of NAI. In June 2001, we abandoned all rights to our equity ownership interest in NAI and removed the investment balance and associated reserves from our balance sheet. Since we no longer held an equity investment in NAI, we transferred our reserve balance related to NAI to a long-term receivable and an associated allowance for doubtful accounts. In 2002, we removed the receivable and associated allowance from our general ledger.

(g) 2001 Charges to Other Accounts consists primarily of balances acquired from our acquisition of Harveys Casino Resorts on July 31, 2001.

(h) See Note 14 to our Consolidated Financial Statements.

(i) 2001 Charges to Other Accounts represents the true-up of our liability to sellers under the Players acquisition agreement. See Note (b) above.

Exhibit 31(1)

## CERTIFICATIONS

I, Gary W. Loveman, certify that:

1.  I have reviewed this annual report on Form 10-K of Harrah's Entertainment, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 4, 2004                         By: /s/ GARY W. LOVEMAN

                                            Gary W. Loveman
                                            *President and Chief Executive Officer*

**Exhibit 31(2)**

I, Charles L. Atwood, certify that:

1.  I have reviewed this annual report on Form 10-K of Harrah's Entertainment, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 4, 2004                    By: /s/ CHARLES L. ATWOOD

                                           Charles L. Atwood
                                           *Senior Vice President and Chief Financial Officer*

Exhibit 32(1)

### Certification of Chief Executive Officer

Pursuant to 18 U.S.C. § 1350, as created by Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned officer of Harrah's Entertainment, Inc. (the "Company"), hereby certifies, to such officer's knowledge, that:

(i) the accompanying Annual Report on Form 10-K of the Company for the year ended December 31, 2004 (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and

(ii) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: March 4, 2004

/s/  GARY W. LOVEMAN
_____

Gary W. Loveman
*President and*
*Chief Executive Officer*

The foregoing certification is being furnished solely to accompany the Report pursuant to 18 U.S.C. § 1350, and is not being filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and is not to be incorporated by reference into any filing of the Company, whether made before or after the date hereof, regardless of any general incorporation language in such filing.

Exhibit 32(2)

### Certification of Chief Financial Officer

Pursuant to 18 U.S.C. § 1350, as created by Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned officer of Harrah's Entertainment, Inc. (the "Company"), hereby certifies, to such officer's knowledge, that:

(i) the accompanying Annual Report on Form 10-K of the Company for the year ended December 31, 2003 (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and

(ii) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: March 4, 2004

/s/ CHARLES L. ATWOOD

Charles L. Atwood
*Senior Vice President and*
*Chief Financial Officer*

The foregoing certification is being furnished solely to accompany the Report pursuant to 18 U.S.C. § 1350, and is not being filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and is not to be incorporated by reference into any filing of the Company, whether made before or after the date hereof, regardless of any general incorporation language in such filing.