## EXHIBIT 6 (Part 1 of 3)

page 1 - 30

# SECURITIES AND EXCHANGE COMMISSION

## WASHINGTON, D.C. 20549

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### FOR THE FISCAL YEAR ENDED DECEMBER 31, 2003

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### Commission File No. 1-10410

# HARRAH'S ENTERTAINMENT, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **62-1411755** |
|---|---|
| (State of incorporation) | (I.R.S. Employer Identification No.) |
| **One Harrah's Court** | **89119** |
| **Las Vegas, Nevada** | (zip code) |
| (Address of principal executive offices) | |

Registrant's telephone number, including area code:
**(702) 407-6000**

### SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, Par Value $0.10 per share | NEW YORK STOCK EXCHANGE |
| | CHICAGO STOCK EXCHANGE |
| | PACIFIC EXCHANGE |
| | PHILADELPHIA STOCK EXCHANGE |

### SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:
None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant as of June 30, 2003, based upon the closing price of $40.24 for the Common Stock on the New York Stock Exchange on that date, was $4,426,690,010.

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). Yes ☒   No ☐

As of January 31, 2004, the Registrant had 111,306,208 shares of Common Stock outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the definitive Proxy Statement for the 2004 Annual Meeting of Stockholders, which will be filed within 120 days after the end of the fiscal year, are incorporated by reference into Part III hereof.

*This Annual Report on Form 10-K includes "forward-looking statements" intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995  You can identify these statements by the fact that they do not relate strictly to historical or current facts  These statements contain words such as "may," "will," "project," "might," "expect," "believe," "anticipate," "intend," "could," "would," "estimate," "continue" or "pursue," or the negative or other variations thereof or comparable terminology  In particular, they include statements relating to, among other things, future actions, new projects, strategies, future performance, the outcome of contingencies such as legal proceedings and future financial results  We have based these forward-looking statements on our current expectations and projections about future events*

*We caution the reader that forward-looking statements involve risks and uncertainties that cannot be predicted or quantified and, consequently, actual results may differ materially from those expressed or implied by such forward-looking statements  Such risks and uncertainties include, but are not limited to, the following factors as well as other factors described from time to time in our reports filed with the Securities and Exchange Commission:*

- *the effect of economic, credit and capital market conditions on the economy in general, and on gaming and hotel companies in particular;*

- *construction factors, including delays, zoning issues, environmental restrictions, soil and water conditions, weather and other hazards, site access matters and building permit issues;*

- *the effects of environmental and structural building conditions relating to our properties;*

- *our ability to timely and cost-effectively integrate into our operations the companies that we acquire including with respect to our previously announced acquisition;*

- *access to available and feasible financing including financing for our acquisition of Horseshoe Gaming on a timely basis;*

- *changes in laws (including increased tax rates), regulations or accounting standards, third-party relations and approvals, and decisions of courts, regulators and governmental bodies;*

- *litigation outcomes and judicial actions, including gaming legislative action, referenda and taxation;*

- *ability of our customer-tracking, customer loyalty and yield-management programs to continue to increase customer loyalty and same-store sales;*

- *our ability to recoup costs of capital investments through higher revenues;*

- *acts of war or terrorist incidents;*

- *abnormal gaming holds; and*

- *the effects of competition, including locations of competitors and operating and market competition*

*Any forward-looking statements are made pursuant to the Private Securities Litigation Reform Act of 1995 and, as such, speak only as of the date made  We undertake no obligation to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise*

2

PART I

**ITEM 1. Business.**

*Overview*

Harrah's Entertainment, Inc., a Delaware corporation, is one of the largest casino entertainment providers in the world. Our business is conducted through a wholly-owned subsidiary, Harrah's Operating Company, Inc., which owns or manages through various subsidiaries 25 casinos in the United States. Our principal asset is the stock of Harrah's Operating Company, Inc., which together with its direct and indirect subsidiaries hold substantially all of the assets of our businesses. We were incorporated on November 2, 1989, and prior to such date operated under predecessor companies. Our principal executive offices are located at One Harrah's Court, Las Vegas, Nevada 89119, telephone (702) 407-6000. Our common stock is traded on the New York Stock Exchange under the symbol "HET".

*2003 Business Development*

In September 2003, we entered into an agreement to acquire Horseshoe Gaming Holding Corp., which owns casino entertainment facilities in Bossier City, Louisiana, Tunica, Mississippi, and Hammond, Indiana, for a total purchase price of $915 million in cash, plus cash held by Horseshoe Gaming as of the closing date and the amount of certain agreed-upon capital expenditures made by Horseshoe Gaming prior to the closing date. In addition, we will assume existing indebtedness of Horseshoe Gaming. We expect to complete this acquisition in the first half of 2004.

Pursuant to two separate transactions we have announced recently, we will acquire certain intellectual property assets from Horseshoe Club Operating Company, which is under separate ownership from Horseshoe Gaming, to secure the rights to the Horseshoe brand in Nevada and to the World Series of Poker brand and tournament, while MTR Gaming Group, Inc. will acquire the remaining assets of the Binion's Horseshoe Hotel and Casino in Las Vegas, Nevada, including the right to use the name "Binion's" at the property, from Horseshoe Club Operating Company. We will operate the hotel and casino jointly with MTR Gaming on an interim basis. We expect to complete each of these transactions during the first quarter of 2004.

We have also agreed to sell our Harrah's Shreveport property in Shreveport, Louisiana for $190 million, subject to regulatory approval, to reduce our exposure in the Shreveport-Bossier City, Louisiana, market given our plans to acquire Horseshoe Gaming and its property in Bossier City. We also expect to complete this transaction during the first half of 2004.

As part of our distribution strategy, we are currently pursuing various development opportunities in the United Kingdom, including the development of destination casino resorts, regional casinos through a joint venture, and an interactive multi-platform subscription-based gaming venture to deliver over the Internet games proven to work in such medium. We launched our interactive venture, LuckyMe, in the United Kingdom in early February 2004. Our remaining development efforts in the United Kingdom require legislative reform under that country's gaming laws, and we are currently pursuing efforts to secure sites for casino entertainment facilities, both directly and through the joint venture, in anticipation of legislative reform.

We began implementing our Fast Cash coinless gaming environment at our properties in 2003. We believe Fast Cash will increase customer satisfaction through the reduction of wait times for change and hopper fills on slot machines. We expect to continue the implementation of Fast Cash during 2004, with a stated goal of installing Fast Cash on 28,000 games by the end of the second quarter of 2004.

In June 2003, we launched a new version of our Total Rewards customer loyalty program, adding features to allow our customers to accumulate reward credits and enhancing the offerings available to customers upon redemption of reward credits.

In May 2003, 900 slot machines were placed in service at Louisiana Downs, our thoroughbred racetrack in Bossier City, Louisiana, and we expect to open a new, permanent facility with approximately 1,400 slot machines during second quarter 2004.

In May 2003, we opened a second hotel tower at our Showboat Atlantic City property, adding approximately 500 rooms to that property.

*Description of Business*

Our casino business commenced operations in 1937. We own or manage casino entertainment facilities in more areas throughout the United States than any other participant in the casino industry. Our casino entertainment facilities typically include hotel and convention space, restaurants and non-gaming entertainment facilities. Two of our properties are racetracks at which we have installed slot machines.

In southern Nevada, Harrah's Las Vegas and The Rio All-Suite Hotel & Casino are located in Las Vegas, and draw customers from throughout the United States. Harrah's Laughlin is located near both the Arizona and California borders adjacent to a natural cove on the Colorado River, and draws customers from the Los Angeles and Phoenix metropolitan areas and, to a lesser extent, from throughout the U.S. via charter aircraft.

In northern Nevada, Harrah's Lake Tahoe, Harveys Resort & Casino and Bill's Casino are located near Lake Tahoe and draw customers from throughout California. Harrah's Reno, located in downtown Reno, draws customers from Northern California, the Pacific Northwest and Canada.

Our Atlantic City casinos, Harrah's Atlantic City, located in the Marina area, and the Showboat Atlantic City, located on the Boardwalk, draw customers from Philadelphia, New York and northern New Jersey.

Our Chicagoland riverboat casinos, Harrah's Joliet in Joliet, Illinois, and Harrah's East Chicago Casino in East Chicago, Indiana, draw customers from the greater Chicago metropolitan area.

In Louisiana, we own Harrah's New Orleans, a land-based casino located in downtown New Orleans. In the southwest part of the state, Harrah's Lake Charles, a dockside casino, serves southwestern Louisiana and eastern Texas, including the Houston metropolitan area. In the northwest part of the state, Harrah's Shreveport, a dockside casino, and Louisiana Downs, a thoroughbred racetrack with slot machines in Bossier City, cater to customers in northwestern Louisiana and east Texas, including the Dallas/Fort Worth metropolitan area. During 2003, we installed approximately 900 slot machines at Louisiana Downs, and work is currently underway on a new, permanent facility with approximately 1,400 slot machines, which we expect to complete during second quarter 2004. We currently own a 95% ownership interest in a limited liability company that now owns both Louisiana Downs and Harrah's Shreveport. In January 2004, we entered agreements to sell Harrah's Shreveport and to acquire the remaining 5% ownership interest in the limited liability company, in each case subject to regulatory approval. We expect to complete these transactions during the first half of 2004.

Harrah's North Kansas City and Harrah's St. Louis, both dockside casinos, draw customers from the Kansas City and St. Louis metropolitan areas, the largest markets in Missouri. Harrah's Metropolis is a dockside casino located in Metropolis, Illinois, on the Ohio River, drawing customers from southern Illinois, western Kentucky and central Tennessee. Harrah's Tunica, a dockside casino complex located in Tunica, Mississippi, is approximately 30 miles from Memphis, Tennessee.

Harrah's Council Bluffs Casino Hotel, a riverboat casino facility, and Bluffs Run Casino, a greyhound racing facility, with approximately 2,800 slot machines combined are located in Council Bluffs, Iowa, across the Missouri River from Omaha, Nebraska. At Bluffs Run, we own the assets other than gaming equipment, and lease these assets to the Iowa West Racing Association, or IWRA, a nonprofit corporation, and we manage the facility for the IWRA under a management agreement expiring in October 2024. Iowa law requires that a qualified nonprofit corporation hold Bluffs Run's gaming and pari-mutuel licenses and its gaming equipment.

In addition to the casinos that we own, we also earn fees through our management of four casinos for Indian tribes:

- Harrah's Phoenix Ak-Chin, located near Phoenix, Arizona, which we manage for the Ak-Chin Indian Community under a management agreement that expires in December 2004;

- Harrah's Rincon Casino and Resort, located near San Diego, California, which we manage for the Rincon San Luiseno Band of Mission Indians under a management agreement that expires in November 2010;

- Harrah's Cherokee Smoky Mountains Casino, which we manage for the Eastern Band of Cherokee Indians on their reservation in Cherokee, North Carolina under a management contract. The current contract is scheduled to expire in November 2004, but subject to regulatory approval, we have agreed to an extension of the contract until 2011. Harrah's Cherokee draws customers from eastern Tennessee, western North Carolina, northern Georgia and South Carolina; and

- Harrah's Prairie Band Casino-Topeka, located near Topeka, Kansas, which we manage for the Prairie Band Potawatomi Nation under a management contract expiring in January 2008. Harrah's Prairie Band draws customers from the Topeka and Wichita, Kansas areas.

We own and operate Bluegrass Downs, a harness racetrack located in Paducah, Kentucky, and a one-third interest in Turfway Park LLC, which is the owner of the Turfway Park thoroughbred racetrack in Boone County, Kentucky. Turfway Park LLC owns a minority interest in Kentucky Downs LLC, which is the owner of the Kentucky Downs racetrack located in Simpson County, Kentucky. In the event casino gaming is established in Kentucky, we hold certain casino management rights, directly or through Turfway Park LLC, at both Turfway Park and Kentucky Downs.

Information about our casino entertainment properties as of December 31, 2003 is set forth below in Item 2. Properties, along with information concerning the status of expansions and improvements at certain properties during 2003.

*Sales and Marketing*

We believe that our nationwide distribution system of 25 casino entertainment facilities provides us the ability to generate play by our customers in more than one market, which we refer to as cross-market play. We believe our customer loyalty program, Total Rewards, in conjunction with this nationwide distribution system, allows us to capture a growing share of our customers' gaming budget and generate increases in same-store sales.

Under Total Rewards, our customers may earn reward credits and redeem those credits at any of our casino entertainment facilities. Total Rewards is structured in tiers, providing customers an incentive to consolidate their play at our casinos. Depending on their level of play with us, customers may be designated as either Total Gold, Total Platinum or Total Diamond customers. Customers who do not participate in Total Rewards are encouraged to join, and those with a Total Rewards card are encouraged to consolidate their play through targeted promotional awards as they graduate to higher tiers.

Through our Total Rewards program, we developed a database containing information about millions of customers and aspects of their casino gaming play. We use this information for marketing promotions, including through direct mail campaigns and the use of electronic mail and our website.

*Patents and Trademarks*

We own the following trademarks used in this document: Harrah's®; LuckyMe℠; Fast Cash℠, Rio®; Showboat®; Bill's®; Harveys®; Total Rewards®; Bluffs Run®; Louisiana Downs℠; Total Gold®; Total Diamond®; and Total Platinum®. Trademark rights are perpetual provided that the mark remains in use by the Company. We consider all of these marks, and the associated name recognition, to be valuable to our business. Horseshoe® is a registered trademark of Horseshoe License Company, a Nevada corporation 51% owned by Horseshoe Club Operating Company and 49% owned by Horseshoe Gaming Holding Corp., and is exclusively licensed to Horseshoe Gaming Holding Corp. and Horseshoe Club Operating Company. World Series of Poker® is a registered trademark of Horseshoe License Company and is exclusively licensed to Horseshoe Club Operating Company.

We hold five U.S. patents covering the technology associated with our Total Rewards program-U.S. Patent No. 5,613,912 issued March 25, 1997, expiring April 5, 2015 (which is the subject of a license agreement with Mikohn Gaming Corporation); U.S. Patent No. 5,761,647 issued June 2, 1998, expiring May 24, 2016; U.S. Patent No. 5,809,482 issued September 15, 1998, expiring September 15, 2015; U.S. Patent No. 6,003,013 issued December 14, 1999, expiring May 24, 2016; and U.S. Patent No. 6,183,362, issued February 6, 2001, expiring May 24, 2016. We consider these patents to be valuable to our business, and we have initiated a suit against a competitor casino company seeking to enforce several of these patents. The defendant counterclaimed, in part seeking to declare these patents invalid and unenforceable. While we expect to prevail in the litigation, a finding that such patents are invalid or unenforceable could adversely affect our business or operations.

*Competition*

We own or manage land-based, dockside, riverboat and Indian casino facilities in most U.S. casino entertainment jurisdictions. We compete with numerous casinos and casino hotels of varying quality and size in the market areas where our properties are located. We also compete with other non-gaming resorts and vacation areas, and with various other casino and other entertainment businesses. The casino entertainment business is characterized by competitors that vary considerably by their size, quality of facilities, number of operations, brand identities, marketing and growth strategies, financial strength and capabilities, level of amenities, management talent and geographic diversity. In certain areas, such as Las Vegas, we compete with a wide range of casinos, some of which are significantly larger and offer substantially more non-gaming activities to attract customers.

In most markets, we compete directly with other casino facilities operating in the immediate and surrounding market areas. In some markets, we face competition from nearby markets in addition to direct competition within our market areas.

In recent years, with fewer new markets opening for development, competition in existing markets has intensified. Many casino operators, including us, have invested in expanding existing facilities, developing new facilities, and acquiring established facilities in existing markets, such as our acquisition of the casinos owned by Rio, Showboat, Players and Harveys, and our planned acquisition of Horseshoe Gaming. This expansion of existing casino entertainment properties, the increase in the number of properties and the aggressive marketing strategies of many of our competitors has increased competition in many markets in which we compete, and this intense competition can be expected to continue. These competitive pressures have adversely affected our financial performance in certain markets and, we believe, have also adversely affected the financial performance of certain competitors operating in these markets.

We believe we are well-positioned to take advantage of any further legalization of casino gaming, the continued positive consumer acceptance of casino gaming as an entertainment activity, and increased visitation to casino facilities. However, the expansion of casino entertainment into new markets, such as the recent expansion of tribal casino opportunities in New York and California and the authorization of slot machines at horse racing tracks in Louisiana, could also present competitive issues for us. At this time, the ultimate impact that these events may have on the industry and on our Company is uncertain.

Moreover, the casino entertainment industry is subject to political and regulatory uncertainty. See also Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Effects of Current Economic and Political Conditions" and portions of "Management's Discussion and Analysis of Financial Condition and Results of Operations—Overall Operating Results" and "—Regional Results and Development Plans."

### Governmental Regulation

The gaming industry is highly regulated, and we must maintain our licenses and pay gaming taxes to continue our operations. Each of our casinos is subject to extensive regulation under the laws, rules and regulations of the jurisdiction where it is located. These laws, rules and regulations generally concern the responsibility, financial stability and character of the owners, managers, and persons with financial interests in the gaming operations. Violations of laws in one jurisdiction could result in disciplinary action in other jurisdictions. A more detailed description of the regulations to which we are subject is contained in Exhibit 99 to this Annual Report on Form 10-K, which Exhibit is incorporated herein by reference.

Our businesses are subject to various federal, state and local laws and regulations in addition to gaming regulations. These laws and regulations include, but are not limited to, restrictions and conditions concerning alcoholic beverages, environmental matters, employees, currency transactions, taxation, zoning and building codes, and marketing and advertising. Such laws and regulations could change or could be interpreted differently in the future, or new laws and regulations could be enacted. Material changes, new laws or regulations, or material differences in interpretations by courts or governmental authorities could adversely affect our operating results.

### Employee Relations

We have approximately 41,000 employees through our various subsidiaries. We consider our labor relations with employees to be good. Approximately 6,850 employees are covered by collective bargaining agreements with certain of our subsidiaries, relating to certain casino, hotel and restaurant employees at Harrah's Atlantic City, Harrah's Las Vegas, Rio, Harrah's East Chicago, Showboat Atlantic City and Harrah's New Orleans.

### Available Information

Our Internet address is *www.harrahs.com*. We make available free of charge on or through our website our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, or the Exchange Act, as soon as reasonably practicable after we electronically file such material with, or furnish it to, the Securities and Exchange Commission, or SEC. We also make available through our website all filings of our executive officers and directors on Forms 3, 4 and 5 under Section 16 of the Exchange Act. These filings are also available on the SEC's website at *www.sec.gov*. Our website contains information about our corporate governance measures, including corporate governance guidelines and other materials adopted during 2003, under the "About Us" link on our home page. We will provide a copy of our corporate guidelines upon receipt of written request addressed to Harrah's Entertainment, Inc., Attn: Corporate Secretary, One Harrah's Court, Las Vegas, Nevada 89119. Reference in this document to our website address does not constitute incorporation by reference of the information contained on the website.

ITEM 2. Properties.

The following table sets forth information about our casino entertainment facilities:

## Summary of Property Information*

| Property | Type of Casino | Casino Space— Sq. Ft.(a) | Slot Machines(a) | Table Games(a) | Hotel Rooms & Suites(a) |
|---|---|---|---|---|---|
| *Las Vegas, Nevada* | | | | | |
| Harrah's Las Vegas | Land-based | 87,700 | 1,400 | 80 | 2,530 |
| Rio | Land-based | 107,000 | 1,200 | 80 | 2,550 |
| *Laughlin, Nevada* | | | | | |
| Harrah's Laughlin | Land-based | 47,000 | 1,200 | 40 | 1,560 |
| *Reno, Nevada* | | | | | |
| Harrah's Reno | Land-based | 57,000 | 1,230 | 45 | 930 |
| *Lake Tahoe, Nevada* | | | | | |
| Harrah's Lake Tahoe | Land-based | 58,000 | 1,300 | 70 | 530 |
| Harveys Lake Tahoe | Land-based | 63,300 | 1,100 | 70 | 740 |
| Bill's Lake Tahoe | Land-based | 18,000 | 520 | 20 | — |
| *Atlantic City, New Jersey* | | | | | |
| Harrah's Atlantic City | Land-based | 127,000 | 4,240 | 70 | 1,630 |
| Showboat Atlantic City | Land-based | 115,700 | 3,970 | 60 | 1,300 |
| *Chicago, Illinois area* | | | | | |
| Harrah's Joliet (Illinois) | Dockside | 39,000 | 1,200 | 20 | 200 |
| Harrah's East Chicago (Indiana) | Dockside | 54,000 | 1,900 | 65 | 290 |
| *Metropolis, Illinois* | | | | | |
| Harrah's Metropolis | Dockside | 29,800 | 1,200 | 20 | 120(b) |
| *Council Bluffs, Iowa* | | | | | |
| Harrah's Council Bluffs | Riverboat | 28,000 | 1,240 | 30 | 250 |
| Bluffs Run Casino(c) | Greyhound Racing Facility | 40,000 | 1,500 | — | — |
| *Shreveport, Louisiana* | | | | | |
| Harrah's Shreveport(d) | Dockside | 28,400 | 1,220 | 30 | 510 |
| *Lake Charles, Louisiana* | | | | | |
| Harrah's Lake Charles | Dockside | 60,000 | 1,460 | 60 | 260 |
| *Tunica, Mississippi* | | | | | |
| Harrah's Tunica | Dockside | 35,000 | 1,180 | 20 | 200 |
| *St. Louis, Missouri* | | | | | |
| Harrah's St. Louis | Dockside | 120,000 | 2,600 | 60 | 290(e) |
| *North Kansas City, Missouri* | | | | | |
| Harrah's North Kansas City | Dockside | 60,100 | 1,970 | 50 | 200 |
| *New Orleans, Louisiana* | | | | | |
| Harrah's New Orleans | Land-based | 100,000 | 2,220 | 120 | — |
| *Phoenix, Arizona* | | | | | |
| Harrah's Ak-Chin(f) | Indian Reservation | 48,000 | 775 | 20 | 150 |
| *Topeka, Kansas* | | | | | |
| Harrah's Prairie Band(f) | Indian Reservation | 33,000 | 950 | 30 | 100(g) |
| *Cherokee, North Carolina* | | | | | |
| Harrah's Cherokee(f) | Indian Reservation | 80,000 | 3,320 | 30 | 250(h) |
| *San Diego, California* | | | | | |
| Harrah's Rincon(f) | Indian Reservation | 58,000 | 1,600 | 40 | 190(i) |
| *Bossier City, Louisiana* | | | | | |
| Louisiana Downs(j) | Thoroughbred Racing Facility | 15,000 | 900 | — | — |

---
\* As of December 31, 2003.

(a) Approximate.

(b) A hotel in which the Company owns a 12.5% special limited partnership interest is adjacent to the Metropolis facility.

(c) The property is owned by the Company, leased to the operator, and managed by the Company for the operator for a fee pursuant to an agreement that expires in October 2024.

(d) On January 20, 2004, the Company, through certain of its subsidiaries, entered into a definitive agreement whereby Boyd Gaming Corporation will acquire all of the outstanding limited and general partnership interests of Red River Entertainment of Shreveport Partnership in Commendam (the "Partnership"), which operates Harrah's Shreveport, subject to regulatory approval. The sale is expected to close during the first half of 2004.

(e) Construction of a second hotel tower with approximately 210 rooms is currently underway at Harrah's St. Louis and is expected to be complete in the third quarter of 2004.

(f) Managed.

(g) Construction is currently underway to expand Harrah's Prairie Band, which will include the addition of approximately 200 hotel rooms and is expected to be complete in late 2004.

(h) Construction of a hotel tower with approximately 320 rooms is currently underway at Harrah's Cherokee and is expected to be complete in the second quarter of 2005.

(i) Construction is currently underway to expand Harrah's Rincon, which will include a hotel tower with approximately 460 rooms and is expected to be complete by the end of 2004.

(j) A temporary casino facility opened at Louisiana Downs in the second quarter of 2003 and 900 slot machines were placed in service. Construction is currently underway on a new, permanent casino facility. The new facility will have approximately 1,400 slot machines and is expected to be complete during second quarter 2004.

## ITEM 3. Legal Proceedings.

The Company is party to ordinary and routine litigation incidental to our business. We do not expect the outcome of any pending litigation to have a material adverse effect on our consolidated financial position or results of operations.

## ITEM 4. Submission of Matters to a Vote of Security Holders.

Not applicable.

PART II

**ITEM 5. Market for the Company's Common Stock and Related Stockholder Matters.**

Our common stock is listed on the New York Stock Exchange and traded under the ticker symbol "HET". The stock is also listed on the Chicago Stock Exchange, the Pacific Exchange and the Philadelphia Stock Exchange.

The following table sets forth the high and low prices per share of our common stock, as reported by the New York Stock Exchange, for the last two years:

|  | High | Low |
|---|---|---|
| **2003** | | |
| First Quarter | $40.75 | $30.30 |
| Second Quarter | 44.30 | 34.20 |
| Third Quarter | 44.10 | 38.65 |
| Fourth Quarter | 49.94 | 40.85 |
| **2002** | | |
| First Quarter | $45.39 | $34.95 |
| Second Quarter | 51.35 | 41.70 |
| Third Quarter | 49.24 | 39.51 |
| Fourth Quarter | 50.60 | 37.65 |

The approximate number of holders of record of our common stock as of March 1, 2004, was 8,690.

During 2003, the Company declared quarterly cash dividends of $0.30 per share, payable on August 27, 2003, to shareholders of record on August 13, 2003, and payable on November 26, 2003, to shareholders of record on November 12, 2003. The Company also declared a quarterly cash dividend of $0.30 per share, payable on February 25, 2004, to shareholders of record on February 11, 2004.

10

**ITEM 6. Selected Financial Data.**

The selected financial data set forth below for the five years ended December 31, 2003, should be read in conjunction with the consolidated financial statements and accompanying notes thereto.

| (In millions, except common stock data and financial percentages and ratios) | 2003(a) | 2002(b) | 2001(c) | 2000(d) | 1999(e) | Compound Growth Rate |
|---|---|---|---|---|---|---|
| **OPERATING DATA** | | | | | | |
| Revenues | $4,322.7 | $4,098.5 | $3,648.5 | $3,290.4 | $2,853.6 | 10.9% |
| Income from operations | 726.3 | 771.8 | 573.3 | 240.7 | 539.0 | 7.7% |
| Income/(loss) from continuing operations | 292.0 | 323.2 | 207.2 | (12.3) | 207.2 | 9.0% |
| Net income/(loss) | 292.6 | 235.0 | 209.0 | (12.1) | 208.5 | 8.8% |
| **COMMON STOCK DATA** | | | | | | |
| Earnings/(loss) per share-diluted | | | | | | |
| From continuing operations | 2.64 | 2.85 | 1.79 | (0.11) | 1.61 | 13.2% |
| Net income/(loss) | 2.65 | 2.07 | 1.81 | (0.10) | 1.62 | 13.1% |
| Cash dividends declared per share | 0.60 | – | – | – | – | N/M |
| **FINANCIAL POSITION** | | | | | | |
| Total assets | 6,578.8 | 6,350.0 | 6,128.6 | 5,166.1 | 4,766.8 | 8.4% |
| Long-term debt | 3,671.9 | 3,763.1 | 3,719.4 | 2,835.8 | 2,540.3 | 9.6% |
| Stockholders' equity | 1,738.4 | 1,471.0 | 1,374.1 | 1,269.7 | 1,486.3 | 4.0% |
| **FINANCIAL PERCENTAGES AND RATIOS** | | | | | | |
| Return on revenues-continuing | 6.8% | 7.9% | 5.7% | (0.4)% | 7.3% | |
| Return on average invested capital(f) | 7.6% | 8.5% | 7.2% | 2.9 % | 7.8% | |
| Return on average equity(f) | 17.9% | 22.2% | 15.4% | (0.9)% | 14.6% | |
| Ratio of earnings to fixed charges(f) | 2.8 | 2.9 | 2.1 | 2.2 | 2.6 | |

N/M = Not Meaningful

Note references are to our Notes to Consolidated Financial Statements. See Item 8.

(a) 2003 includes $11.1 million in pretax charges for write-downs, reserves and recoveries (see Note 8) and $19.1 million in pretax charges for premiums paid for, and write-offs associated with, debt retired before maturity.

(b) 2002 includes $5.0 million in pretax charges for write-downs, reserves and recoveries (see Note 8), a $6.1 million pretax charge for our exposure under a letter of credit issued on behalf of National Airlines, Inc., and a charge of $91.2 million, net of tax benefits of $2.8 million, related to a change in accounting principle (see Note 3). 2002 also includes the financial results of Jazz Casino Company LLC from the date of our acquisition of a majority ownership interest on June 7, 2002. 2002 results have been reclassified to reflect Harrah's Vicksburg as discontinued operations.

(c) 2001 includes $22.5 million in pretax charges for write-downs, reserves and recoveries (see Note 8) and $26.2 million of pretax income from dispositions of nonstrategic assets and the settlement of a contingency related to a former affiliate. 2001 also includes the financial results of Harveys Casino Resorts from its July 31, 2001, date of acquisition. 2001 results have been reclassified to reflect Harrah's Vicksburg as discontinued operations.

(d) 2000 includes $220.0 million in pretax reserves for receivables not expected to be recovered from JCC Holding Company and its subsidiary, Jazz Casino Company LLC, $6.1 million in pretax charges for other write-downs, reserves and recoveries and $39.4 million in pretax write-offs and reserves for our investment in, loans to and net estimated exposure under letters of credit issued

on behalf of National Airlines, Inc. 2000 also includes the financial results of Players International, Inc., from its March 22, 2000, date of acquisition. 2000 results have been reclassified to reflect Harrah's Vicksburg as discontinued operations.

(e)  1999 includes $2.2 million in pretax charges for write-downs, reserves and recoveries, $59.8 million of pretax gains from sales of our equity interests in nonconsolidated affiliates and $17.0 million in pretax losses on debt retired before maturity. 1999 results have been reclassified to reflect Harrah's Vicksburg as discontinued operations.

(f)  Ratio computed based on Income/(loss) from continuing operations.

**ITEM 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

Harrah's Entertainment, Inc., a Delaware corporation, was incorporated on November 2, 1989, and prior to such date operated under predecessor companies. As of December 31, 2003, we operate 25 casinos in 12 states under the Harrah's, Rio, Showboat and Harveys brand names. Our casinos include land-based casinos and casino hotels, dockside casinos, a greyhound racetrack, a thoroughbred racetrack and managed casinos on Indian lands.

In this discussion, the words "Harrah's Entertainment," "Company," "we," "our," and "us" refer to Harrah's Entertainment, Inc., together with its subsidiaries where appropriate.

**OVERALL OPERATING RESULTS**

In 2003, our revenues increased for the sixth consecutive year, but income from operations declined 5.9% from 2002. Higher gaming taxes, significant supply additions and a sluggish economy made for a difficult operating environment. Organic growth, growth through investment and growth through new business development remain priorities of our Company, and costs associated with initiatives to position the Company for another period of sustained growth contributed to the decline in income from continuing operations in 2003 versus the prior year.

| (In millions, except earnings per share) | 2003 | 2002 | 2001 | Percentage Increase/(Decrease) 03 vs 02 | 02 vs 01 |
|---|---|---|---|---|---|
| Casino revenues | $3,853.2 | $3,650.1 | $3,175.5 | 5.6 % | 14.9% |
| Total revenues | 4,322.7 | 4,098.5 | 3,648.5 | 5.5 % | 12.3% |
| Income from operations | 726.3 | 771.8 | 573.3 | (5.9)% | 34.6% |
| Income from continuing operations | 292.0 | 323.2 | 207.2 | (9.7)% | 56.0% |
| Net income | 292.6 | 235.0 | 209.0 | 24.5 % | 12.4% |
| Earnings per share—diluted | | | | | |
| From continuing operations | 2.64 | 2.85 | 1.79 | (7.4)% | 59.2% |
| Net income | 2.65 | 2.07 | 1.81 | 28.0 % | 14.4% |
| Operating margin | 16.8% | 18.8% | 15.7% | (2.0)pts | 3.1pts |

Total revenues grew 5.5% in 2003, primarily as a result of a full year of consolidation of Jazz Casino Company LLC ("JCC") into our financial results compared to the partial year in 2002 following our acquisition of a controlling interest in that property, our acquisition of Louisiana Downs, Inc. ("Louisiana Downs") in December 2002 and the subsequent introduction of slot machines at that property in mid-2003, and the contributions received from recent targeted capital investments.

In 2003, our income from operations decreased 5.9% due primarily to increased gaming taxes in several states and increased development costs. Net income increased 24.5% and diluted earnings per share increased 28.0% over our 2002 results, due to a $91.2 million net charge recorded in 2002 for the impairment of intangible assets acquired in our 1999 acquisition of Rio Hotel and Casino, Inc. ("Rio").

Certain events that affected our 2003 results, or that may affect future results, are listed below. These items are discussed in greater detail elsewhere in our discussion of operating results and in the Debt and Liquidity section.

- In December 2002, we acquired a controlling interest in Louisiana Downs, Inc., a thoroughbred racetrack in Bossier City, Louisiana. In May 2003, 900 slot machines were placed in service, and we expect to open a new, permanent facility with approximately 1,400 slot machines during second quarter 2004.

- Gaming tax rate changes in several states had a negative effect on income from operations and on our ability to market profitably to some customers of our casinos in those states.

- Our customer loyalty program, Total Rewards, was enhanced in 2003 to give our customers greater flexibility and control over redemption of their accumulated rewards.

- We entered into an agreement for a new credit facility to provide up to $1.9625 billion in borrowings, which replaced the $1.857 billion credit and letter of credit facilities. We also issued $500 million in 10-year, unsecured senior notes at 5⅜%.

- We retired $159.5 million of our 7⅞% Senior Subordinated Notes. Charges of $19.1 million for premiums paid and the write-off of unamortized deferred financing costs related to the 7⅞% Notes and the retired credit facilities were charged to income from continuing operations.

- We announced an agreement to acquire Horseshoe Gaming Holding Corporation ("Horseshoe Gaming"). The acquisition is subject to regulatory approvals and is expected to close in the first half of 2004.

- In third and fourth quarters of 2003, the Company declared cash dividends of 30 cents per share.

- A charge of $6.3 million was taken in fourth quarter 2003 to write off the remaining goodwill for Harrah's Reno as a result of our annual analysis for impairment of our nonamortizing intangible assets.

## STRATEGIC ACQUISITIONS

As part of our growth strategy and to further enhance our geographic distribution, strengthen our access to valued customers and leverage our technological and centralized services infrastructure, in the past six years we have acquired four casino companies, the remaining interest in the New Orleans casino and a thoroughbred racetrack. All of our acquisition transactions were accounted for as

purchases. The following table provides an overview of our acquisition activities and the discussion following the table provides a brief review of our acquisitions during the past three years.

| Company | Date Acquired | Total Purchase Price(a) | Goodwill Assigned | Number of Casinos | Geographic Location |
|---|---|---|---|---|---|
| (Dollars in millions) | | | | | |
| Showboat, Inc. . . . . . . . . . . . . . . | June 1998 | $1,045 | $322 | 4(b) | Atlantic City, New Jersey<br>East Chicago, Indiana |
| Rio Hotel & Casino Inc. . . . . . . | January 1999 | 987 | 93(c) | 1 | Las Vegas, Nevada |
| Players International, Inc . . . . . . | March 2000 | 439 | 204 | 3 | Lake Charles, Louisiana<br>Metropolis, Illinois<br>St. Louis, Missouri |
| Harveys Casino Resorts . . . . . . . | July 2001 | 712 | 265 | 4 | Central City, Colorado(d)<br>Council Bluffs, Iowa<br>(2 properties)<br>Lake Tahoe, Nevada |
| JCC Holding Company(e) . . . . . | June 2002<br>December 2002 | 149 | – | 1 | New Orleans, Louisiana |
| Louisiana Downs, Inc. . . . . . . . . | December 2002 | 94 | 36 | 1(f) | Bossier City, Louisiana |

(a) Total purchase price includes the market value of debt assumed determined as of the acquisition date and of assets that were subsequently sold.

(b) Interests in two casinos that were included in the acquisition were subsequently sold.

(c) This goodwill was determined to be impaired and was written off in 2002.

(d) This property was sold in 2003.

(e) Acquired additional 14% interest in June 2002 and remaining 37% interest in December 2002.

(f) Acquired a thoroughbred racetrack that was expanded to include slot machines in 2003.

### Harveys Casino Resorts

On July 31, 2001, we completed our acquisition of Harveys Casino Resorts ("Harveys"). We paid approximately $294 million for the equity interests in Harveys, assumed approximately $350 million in outstanding debt and paid approximately $18 million in acquisition costs. We financed the acquisition, and retired Harveys assumed debt, with borrowings under our established debt programs. The purchase included the Harveys Resort & Casino in Lake Tahoe, Nevada, the Harveys Casino Hotel and the Bluffs Run Casino, both in Council Bluffs, Iowa, and the Harveys Wagon Wheel Hotel/Casino in Central City, Colorado. The addition of the Harveys properties expanded our geographic distribution, increased our nationwide casino square footage by almost 15% and added 1,109 hotel rooms, 149 table games and 5,768 slot machines to serve our customers. The acquisition introduced our Total Rewards customer-loyalty program to 1.7 million potential new customers within 150 miles of Council Bluffs and strengthened our relationships with customers throughout the Nevada-Northern California gaming market.

With our acquisition of Harveys, we assumed a $50 million contingent liability, which was dependent on the results of a referendum that was decided by the voters in Pottawattamie County, Iowa, in November 2002. The referendum, which re-approved gaming at racetracks and on riverboats for another eight years, passed and we paid an additional $50 million in acquisition costs in fourth quarter 2002.

In second quarter 2003, we sold Harveys Wagon Wheel Hotel/Casino in Central City, Colorado, which we had concluded was a nonstrategic asset for us. A loss of $0.7 million, net of tax, was recorded on this sale. The Colorado property has been presented in our financial statements as discontinued

operations since 2002, and our 2001 results were reclassified to reflect that property as discontinued operations.

*Jazz Casino Company*

On June 7, 2002, we acquired additional shares of JCC's common stock, which increased our ownership from 49% to 63% and required a change in our accounting treatment for our investment in JCC from the equity method to consolidation of JCC in our financial statements. We began consolidating JCC in our financial results on June 7, 2002. On December 10, 2002, we acquired all of the remaining shares of JCC's stock to increase our ownership to 100%.

We paid $72.4 million ($10.54 per share) for the additional ownership interest in JCC, acquired approximately $45.8 million of JCC's debt, assumed approximately $28.2 million of JCC's Senior Notes, which we subsequently retired, and incurred approximately $2.4 million of acquisition costs. We financed the acquisition and retired JCC's debt with funds from various sources, including cash flows from operations and borrowings under our established debt programs.

*Louisiana Downs*

On December 20, 2002, we acquired a controlling interest in Louisiana Downs, a thoroughbred racetrack in Bossier City, Louisiana. The agreement gave Harrah's a 95% ownership interest in a company that now owns both Louisiana Downs and Harrah's Shreveport. In May 2003, approximately 900 slot machines were put into service and Louisiana Downs became the only land-based gaming facility in northern Louisiana. We expect to open a new, permanent facility with approximately 1,400 slot machines by second quarter 2004.

We paid approximately $94.0 million, including $29.3 million in short-term notes that were paid in full in January 2003 and $15.0 million in equity interest in Harrah's Shreveport, for the interest in Louisiana Downs and approximately $0.5 million of acquisition costs. We financed the acquisition with funds from various sources, including cash flows from operations and borrowings under our established debt programs.

Subsequent to the end of 2003, we reached an agreement with the minority owners of the company that owns Louisiana Downs and Harrah's Shreveport to purchase their ownership interest in that company. The agreement is subject to customary approvals and is expected to be consummated by the end of first quarter 2004. Any excess of the cost to purchase the minority ownership above the capital balances will be assigned to goodwill.

*Harrah's East Chicago—Buyout of Minority Partners*

In second quarter 2003, we paid approximately $28.8 million to former partners in the Harrah's East Chicago property to settle outstanding litigation with the partners relating to a buyout in 1999 of the partners' interest in the property and to terminate the contractual rights of the partners to repurchase an 8.55% interest in the property. The two remaining minority partners in our East Chicago property owned, in aggregate, 0.45% of this property. In December 2003 and January 2004, we acquired these ownership interests for aggregate consideration of approximately $0.8 million. As a result of these transactions, the East Chicago property is now wholly owned.

In addition to these completed transactions, we have announced the following planned acquisitions.

*Horseshoe Gaming*

On September 11, 2003, we announced that we had signed a definitive agreement to acquire Horseshoe Gaming for $1.45 billion, including assumption of debt. A $75 million escrow payment was made in 2003, and under certain circumstances, this amount would be forfeited if the acquisition does

not close. We expect to finance the acquisition through working capital, existing credit facilities and/or, depending on market conditions, the issuance of new debt. The purchase includes casinos in Hammond, Indiana; Tunica, Mississippi; and Bossier City, Louisiana. We also announced our intention to sell our Harrah's brand casino in Shreveport to avoid overexposure in that market, and in January 2004, we announced that we have an agreement, subject to regulatory approvals, to sell that property to another gaming company. After consideration of the sale of Harrah's Shreveport, the Horseshoe acquisition will add a net 107,100 square feet of casino space, more than 4,360 slot machines and 138 table games to our existing portfolio. This acquisition will give Harrah's rights to the Horseshoe brand in all of the United States, except in Nevada. The acquisition, which is subject to regulatory approvals, is expected to close in the first half of 2004.

*Binion's Horseshoe Hotel and Casino*

Pursuant to two separate transactions that we announced in January and February 2004, we will acquire certain intellectual property assets from Horseshoe Club Operating Company, to secure the rights to the Horseshoe brand in Nevada and to the World Series of Poker brand and tournament, while MTR Gaming Group, Inc. will acquire the remaining assets of the Binion's Horseshoe Hotel and Casino in Las Vegas, Nevada, including the right to use the name "Binion's" at the property, from Horseshoe Club Operating Company. We will operate the hotel and casino jointly with MTR Gaming on an interim basis. We expect to complete each of these transactions during the first quarter of 2004.

## REGIONAL RESULTS AND DEVELOPMENT PLANS

The executive decision makers of our Company review operating results, assess performance and make decisions related to the allocation of resources on a property-by-property basis. We, therefore, believe that each property is an operating segment and that it is appropriate to aggregate and present the operations of our Company as one reportable segment. In order to provide more detail in a more understandable manner than would be possible on a consolidated basis, our properties have been grouped as follows to facilitate discussion of our operating results:

| West | East | North Central | South Central | Managed/Other |
|------|------|---------------|---------------|---------------|
| Harrah's Reno | Harrah's Atlantic City | Harrah's Joliet | Harrah's Shreveport | Harrah's Ak-Chin |
| Harrah's/Harveys Lake Tahoe | Showboat Atlantic City | Harrah's East Chicago | Harrah's Lake Charles | Harrah's Cherokee |
| Bill's | | Harrah's North Kansas City | Harrah's Tunica | Harrah's Prairie Band |
| Harrah's Las Vegas | | Harrah's Council Bluffs | Harrah's New Orleans (after June 7, 2002) | Harrah's Rincon |
| Rio | | Bluffs Run | Louisiana Downs | Harrah's New Orleans (prior to June 7, 2002) |
| Harrah's Laughlin | | Harrah's St. Louis | | |
| | | Harrah's Metropolis | | |

*West Results*

| (In millions) | 2003 | 2002 | 2001 | Percentage Increase/(Decrease) | |
|---------------|------|------|------|-------------------|----------|
| | | | | 03 vs 02 | 02 vs 01 |
| Casino revenues | $ 904.7 | $ 847.7 | $ 766.7 | 6.7% | 10.6% |
| Total revenues | 1,346.7 | 1,265.5 | 1,184.2 | 6.4% | 6.9% |
| Income from operations | 220.8 | 193.9 | 116.5 | 13.9% | 66.4% |
| Operating margin | 16.4% | 15.3% | 9.8% | 1.1pts | 5.5pts |

*Southern Nevada*

Strong cross-market and retail play, effective marketing and air charter programs and effective cost control measures drove record revenues and income from operations in Southern Nevada in 2003. We define cross-market play as gaming by customers at Harrah's properties other than their "home" casino, and retail play is defined as Total Rewards customers who typically spend up to $50 per visit. Revenues at Harrah's Las Vegas were 7.3% higher than in 2002, and income from operations was up 23.8%. Rio's revenues increased 12.2% in 2003, and income from operations was 30.3% over last year. Revenues and income from operations were up 4.0% and 11.5%, respectively, at Harrah's Laughlin.

2002 revenues were 1.3% higher than 2001 revenues in Southern Nevada, where record revenues at Harrah's Las Vegas and Laughlin more than offset the year-over-year decline in revenues at Rio. Revenues at Harrah's Las Vegas and Laughlin increased 3.7% and 7.5%, respectively, while revenues at Rio were 2.5% below 2001 revenues. 2002 income from operations in Southern Nevada increased 94.9% over 2001, driven primarily by improved performance at the Rio due to cost management measures and the property's decision to exit the high-end international table games business in third quarter 2001. A charge of $13 million was recorded in 2001 to recognize the cost of this decision. Cost management measures also contributed to the improved performance in 2002 at Harrah's Las Vegas and Laughlin where income from operations grew 10.9% and 7.5%, respectively from 2001.

*Northern Nevada*

Northern Nevada revenues rose 1.4% in 2003, but income from operations was down 9.3%. Our Northern Nevada properties faced the challenge of increased competition from Indian casinos in California and weak retail and unrated play (play by customers without a Total Rewards card). Increased utilization of air charter programs and targeted marketing programs helped maintain revenues, but the costs of these programs resulted in some margin erosion. With the expectation of continued expansion of Indian gaming in California, we believe that achieving growth at our Northern Nevada properties, particularly in Reno, will be a challenge. Our Lake Tahoe properties will be less affected due to the unique destination qualities of that market and successful execution of our cross-marketing strategy.

In our annual assessment of goodwill and other nonamortizing intangible assets, we determined that the remaining goodwill associated with our Reno property was impaired. A charge of approximately $6.3 million, representing the remaining unamortized goodwill at Reno, was taken in the fourth quarter of 2003 for this impairment.

Northern Nevada posted record revenues in 2002 due to the inclusion of a full year's revenues from the Harveys casino, which was acquired on July 31, 2001. This property contributed $136.5 million to Northern Nevada revenues in 2002. Excluding revenues contributed by Harveys from both periods, Northern Nevada revenues were down from 2001 due to weak market conditions in the Reno area caused, in part, by heightened levels of competition from Indian casinos in the Northern California area. Income from operations was 26.3% higher than in 2001, due also to the inclusion of a full year's results from Harveys Lake Tahoe and to cost synergies associated with the integration of the Harveys property into Harrah's systems.

17

*East Results*

| (In millions) | 2003 | 2002 | 2001 | Percentage Increase/(Decrease) | |
| --- | --- | --- | --- | --- | --- |
| | | | | 03 vs 02 | 02 vs 01 |
| Casino revenues | $817.1 | $808.7 | $751.0 | 1.0 % | 7.7% |
| Total revenues | 781.3 | 777.6 | 724.0 | 0.5 % | 7.4% |
| Income from operations | 217.3 | 216.9 | 182.7 | 0.2 % | 18.7% |
| Operating margin | 27.8% | 27.9% | 25.2% | (0.1)pt | 2.7pts |

Contributions from recent investments at our Atlantic City properties and execution of a highly targeted marketing program helped offset the impact of a new competitor in the Atlantic City market in 2003. At Showboat Atlantic City, where a new hotel tower opened in second quarter 2003 and 450 slot machines were added in third quarter 2003, revenues were up 2.2% and income from operations was 10.1% higher than in 2002. Harrah's Atlantic City's revenues and income from operations declined 0.9% and 5.2%, respectively, from 2002 levels, as that property was more affected by the opening of the first new competitor in Atlantic City in more than a decade. An additional 500 slot machines were added at this property in December 2002.

Revenues at Harrah's Atlantic City increased for the sixth consecutive year in 2002, and its income from operations, which increased for the fourth consecutive year, was 16.0% higher than in 2001. These increases were driven by the opening of the new hotel tower and the addition of approximately 450 slot machines at this property in second quarter 2002 and by more cost-effective marketing programs. The 452-room addition increased the hotel's capacity to more than 1,600 rooms and completed a project that created an additional 28,000 square feet of casino floor space and expanded a buffet area. These capital improvements cost approximately $180 million.

Revenues at Showboat Atlantic City increased in 2002 and its income from operations was 24.1% higher than in 2001. Property enhancements and more cost-effective marketing drove the improved results at this property. This property, which is more reliant on customers who travel to Atlantic City by bus, was impacted by the September 11, 2001, terrorist attacks and construction disruptions related to reconfiguration of the casino floor. A reconfiguration of Showboat's casino floor was completed in the second quarter of 2001, a new buffet and coffee shop opened in the fourth quarter of 2001 and our tiered Total Rewards customer-loyalty program was implemented during 2001 at this property.

*North Central Results*

| (In millions) | 2003 | 2002 | 2001 | Percentage Increase/(Decrease) | |
| --- | --- | --- | --- | --- | --- |
| | | | | 03 vs 02 | 02 vs 01 |
| Casino revenues | $1,397.5 | $1,431.2 | $1,243.7 | (2.4)% | 15.1 % |
| Total revenues | 1,361.3 | 1,410.4 | 1,249.4 | (3.5)% | 12.9 % |
| Income from operations | 224.1 | 307.0 | 278.9 | (27.0)% | 10.1 % |
| Operating margin | 16.5% | 21.8% | 22.3% | (5.3)pts | (0.5)pts |

Higher gaming taxes and competitive pressures in 2003 led to declines in revenues and income from operations at our North Central properties.

The revenue and income from operations increases reported by the North Central properties for 2002 versus 2001 were due to inclusion of a full year of operations of the Harveys properties, which were acquired July 31, 2001. The year-over-year growth was also enhanced by capital investments that generated strong customer demand and higher cash flow.

18

*Chicagoland/Illinois*

Combined 2003 revenues and income from operations at our Chicagoland/Illinois properties were 4.5% and 34.4%, respectively, below 2002. Higher gaming and admission taxes, heightened competition and winter storms during the first quarter of 2003 were responsible for the declines. During second quarter 2003, legislation was passed in Indiana that increased the effective tax rate and retroactively revised the methodology by which state gaming taxes are to be computed for those properties that converted from cruising to dockside operations. This revision resulted in a $5.1 million charge for additional taxes for the period ended June 30, 2003. New tax legislation in Illinois in 2003 raised the maximum gaming tax rate to 70% and impacted our income from operations by $16.2 million in 2003. In order to sustain profitability under the higher tax scheme, operational changes were implemented at Joliet in the third quarter, and revenues declined as a result of these changes. Revenue declines at Joliet were partially offset by higher revenues from our East Chicago property, which benefited from a full year of dockside operations. A $27 million renovation project designed to enhance the amenities and update the look of Harrah's East Chicago is scheduled for completion in first quarter 2004. At December 31, 2003, $4.0 million had been spent on this project.

2002 combined revenues at our Chicagoland/Illinois properties were 7.3% higher than in 2001 and income from operations was up 9.2%. 2001 income from operations was negatively impacted by accelerated depreciation on riverboats that were removed from service at Harrah's Joliet in late September 2001, when the property was converted from riverboats to barges. 2002 income from operations was negatively impacted by approximately $27.5 million of additional gaming taxes in Illinois and Indiana due to state legislations effective July 1, 2002. The Illinois legislation raised the maximum graduated gaming tax rate from 35% to 50%, and in Indiana the base gaming tax rate increased from 20% to 22.5%. The Indiana legislation also included provisions that allowed casinos to convert from cruising to dockside operations. If a casino elected to become a dockside operation, the gaming tax rate structure changed to a graduated scale with a maximum tax rate of 35%, mitigated to some extent by a change in the method for computing admission taxes. We converted our Harrah's East Chicago operation from cruising to dockside during third quarter 2002. In first quarter 2002, we completed the opening of a $47 million hotel at Harrah's East Chicago. The first 10 floors of the 15-floor hotel opened in late December 2001.

*Missouri*

Combined revenues for our Missouri properties declined 4.1% from 2002 and income from operations was down 20.9% due primarily to heightened competition in both the St. Louis and North Kansas City markets. Fourth quarter 2003 results for Harrah's St. Louis were strong, and we are optimistic that this property will continue to rebound from the increased competition in that market. In the Kansas City market, a competitor opened its expanded facility in third quarter 2003 and another competitor opened its new barge facility in fourth quarter 2003.

Construction is underway on a $80 million expansion at Harrah's St. Louis, which will include a second hotel tower, redesign of the hotel lobby, new valet parking areas, the addition of parking garage express ramps and the expansion of two restaurants and other amenities. A new restaurant and nightclub are scheduled to open at the end of first quarter 2004 and the hotel tower and remaining amenities are due to open in third quarter 2004. As of December 31, 2003, $29.5 million had been spent on this project.

2002 combined revenues for our Missouri properties were 4.3% below 2001 revenues, and income from operations was 3.7% below 2001 due to increased competition and intense promotional activity in the St. Louis market.

19

*Iowa*

Combined 2003 revenues from our Iowa properties were 0.9% above 2002 revenues, but income from operations was 10.5% below 2002 due, in part, to higher gaming taxes at our Bluffs Run property, where gaming taxes increased in accordance with a predetermined rate increase.

On a combined basis, our two Iowa properties contributed $236.7 million in revenues and $35.8 million in income from operations to our 2002 results compared to $103.6 million in revenues and $17.6 million in income from operations for the five months that we owned these properties in 2001.

The Iowa Supreme Court issued an opinion in June 2002 that has the effect of reducing the gaming tax rate on gaming revenues earned by casinos at racetracks operating in the state, including our Bluffs Run Casino. Casinos at racetracks are taxed at a higher rate (34% in 2003) than the casinos on riverboats operating in Iowa (20%). The Court ruled this disparity was unconstitutional. The State appealed the Iowa Supreme Court's decision to the United States Supreme Court and in June 2003, the United States Supreme Court overturned the ruling by the Iowa Supreme Court on U.S. constitutional grounds; however, in February 2004, the Iowa Supreme Court ruled that the state law that permits the disparity violates the Iowa Constitution. We followed the instructions of the Iowa Racing and Gaming Commission to pay taxes at the 20% rate for Bluffs Run. However, given the uncertainty of this situation, we continued to accrue gaming taxes at the higher rate and have accrued approximately $24.9 million in state gaming taxes that we may not have to pay. An additional payment based on a multiple of the calculated annual savings may be due to Iowa West Racing Association ("Iowa West"), the entity holding the pari-mutuel and gaming license for the Bluffs Run Casino and with whom we have a management agreement to operate that property. Any additional payment that may be due to Iowa West would increase goodwill attributed to the Bluffs Run property.

*South Central Results*

| (In millions) | 2003 | 2002 | 2001 | Percentage Increase/(Decrease) 03 vs 02 | 02 vs 01 |
|---|---|---|---|---|---|
| Casino revenues | $733.6 | $562.1 | $413.6 | 30.5 % | 35.9% |
| Total revenues | 742.8 | 569.3 | 416.9 | 30.5 % | 36.6% |
| Income from operations | 105.3 | 88.9 | 60.0 | 18.4 % | 48.2% |
| Operating margin | 14.2% | 15.6% | 14.4% | (1.4)pts | 1.2pts |

A full year of consolidation of New Orleans' results subsequent to the acquisition of a controlling interest in that property in early June 2002 and results from Louisiana Downs, which was acquired in December 2002, drove combined 2003 revenues at our South Central properties up 30.5% and combined income from operations up 18.4%. Harrah's New Orleans contributed $285.4 million in revenues and $46.8 million in income from operations in 2003 compared to $154.5 million in revenues and $16.0 million in income from operations subsequent to its consolidation in 2002. The opening of an expanded buffet and new steakhouse at Harrah's New Orleans in 2003 attracted new business to that property. Prior to our acquisition of a controlling interest in that property, we had limited ability to invest in amenities, and we are now actively pursuing such opportunities. We are currently in the design stage for a new hotel project for this property.

On December 20, 2002, we completed our acquisition of a controlling interest in Louisiana Downs, a thoroughbred racetrack in Bossier City, Louisiana, and in May 2003, 900 slot machines were placed in service there. Construction is scheduled for completion in second quarter 2004 on Phase II of the expansion of Louisiana Downs, which will include a new, permanent facility with approximately 1,400 slot machines. Our renovation and expansion of Louisiana Downs is expected to cost approximately $110 million, $56.8 million of which had been spent as of December 31, 2003. Louisiana Downs contributed $56.9 million in revenues in 2003, but preopening costs related to the introduction of slot machines at the facility drove a loss from operations of $1.4 million.

The increases in combined results for our South Central properties in 2002 over 2001 were also due to the consolidation of New Orleans' results subsequent to the acquisition of a controlling interest in that property in early 2002. Our growth was also enhanced by capital investments that generated strong customer demand and higher cash flow at Harrah's Shreveport.

The Lake Charles property continues to contend with increased competition in the area, including the addition of slot machines at a racetrack located closer than our property to one of our Texas feeder markets and additional Indian casino offerings. Approximately $55.4 million of goodwill is allocated to the Lake Charles property. Should the negative operating trend at our Lake Charles property continue, it could impact the annual analysis for the impairment of goodwill for that operating unit.

Due to our intention to sell Harrah's Shreveport, we have classified that property in Assets held for sale on our Consolidated Balance Sheets and have ceased depreciating its assets. Since the Horseshoe Gaming acquisition will give us a continued presence in the Shreveport-Bossier City market, Harrah's Shreveport's operating results have not been classified as discontinued operations. We do not anticipate a material gain or loss on this sale.

On June 30, 2003, we announced an agreement to sell Harrah's Vicksburg and that sale was completed on October 27, 2003. 2003 results for Harrah's Vicksburg are presented as Discontinued operations and results for 2002 and 2001 have been reclassified to conform to the 2003 presentation. A loss of $0.5 million, net of tax, resulted from this sale.

*Managed Casinos and Other*

| (In millions) | 2003 | 2002 | 2001 | Percentage Increase/(Decrease) 03 vs 02 | Percentage Increase/(Decrease) 02 vs 01 |
|---|---|---|---|---|---|
| Revenues | $90.6 | $75.7 | $73.9 | 19.7 % | 2.4% |
| Income from operations | 11.4 | 21.6 | (12.1) | (47.2)% | N/M |

N/M = Not meaningful

With the acquisition of the remaining interest in the New Orleans casino in 2002, our managed casinos now consist of four tribal casinos. The table below gives the location and expiration date of the current management contracts for our Indian properties as of December 31, 2003.

| Casino | Location | Expiration of Management Agreement |
|---|---|---|
| Harrah's Cherokee | Cherokee, North Carolina | November 2004 |
| Harrah's Ak-Chin | near Phoenix, Arizona | December 2004 |
| Harrah's Rincon | near San Diego, California | November 2010 |
| Harrah's Prairie Band | near Topeka, Kansas | January 2008 |

Revenues from our managed properties were higher in 2003 than in the previous year due to a full year of management fees from Harrah's Rincon Casino and Resort, owned by the Rincon San Luiseno

Band of Mission Indians ("Rincon") in Southern California, which opened in August 2002. The increased fees from Rincon were partially offset by changes in fee structures provided by extended management agreements and by the elimination of management fees from Harrah's New Orleans subsequent to its consolidation with our financial results in June 2002.

2002 revenues from our managed properties were higher than 2001 revenues due to fees from Rincon subsequent to its August 2002 opening and to higher fees from New Orleans prior to its consolidation in June 2002, partially offset by changes in fee structures provided by extended management agreements.

In 2003, we extended our contract to manage the tribal casino at Rincon, and we have also executed an extension for management of the Cherokee property until November 2011, which is pending approval by the National Indian Gaming Commission. New contracts may provide for reductions in management fees; however, expansions at the properties are expected to increase the fee base and keep the overall income stream stable.

A $165 million expansion of the Harrah's Rincon property began in December 2003. The expansion will add a 21-story, 485-room hotel tower, a spa, a new hotel lobby, additional meeting space, additional casino space and a 1,200-space parking structure. The expansion is scheduled to be completed by the end of 2004.

Construction is underway on a $55 million expansion project at Harrah's Prairie Band. The expansion will include the addition of 198 hotel rooms, a 12,000 square foot convention center and a new restaurant. The project is scheduled for completion in late 2004.

Construction began in January 2004 on a $60 million expansion of Harrah's Cherokee Smoky Mountains Casino in Cherokee, North Carolina, that will add a 15-story, 324-room hotel tower, which is scheduled for completion in second quarter 2005. A 252-room hotel and 30,000 square foot conference center opened at that property in second quarter 2002, and in fourth quarter 2002, an expansion project was completed that added approximately 22,000 square feet of casino space.

An expansion to the Harrah's Ak-Chin casino opened in first quarter 2001 and included a new 146-room hotel, an additional restaurant, meeting and banquet room facilities, a resort pool and a landscaped courtyard. A new twenty-five year compact between the State of Arizona and the Ak-Chin Indian Community was approved in February 2003. The new compact increases the number of permitted machines and adds blackjack and jackpot poker to the scope of gaming at the Ak-Chin casino.

Construction costs of Indian casinos and hotels have been funded by the tribes or by the tribes' debt, some of which we guarantee. See Debt and Liquidity for further discussion of our guarantees of debt related to Indian projects.

Also included in Managed Casinos and Other are our development expenses, brand marketing costs, income from nonconsolidating subsidiaries and other costs that are directly related to our casino operations and development but are not property specific.

*Other Factors Affecting Net Income*

| (Income)/Expense | 2003 | 2002 | 2001 | Percentage Increase/(Decrease) 03 vs 02 | 02 vs 01 |
|---|---|---|---|---|---|
| (In millions) | | | | | |
| Development costs | $ 19.6 | $ 9.5 | $ 6.4 | N/M | 48.4 % |
| Write-downs, reserves and recoveries | 11.1 | 5.0 | 22.5 | N/M | (77.8)% |
| Project opening costs | 7.9 | 1.8 | 13.1 | N/M | (86.3)% |
| Corporate expense | 52.6 | 56.6 | 52.7 | (7.1)% | 7.4 % |
| Amortization of intangible assets | 4.8 | 4.5 | 25.0 | 6.7 % | (82.0)% |
| Interest expense, net | 234.4 | 240.2 | 255.8 | (2.4)% | (6.1)% |
| Losses on early extinguishments of debt | 19.1 | – | – | N/M | – |
| Other income | (2.9) | (2.1) | (28.2) | 38.1 % | (92.6)% |
| Effective tax rate | 36.2 % | 36.8 % | 36.4 % | (0.6)pts | 0.4 pts |
| Minority interests | $ 11.6 | $ 14.0 | $ 12.6 | (17.1)% | 11.1 % |
| Discontinued operations, net of income taxes | (0.7) | (3.0) | (1.7) | N/M | N/M |
| Change in accounting principle, net of income taxes | – | 91.2 | – | N/M | N/M |

N/M = Not meaningful

Development costs were higher in 2003 due to increased development activities in many jurisdictions considering casinos or casino-like businesses. In 2003, we signed a letter of intent, subject to definitive documents, to form a 50/50 joint venture with Gala Group, a United Kingdom ("UK") based gaming operator, to develop regional casinos in the UK. The arrangement also permits us to develop UK destination resorts outside of the joint venture. As part of this effort, we formed a joint venture with Gala Group for the purpose of placing options on land in the UK. Development in the UK is dependent on passage of proposed legislative reform of the UK gaming laws and regulations. LuckyMe, our new internet gaming operation based in the UK, began operations in first quarter 2004.

Write-downs, reserves and recoveries include various pretax charges to record asset impairments, contingent liabilities, project write-offs and recoveries at time of sale of previously recorded reserves for asset impairment. The components of Write-downs, reserves and recoveries were as follows:

| (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| Impairment of goodwill | $ 6.3 | $ – | $ – |
| Impairment of long-lived assets | 2.5 | 1.5 | 8.2 |
| Write-off of abandoned assets and other costs | 3.2 | 6.9 | 8.5 |
| Settlement of sales tax contingency | (0.9) | (6.5) | – |
| Charge for structural repairs at Reno | – | 5.0 | – |
| Termination of contracts | – | 0.2 | 4.1 |
| Recoveries from previously impaired assets and reserved amounts | – | (2.1) | (0.6) |
| Reserves for New Orleans casino | – | – | 2.3 |
| | $11.1 | $ 5.0 | $22.5 |

Project opening costs for each of the three years presented include costs incurred in connection with the integration of acquired properties into the Harrah's systems and technology and costs incurred in connection with expansion and renovation projects at various properties.

Corporate expense decreased 7.1% in 2003 from 2002, primarily due to lower incentive compensation plan expenses.

Amortization of intangible assets in 2003 was basically flat compared to 2002 and both years are considerably lower than in 2001 due to the implementation of Statement of Financial Accounting

Standards ("SFAS") No. 142 in first quarter 2002, whereby we ceased amortization of goodwill and intangible assets with indefinite lives. Certain other intangible assets with defined lives related to acquisitions are being amortized. (See Notes 2 and 3 to our Consolidated Financial Statements.)

The Company's average debt balance was slightly higher in 2003 than in 2002; however, interest expense was lower due to lower interest rates throughout 2003 on variable rate debt. Our average debt balance was also higher in 2002 than in 2001 due to acquisitions and our stock repurchase program, but interest expense decreased in 2002 from 2001 due to lower rates on variable rate debt. The average interest rate on our variable-rate debt, excluding the impact of our swap agreements, was 2.3% at December 31, 2003 and 2002, compared to 4.0% at December 31, 2001. A change in interest rates will impact our financial results. Assuming a constant outstanding balance for our variable-rate debt for the next twelve months, a hypothetical 1% change in corresponding interest rates would change interest expense for the next twelve months by approximately $11.1 million. Our variable rate debt, including fixed-rate debt for which we have entered into interest rate swap agreements, represents approximately 33% of our total debt, while our fixed-rate debt is approximately 67% of our total debt. (For discussion of our interest rate swap agreements, see Debt and Liquidity, Interest Rate Swap Agreements.)

Losses on the early extinguishments of debt represent premiums paid and write-offs of unamortized deferred financing costs associated with debt retired before maturity. In compliance with SFAS No. 145 (See Note 6 to our Consolidated Financial Statements) these losses on early extinguishments of debt no longer qualify for presentation as extraordinary items. (See Debt and Liquidity—Extinguishments of Debt.)

2003 Other income includes interest income on the cash surrender value of life insurance policies and settlement of a litigation claim, partially offset by benefits from a life insurance policy. 2002 Other income included interest income on the cash surrender value of life insurance policies, net proceeds from litigation settlements and other miscellaneous items. In 2001, Other income included a gain on the settlement of the 1998 condemnation of land in Atlantic City, the sale of nonstrategic land in Nevada and resolution of a contingency related to a former affiliate.

The effective tax rate for 2003, as well as for 2002 and 2001, is higher than the federal statutory rate primarily due to state income taxes. The effective tax rate in 2001 was also affected by that portion of our goodwill amortization that was not deductible for tax purposes. With the cessation of goodwill amortization in the first quarter of 2002 as the result of the implementation of SFAS No. 142, our effective tax rate declined from the 2001 rate; however, our effective tax rate increased in second quarter 2002 due to the exposure to higher state income taxes enacted in that year.

Minority interests reflect joint venture partners' shares of income at joint venture casinos.

Discontinued operations reflect the results of Harveys Wagon Wheel Hotel/Casino in Central City, Colorado, and Harrah's Vicksburg, both of which were sold in 2003. 2002 and 2001 results for these two properties have been reclassified to conform to the 2003 presentation.

The change in accounting principle represents the first quarter 2002 charge for the impairment of Rio's goodwill and trademark recorded in connection with the implementation of SFAS No. 142. (See Note 3 to our Consolidated Financial Statements.)

## CAPITAL SPENDING AND DEVELOPMENT

Part of our plan for growth and stability includes disciplined capital improvement projects, and 2003, 2002 and 2001 were all years of significant capital reinvestment.

In addition to the specific development and expansion projects discussed in Regional Results and Development Plans, we perform on-going refurbishment and maintenance at our casino entertainment facilities to maintain our quality standards. We also continue to pursue development and acquisition

opportunities for additional casino entertainment facilities that meet our strategic and return on investment criteria. Prior to the receipt of necessary regulatory approvals, the costs of pursuing development projects are expensed as incurred. Construction-related costs incurred after the receipt of necessary approvals are capitalized and depreciated over the estimated useful life of the resulting asset. Project opening costs are expensed as incurred.

Our capital spending for 2003 totaled approximately $427.0 million. 2002 capital spending was approximately $376.0 million, excluding the costs of our acquisitions of Louisiana Downs and the remaining interest in JCC, and 2001 capital spending was $550.5 million, excluding the costs of our acquisition of Harveys. Estimated total capital expenditures for 2004 are expected to be between $500 million and $550 million and do not include estimated expenditures for announced acquisitions or unidentified development opportunities.

Our planned development projects, if they go forward, will require, individually and in the aggregate, significant capital commitments and, if completed, may result in significant additional revenues. The commitment of capital, the timing of completion and the commencement of operations of casino entertainment development projects are contingent upon, among other things, negotiation of final agreements and receipt of approvals from the appropriate political and regulatory bodies. Cash needed to finance projects currently under development as well as additional projects being pursued is expected to be made available from operating cash flows, established debt programs (see Debt and Liquidity), joint venture partners, specific project financing, guarantees of third-party debt and, if necessary, additional debt and/or equity offerings.

## DEBT AND LIQUIDITY

We generate substantial cash flows from operating activities, as reflected on the Consolidated Statements of Cash Flows. These cash flows reflect the impact on our consolidated operations of the success of our marketing programs, our strategic acquisitions, on-going cost containment focus and favorable variable interest rates. For 2003, we reported cash flows from operating activities of $737.2 million, a 0.7% increase over the $732.4 million reported in 2002. The 2002 amount reflected a 6.9% decrease over the 2001 level.

We use the cash flows generated by the Company to fund reinvestment in existing properties for both refurbishment and expansion projects, to pursue additional growth opportunities via strategic acquisitions of existing companies and new development opportunities and to return capital to our shareholders in the form of stock repurchase programs and dividends. When necessary, we supplement the cash flows generated by our operations with funds provided by financing activities to balance our cash requirements.

Our cash and cash equivalents totaled approximately $409.9 million at December 31, 2003, compared to $396.4 million at December 31, 2002. The following provides a summary of our cash flows for the years ended December 31.

| (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| Cash provided by operating activities | $ 737.2 | $ 732.4 | $ 786.6 |
| Capital investments | (403.5) | (369.4) | (500.3) |
| Payments for business acquisitions | (75.0) | (162.4) | (251.9) |
| Minority interest buyout | (29.1) | − | (8.5) |
| Investments in affiliates | (4.3) | (0.1) | (5.7) |
| Proceeds from asset/investment sales | 5.3 | 34.7 | 30.8 |
| Other investing activities | (14.9) | (7.2) | (12.9) |
| Free cash flow | 215.7 | 228.0 | 38.1 |
| Cash (used in)/provided by financing activities | (248.0) | (173.3) | 79.4 |
| Cash provided by/(used for) assets held for sale | 45.9 | 4.7 | (62.0) |
| Net increase in cash and cash equivalents | $ 13.6 | $ 59.4 | $ 55.5 |

We believe that our cash equivalents balance, our cash flow from operations and the financing sources discussed herein, will be sufficient to meet our normal operating requirements during the next twelve months and, to fund additional acquisitions, including our announced Horseshoe Gaming acquisition, or investments. In addition, we may consider issuing additional debt or equity securities in the future to fund potential acquisitions or growth or to refinance existing debt. We continue to review additional opportunities to acquire or invest in companies, properties and other investments that meet our strategic and return on investment criteria. If a material acquisition or investment is completed, our operating results and financial condition could change significantly in future periods.

The majority of our debt is due in December 2005 and beyond. Payments of short-term debt obligations and other commitments are expected to be made from operating cash flows. Long-term obligations are expected to be paid through operating cash flows, refinancing of debt, joint venture partners or, if necessary, additional debt and/or equity offerings.

*Credit Agreement*

On April 29, 2003, we entered into an agreement for new credit facilities (the "Credit Agreement") for up to $1.9625 billion in borrowings. This Credit Agreement replaced the $1.857 billion credit and letter of credit facilities that were scheduled to mature in April 2003 ($332 million) and April 2004 ($1.525 billion). The Credit Agreement matures on April 23, 2008, and consists of a five-year revolving credit facility for up to $1.0625 billion and a five-year term reducing facility for up to $900 million. The Credit Agreement contains a provision that would allow an increase in the borrowing capacity to $2 billion, if mutually acceptable to us and our lenders. Interest on the Credit Agreement is based on our debt ratings and leverage ratio and is subject to change. As of December 31, 2003, the Credit Agreement bore interest based upon 105 points over LIBOR and bore a facility fee for borrowed and unborrowed amounts of 25 basis points. At our option, we may borrow at the prime rate under the new Credit Agreement. As of December 31, 2003, $947.8 million in borrowings were outstanding under the Credit Agreement with an additional $66.5 million committed to back letters of credit. After consideration of these borrowings, but before consideration of amounts borrowed under the commercial paper program, $948.2 million of additional borrowing capacity was available to the Company as of December 31, 2003.

*Interest Rate Swap Agreements*

To manage the mix of our debt between fixed and variable rate instruments, we entered into interest rate swap agreements to modify the interest characteristics of our outstanding debt without an exchange of the underlying principal amount. The differences to be paid or received under the terms of our interest rate swap agreements are accrued as interest rates change and recognized as an adjustment to interest expense for the related debt. Changes in the variable interest rates to be paid or received pursuant to the terms of our interest rate swap agreements will have a corresponding effect on our future cash flows.

These agreements contain a credit risk that the counterparties may be unable to meet the terms of the agreements. We minimize that risk by evaluating the creditworthiness of our counterparties, which are limited to major banks and financial institutions, and do not anticipate nonperformance by the counterparties.

As of December 31, 2003, we were a party to two interest rate swaps for a total notional amount of $200 million. These swaps were effective December 29, 2003, and will expire December 15, 2005. Subsequent to the end of 2003, we entered into two additional swap agreements for a total notional amount of $300 million, $200 million of which will expire in June 2007, and $100 million of which will expire in December 2005. The following table summarizes the terms of our swap agreements.

| Swap Effective Date | Notional Amount | Fixed Rate Received | Variable Rate Paid | Next Reset Date | Swap Expiration Date |
|---|---|---|---|---|---|
| | (in millions) | | | | |
| Dec. 29, 2003 . . . . . . . . . . . . . . . . . . . | $ 50 | 7.875% | 6.968% | June 15, 2004 | Dec. 15, 2005 |
| Dec. 29, 2003 . . . . . . . . . . . . . . . . . . . | 150 | 7.875% | 6.972% | June 15, 2004 | Dec. 15, 2005 |
| Jan. 30, 2004 . . . . . . . . . . . . . . . . . . . | 200 | 7.125% | 5.399% | June 1, 2004 | June 1, 2007 |
| Feb. 2, 2004 . . . . . . . . . . . . . . . . . . . | 100 | 7.875% | 6.975% | June 15, 2004 | Dec. 15, 2005 |

*Commercial Paper*

To provide the Company with cost-effective borrowing flexibility, we have a $200 million commercial paper program that is used to borrow funds for general corporate purposes. Although the debt instruments are short-term in tenor, they are classified as long-term debt because the commercial paper is backed by our Credit Agreement, and we have committed to keep available capacity under our Credit Agreement in an amount equal to or greater than amounts borrowed under this program. At December 31, 2003, $50 million was outstanding under this program.

*Issuance of New Debt*

In addition to our Credit Agreement, we have issued debt and entered into credit agreements to provide the Company with cost-effective borrowing flexibility and to replace short-term. The table below summarizes the face value of debt obligations entered into during the last three years and outstanding at December 31, 2003.

| Debt | Issued | Matures | Face Value Outstanding at December 31, 2003 |
|---|---|---|---|
| | | | (In millions) |
| Commercial Paper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2003 | 2004 | $ 50.0 |
| 5.375% Senior Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . | December 2003 | 2013 | 500.0 |
| 8.0% Senior Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | January 2001 | 2011 | 500.0 |
| 7.125% Senior Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . | June 2001 | 2007 | 500.0 |

*Extinguishments of Debt*

Funds from the new debt discussed above, as well as proceeds from our Credit Agreement, were used to retire certain of our outstanding debt, in particular those debt obligations assumed in our acquisition transactions, to reduce our effective interest rate and/or lengthen maturities. The following table summarizes the debt obligations, in addition to our previous credit and letter of credit facilities, that we have retired over the last three years.

| Issuer | Date Retired | Debt Extinguished | Face Value Retired |
|---|---|---|---|
| | | | (In millions) |
| Harrah's Operating Company . . . . . . . | December 2003 | Senior Subordinated Notes due 2005 | $147.1 |
| Harrah's Operating Company . . . . . . . | August 2003 | Senior Subordinated Notes due 2005 | 12.4 |
| JCC . . . . . . . . . . . . . . . . . . . . . . . . | December 2002 | Senior Notes due 2008 | 28.2 |
| Harveys . . . . . . . . . . . . . . . . . . . . . | September 2001 | 10.625% Senior Subordinated Notes due 2006 | 150.0 |
| Showboat . . . . . . . . . . . . . . . . . . . | August 2001 | 13% Senior Subordinated Notes due 2009 | 2.1 |
| Harveys . . . . . . . . . . . . . . . . . . . . . | July 2001 | Credit facility due 2004 | 192.0 |

In July 2003, our Board of Directors authorized the Company to retire, from time to time through cash purchases, portions of our outstanding debt in open market purchases, privately negotiated transactions or otherwise. These repurchases will be funded through available cash from operations, borrowings from our Credit Agreement and our new Senior Notes. Such repurchases will depend on prevailing market conditions, the Company's liquidity requirements, contractual restrictions and other factors. As of December 31, 2003, $159.5 million of our 7⅞% Senior Subordinated Notes had been retired under this authorization.

Charges of $19.1 million representing premiums paid and write-offs of unamortized deferred financing costs associated with the early retirement of portions of our 7⅞% Senior Subordinated Notes and of our previous credit and letter of credit facilities were recorded in 2003. In compliance with SFAS No. 145, these losses no longer qualify for presentation as extraordinary items and are, therefore, included in income from continuing operations on our Consolidated Statements of Income.

*Equity Repurchase Programs*

During the past three years, our Board of Directors has authorized plans whereby we have purchased shares of the Company's common stock in the open market from time to time as market conditions and other factors warranted. The table below summarizes the plans in effect during the past three years.

| Plan Authorized | Number of Shares Authorized | Number of Shares Purchased as of December 31, 2003 | Average Price Per Share |
|---|---|---|---|
| July 2001 . . . . . . . . . . . . . . . . . . . . . . . . | 6.0 million | 6.0 million | $37.15 |
| July 2002 . . . . . . . . . . . . . . . . . . . . . . . . | 2.0 million | 1.4 million | 39.24 |
| November 2002 . . . . . . . . . . . . . . . . . . . . . | 3.0 million | 0.5 million | 35.87 |

The November 2002 authorization was to expire December 31, 2003, but it has been extended until December 31, 2004. The repurchases were funded through available operating cash flows and borrowings from our established debt programs.

*Guarantees of Third-Party Debt and Other Obligations and Commitments*

The following tables summarize our contractual obligations and other commitments as of December 31, 2003.

| | | Payments Due by Period | | | |
|---|---|---|---|---|---|
| Contractual Obligations | Total | Less than 1 year | 1-3 years | 4-5 years | After 5 years |
| (In millions) | | | | | |
| Debt | $ 3,672.8 | $ 1.3 | $1,273.9 | $821.6 | $1,576.0 |
| Capital lease obligations | 0.7 | 0.3 | 0.4 | – | – |
| Operating lease obligations | 628.4 | 43.0 | 103.9 | 58.7 | 422.8 |
| Purchase orders obligations | 45.0 | 45.0 | – | – | – |
| Guaranteed payments to State of Louisiana | 134.8 | 60.0 | 74.8 | – | – |
| Community reinvestment | 94.3 | 4.3 | 12.3 | 8.4 | 69.3 |
| Construction commitments | 81.5 | 81.5 | – | – | – |
| Other contractual obligations | 43.1 | 30.9 | 8.9 | 1.5 | 1.8 |
| | $ 4,700.6 | $266.3 | $1,474.2 | $890.2 | $2,069.9 |

| | | Amount of Commitment Expiration Per Period | | | |
|---|---|---|---|---|---|
| Other Commitments | Total amounts committed | Less than 1 year | 1-3 years | 4-5 years | Over 5 years |
| (In millions) | | | | | |
| Guarantees of loans | $ 152.9 | $ 30.9 | $ 103.3 | $ 18.7 | $ – |
| Letters of credit | 66.5 | 66.5 | – | – | – |
| Minimum payments to tribes | 26.7 | 13.4 | 5.4 | 2.4 | 5.5 |

The agreements pursuant to which we manage casinos on Indian lands contain provisions required by law that provide that a minimum monthly payment be made to the tribe. That obligation has priority over scheduled repayments of borrowings for development costs and over the management fee earned and paid to the manager. In the event that insufficient cash flow is generated by the operations to fund this payment, we must pay the shortfall to the tribe. Subject to certain limitations as to time, such advances, if any, would be repaid to us in future periods in which operations generate cash flow in excess of the required minimum payment. These commitments will terminate upon the occurrence of certain defined events, including termination of the management contract. Our aggregate monthly commitment for the minimum guaranteed payments pursuant to the contracts for the four managed Indian-owned facilities now open, which extend for periods of up to 83 months from December 31, 2003, is $1.2 million. Each of these casinos currently generates sufficient cash flows to cover all of their obligations, including their debt service.

We may guarantee all or part of the debt incurred by Indian tribes with which we have entered a management contract to fund development of casinos on the Indian lands. For all existing guarantees of Indian debt, we have obtained a first lien on certain personal property (tangible and intangible) of the casino enterprise. There can be no assurance, however, that the value of such property would satisfy our obligations in the event these guarantees were enforced. Additionally, we have received limited waivers from the Indian tribes of their sovereign immunity to allow us to pursue our rights under the contracts between the parties and to enforce collection efforts as to any assets in which a security interest is taken. The aggregate outstanding balance of such debt as of December 31, 2003, was $112.9 million. Some of our guarantees of the debt for casinos on Indian lands were modified during 2003, triggering the requirements under Financial Accounting Standards Board Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others," to recognize a liability for the estimated fair value of those guarantees.

Liabilities, representing the fair value of our guarantees, and corresponding assets, representing the portion of our management fee receivable attributable to our agreements to provide the related guarantees, were recorded and are being amortized over the lives of the related agreements. We estimate the fair value of the obligation by considering what premium would have been required by us or by an unrelated party. The amounts recognized represent the present value of the premium in interest rates and fees that would have been charged to the tribes if we had not provided the guarantees. The unamortized balance of the liability for the guarantees and of the related assets at December 31, 2003, was $7.0 million.

Depending upon future changes in the gaming tax rate imposed by the Iowa legislature, an additional payment based on a multiple of the calculated annual savings may be due Iowa West, the entity holding the pari-mutuel and gaming license for the Bluffs Run Casino in Council Bluffs, Iowa, and with whom we have a management agreement to operate that property. Any additional payment that may be due to Iowa West would increase goodwill related to our acquisition of Harveys. Given the uncertainty of the tax rate situation in Iowa (see discussion in Regional Results and Development Plans, North Central Results, Iowa), we cannot estimate the amount of this contingency.

## EFFECTS OF CURRENT ECONOMIC AND POLITICAL CONDITIONS

### Competitive Pressures

Due to the limited number of new markets opening for development in recent years, many casino operators are reinvesting in existing markets to attract new customers, thereby increasing competition in those markets. As companies have completed expansion projects, supply has typically grown at a faster pace than demand in some markets and competition has increased significantly. Furthermore, several operators, including Harrah's, have announced plans for additional developments or expansions in some markets.

The Louisiana legislature has authorized the use of slot machines at horse racing tracks in four parishes in Louisiana. We operate casinos in three of these markets. In first quarter 2002, a horse racing facility, located in one of those parishes where the use of slot machines has been authorized and near our property in Lake Charles, Louisiana, opened with approximately 1,500 machines. The horse racing facility is approximately twenty-five miles closer to one of our major feeder markets than our property. Revenues and income from operations at our Lake Charles property have been negatively impacted by the addition of this new competitor. In fourth quarter 2002, we acquired a controlling interest in Louisiana Downs, a thoroughbred racetrack in Bossier City, Louisiana, which is in another of the parishes where the use of slot machines has been authorized and is located near our Shreveport property. In Orleans Parish, where Harrah's New Orleans is located, voters approved the use of slot machines at a racetrack in October 2003.

In the third quarter of 2001, the State of Louisiana selected a competitor to receive the fifteenth and final riverboat gaming license to be issued by the State, under the legislation legalizing riverboat gaming in that State. The competitor's project is for a riverboat casino in Lake Charles. Construction of that facility began in September 2003, and it is anticipated to open in early 2005. We believe that the new riverboat competition in the Lake Charles area will have a negative impact on our operations there.

In Atlantic City, a competitor opened a 2,000-room hotel and casino in July 2003. A competitor in Missouri completed a large casino expansion in third quarter 2002 that is located near our St. Louis property, a competitor in the Joliet market completed a new barge facility in second quarter 2002 and another competitor in the Chicagoland market replaced its boats with barges in second quarter 2003. In the Kansas City market, a competitor opened its expanded facility in third quarter 2003 and another competitor opened its new barge facility in fourth quarter 2003. The short-term impact of increased competition in these markets has been negative. In Illinois, we are bidding on the final gaming license