# EXHIBIT 6 (Part 2 of 3)

Page 31 - 60

to be issued by the State and, if we are not successful and a competitor location is chosen, it could have an impact on our Chicagoland operations.

A competitor is scheduled to open a new property in Las Vegas in 2005, which could impact our properties there.

In October 2001, the legislature of the State of New York approved a bill authorizing six new tribal casinos in that state and video lottery terminals at tracks. The measure allows the governor of New York to negotiate gaming compacts with American Indian tribes to operate three casinos in the Catskills and three casinos in western New York.

In September 1999, the State of California and approximately 60 Indian tribes executed Class III Gaming Compacts, which other California tribes can join. The Compacts will allow each tribe to operate, on tribal trust lands, two casinos with up to 2,000 slot machines per tribe and unlimited house-banked card games. Our own agreements with Rincon are a result of these events (see Regional Results and Development Plans, Managed Casinos and Other).

Other states are also considering legislation enabling the development and operation of casinos or casino-like operations.

Although the short-term effect of such competitive developments on our Company generally has been negative, we are not able to determine the long-term impact, whether favorable or unfavorable, that these trends and events will have on current or future markets. We believe that the geographic diversity of our operations; our focus on multi-market customer relationships; our service training, our rewards and customer loyalty programs; and our continuing efforts to establish our brands as premier brands upon which we have built strong customer loyalty have well-positioned us to face the challenges present within our industry. We utilize the capabilities of WINet, a sophisticated nationwide customer database, and Total Rewards, a nationwide loyalty program that allows our customers to earn cash, comps and other benefits for playing at Harrah's Entertainment casinos. We believe these sophisticated marketing tools provide us with competitive advantages, particularly with players who visit more than one market.

*Political Uncertainties*

The casino entertainment industry is subject to political and regulatory uncertainty. From time to time, individual jurisdictions have also considered legislation or referendums, which could adversely impact our operations. The likelihood or outcome of similar legislation and referendums in the future cannot be predicted.

The casino entertainment industry represents a significant source of tax revenues to the various jurisdictions in which casinos operate. From time to time, various state and federal legislators and officials have proposed changes in tax laws, or in the administration of such laws, which would affect the industry. It is not possible to determine the scope or likelihood of possible future changes in tax laws or in the administration of such laws. If adopted, such changes could have a material adverse effect on our financial results.

*Economic Conditions*

Historically, economic conditions have had little effect on our operations, but we believe that adverse economic conditions did have some impact on our 2003 operating results and could affect future results. We feel that our marketing programs, use of our technology to change the mix of slot machines and table games and our cost management programs have helped offset the impact of the sluggish economy.

*National Defense and Homeland Security Matters*

The September 11, 2001, terrorist attacks, the potential for future terrorist attacks, the national and international responses to terrorist attacks and other acts of war or hostility have created many economic and political uncertainties, which could adversely affect our business and results of operations in ways that cannot presently be predicted. For example, the United States Coast Guard is considering regulations designed to increase homeland security, which, if passed, could affect some of our properties and require significant expenditures to bring such properties into compliance. Furthermore, given current conditions in the global insurance markets, we are predominantly uninsured for losses and interruptions caused by terrorist acts and acts of war.

## SIGNIFICANT ACCOUNTING POLICIES AND ESTIMATES

We prepare our Consolidated Financial Statements in conformity with accounting principles generally accepted in the United States. Certain of our accounting policies, including the estimated lives assigned to our assets, the determination of bad debt, asset impairment, fair value of guarantees and self-insurance reserves, the purchase price allocations made in connection with our acquisitions and the calculation of our income tax liabilities, require that we apply significant judgment in defining the appropriate assumptions for calculating financial estimates. By their nature, these judgments are subject to an inherent degree of uncertainty. Our judgments are based on our historical experience, terms of existing contracts, our observance of trends in the industry, information provided by our customers and information available from other outside sources, as appropriate. There can be no assurance that actual results will not differ from our estimates. The policies and estimates discussed below are considered by management to be those in which our policies, estimates and judgments have a significant impact on issues that are inherently uncertain.

*Property and Equipment*

We have significant capital invested in our property and equipment, which represents approximately 62% of our total assets. Judgments are made in determining the estimated useful lives of assets, salvage values to be assigned to assets and if or when an asset has been impaired. The accuracy of these estimates affects the amount of depreciation expense recognized in our financial results and whether we have a gain or loss on the disposal of the asset. We assign lives to our assets based on our standard policy, which is established by management as representative of the useful life of each category of asset. We review the carrying value of our property and equipment whenever events and circumstances indicate that the carrying value of an asset may not be recoverable from the estimated future cash flows expected to result from its use and eventual disposition. The factors considered by management in performing this assessment include current operating results, trends and prospects, as well as the effect of obsolescence, demand, competition and other economic factors. In estimating expected future cash flows for determining whether an asset is impaired, assets are grouped at the operating unit level, which for most of our assets is the individual casino.

*Goodwill and Other Intangible Assets*

We have approximately $1.2 billion in goodwill and other intangible assets on our Consolidated Balance Sheet resulting from our acquisition of other businesses. An accounting standard adopted in 2002 requires an annual review of goodwill and other nonamortizing intangible assets for impairment. We completed our initial assessment for impairment of goodwill and other nonamortizing intangible assets and recorded an impairment charge in first quarter 2002. We complete our annual assessment for impairment in fourth quarter each year, and in fourth quarter 2003, we determined that, except for the goodwill associated with Harrah's Reno, goodwill and intangible assets with indefinite lives have not been impaired. A charge was recorded in fourth quarter for the impairment of Reno's remaining goodwill. The annual evaluation of goodwill and other nonamortizing intangible assets requires the use

of estimates about future operating results of each reporting unit to determine their estimated fair value. Changes in forecasted operations can materially affect these estimates. Once an impairment of goodwill or other intangible assets has been recorded, it cannot be reversed.

*Total Rewards Point Liability Program*

Our customer rewards program, Total Rewards, offers incentives to customers who gamble at our casinos throughout the United States. Prior to 2003, customers received cash-back and other offers made in the form of coupons that were mailed to the customer and were redeemable on a subsequent visit to one of our properties. The coupons generally expired 30 days after they were issued. Given the requirement of a return visit to redeem the offer and the short-term expiration date, with no ability to renew or extend the offer, we recognized the expense of these offers when the coupons were redeemed.

In fourth quarter 2002, a decision was made to change our Total Rewards program in 2003 to give our customers greater flexibility and control over the rewards they receive for playing at our casinos. Under the new program, customers are able to accumulate, or bank, reward credits over time that they may redeem at their discretion under the terms of the program. The reward credit balance will be forfeited if the customer does not earn a reward credit over the prior six-month period. As a result of the ability of the customer to bank the reward credits under the revised program, our accounting for the Total Rewards program changed and we accrue the expense of reward credits, after consideration of estimated breakage, as they are earned. To implement this change in the program, an initial bank of reward credits was offered to our existing customers. The amount of credits offered for this initial bank was calculated based upon 2002 tracked play at our casinos. As a result of the decision to extend this initial offer, an accrual of $6.9 million was recorded in 2002 to recognize our estimate of the expense of this implementation offer. Under the current program, the value of the cost to provide reward credits is expensed as the reward credits are earned. To arrive at the estimated cost associated with reward credits, estimates and assumptions are made regarding incremental marginal costs of the benefits, breakage rates and the mix of goods and services for which reward credits will be redeemed. We use historical data to assist in the determination of estimated accruals. At December 31, 2003, $25.7 million was accrued for the cost of anticipated Total Rewards credit redemptions.

*Bad Debt Reserves*

We reserve an estimated amount for receivables that may not be collected. Methodologies for estimating bad debt reserves range from specific reserves to various percentages applied to aged receivables. Historical collection rates are considered, as are customer relationships, in determining specific reserves. At December 31, 2003, we had $51.5 million in our bad debt reserve. As with many estimates, management must make judgments about potential actions by third parties in establishing and evaluating our reserves for bad debts.

*Self-Insurance Accruals*

We are self-insured up to certain limits for costs associated with general liability, workers' compensation and employee health coverage. Insurance claims and reserves include accruals of estimated settlements for known claims, as well as accruals of actuarial estimates of incurred but not reported claims. At December 31, 2003, we had total self-insurance accruals reflected on our Consolidated Balance Sheet of $89.3 million. In estimating these costs, we consider historical loss experience and make judgments about the expected levels of costs per claim. We also rely on independent consultants to assist in the determination of estimated accruals. These claims are accounted for based on actuarial estimates of the undiscounted claims, including those claims incurred but not reported. We believe the use of actuarial methods to account for these liabilities provides a consistent and effective way to measure these highly judgmental accruals; however, changes in health care costs, accident frequency and severity and other factors can materially affect the estimate for these

liabilities. We continually monitor the potential for changes in estimates, evaluate our insurance accruals and adjust our recorded provisions.

## RECENTLY ISSUED AND PROPOSED ACCOUNTING STANDARDS

The following are accounting standards adopted or issued in 2003 that are applicable to our Company.

During second quarter 2001, the FASB issued SFAS No. 143, "Accounting for Asset Retirement Obligations." SFAS No. 143 establishes accounting standards for the recognition and measurement of an asset retirement obligation and its associated asset retirement cost. It also provides accounting guidance for legal obligations associated with the retirement of tangible long-lived assets. For our Company, SFAS No. 143 was effective in 2003, and had no effect on our financial statements.

In April 2002, the FASB issued SFAS No. 145, "Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections," which all but eliminates the presentation in income statements of debt extinguishments as extraordinary items. For our Company, SFAS No. 145 was effective for our fiscal years beginning after May 15, 2002. We implemented SFAS No. 145 on January 1, 2003, and have presented 2003 losses on early extinguishments of debt as a component of our Income from continuing operations. In accordance with SFAS No. 145, we have also reclassified prior periods.

In June 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities," which generally requires companies to recognize costs associated with exit or disposal activities when they are incurred rather than at the date of a commitment to an exit or disposal plan. SFAS No. 146 was effective for exit or disposal activities initiated after December 31, 2002, and had no effect on our financial results.

In November 2002, the FASB issued Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others" ("FIN 45") which requires future guarantee obligations to be recognized as liabilities at inception of the guarantee contract and increases disclosure requirements for guarantees. The initial recognition provisions apply on a prospective basis to guarantees issued or modified after December 31, 2002. The disclosure requirements in the FIN 45 were implemented in 2002, with the initial recognition provisions adopted beginning January 1, 2003. (See Debt and Liquidity, Guarantees of Third-Party Debt and Other Obligations and Commitments.)

In December 2002, the FASB issued SFAS No. 148, "Accounting for Stock-Based Compensation—Transition and Disclosure—an amendment of FASB Statement No. 123," to provide alternative methods of transition for a voluntary change to the fair-value-based method of accounting for stock-based employee compensation. SFAS No. 148 also requires disclosure in both annual and interim financial statements about the method of accounting for stock-based employee compensation and the effect of the method used on reported results. The transition guidance and annual disclosure provisions of SFAS No. 148 are effective for fiscal years ending after December 15, 2002, and the annual disclosure provisions were implemented in our 2002 Annual Report. We implemented the interim disclosure provisions in first quarter 2003.

In January 2003, the FASB issued FASB Interpretation No. 46, "Consolidation of Variable Interest Entities" ("FIN 46"), which addresses consolidation by business enterprises where equity investors do not bear the residual economic risks and rewards. These entities have been commonly referred to as "special-purpose entities." Companies were required to apply the provisions of FIN 46 prospectively for all variable interest entities created after January 31, 2003. In December 2003, the FASB issued a revision to FIN 46 to clarify some of the provisions of the original interpretation and to exempt certain entities from its requirements. The additional guidance explains how to identify variable interest entities

34

and how an enterprise should assess its interest in an entity to decide whether to consolidate that entity. Application of revised FIN 46 is required for public companies with interests in "special-purpose entities" for periods ending after December 15, 2003. Application for public entities for all other types of entities is required in financial statements for periods ending after March 15, 2004. We do not expect FIN 46 to have a significant impact on our results of operations or financial position.

## PRIVATE SECURITIES LITIGATION REFORM ACT

This Annual Report includes "forward-looking statements" intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995. You can identify these statements by the fact that they do not relate strictly to historical or current facts. These statements contain words such as "may," "will," "project," "might," "expect," "believe," "anticipate," "intend," "could," "would," "estimate," "continue" or "pursue," or the negative or other variations thereof or comparable terminology. In particular, they include statements relating to, among other things, future actions, new projects, strategies, future performance, the outcome of contingencies such as legal proceedings and future financial results. We have based these forward-looking statements on our current expectations and projections about future events.

We caution the reader that forward-looking statements involve risks and uncertainties that cannot be predicted or quantified and, consequently, actual results may differ materially from those expressed or implied by such forward-looking statements. Such risks and uncertainties include, but are not limited to, the following factors as well as other factors described from time to time in our reports filed with the Securities and Exchange Commission:

- the effect of economic, credit and capital market conditions on the economy in general, and on gaming and hotel companies in particular;

- construction factors, including delays, zoning issues, environmental restrictions, soil and water conditions, weather and other hazards, site access matters and building permit issues;

- the effects of environmental and structural building conditions relating to our properties;

- our ability to timely and cost-effectively integrate into our operations the companies that we acquire, including with respect to our previously announced acquisition of Horseshoe Gaming;

- access to available and feasible financing, including financing for our acquisition of Horseshoe Gaming on a timely basis;

- changes in laws (including increased tax rates), regulations or accounting standards, third-party relations and approvals, and decisions of courts, regulators and governmental bodies;

- litigation outcomes and judicial actions, including gaming legislative action, referenda and taxation;

- ability of our customer-tracking, customer loyalty and yield-management programs to continue to increase customer loyalty and same-store sales;

- our ability to recoup costs of capital investments through higher revenues;

- acts of war or terrorist incidents;

- abnormal gaming holds; and

- the effects of competition, including locations of competitors and operating and market competition.

Any forward-looking statements are made pursuant to the Private Securities Litigation Reform Act of 1995 and, as such, speak only as of the date made. We undertake no obligation to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise.

**ITEM 7A. Quantitative and Qualitative Disclosure About Market Risk.**

We are exposed to market risk, primarily changes in interest rates. We attempt to limit our exposure to interest rate risk by managing the mix of our debt between fixed rate and variable rate obligations. Of our approximate $3.7 billion total debt at December 31, 2003, $1.2 billion, including the fixed-rate debt for which we have entered into interest rate swap agreements, is subject to variable interest rates. The average interest rate on our variable-rate debt, excluding the impact of our swap agreements, was 2.3% at December 31, 2003. Assuming a constant outstanding balance for our variable rate debt for the next twelve months, a hypothetical 1% change in interest rates would change interest expense for the next twelve months by approximately $11.1 million. We utilize interest rate swaps to manage the mix of our debt between fixed and variable rate instruments. We do not purchase or hold any derivative financial instruments for trading purposes.

The table below provides information as of December 31, 2003, about our financial instruments that are sensitive to changes in interest rates, including debt obligations and interest rate swaps. For debt obligations, the table presents notional amounts and weighted average interest rates by contractual maturity dates. For interest rate swaps, the table presents notional amounts and weighted average interest rates by contractual maturity dates. Notional amounts are used to calculate the contractual payments to be exchanged under the contract and weighted average variable rates are based on implied forward rates in the yield curve as of December 31, 2003.

| (In millions) | 2004 | 2005 | 2006 | 2007 | 2008 | Thereafter | Total | Fair Value |
|---|---|---|---|---|---|---|---|---|
| **Liabilities** | | | | | | | | |
| **Long-term debt** | | | | | | | | |
| Fixed rate | $1.6 | $592.1 | $1.7 | $500.5 | $1.8 | $1,578.0 | $2,675.7 | $3,000.0(1) |
|   Average interest rate | 7.5% | 7.9% | 7.3% | 7.1% | 7.1% | 7.0% | 7.2% | |
| Variable rate | $ — | $22.5 | $52.5 | $105.0 | $817.8 | $ — | $997.8 | 997.8(1) |
|   Average interest rate | —% | 2.3% | 2.3% | 2.3% | 2.3% | —% | 2.3% | |
| | | | | | | | | |
| **Interest Rate Derivatives** | | | | | | | | |
| **Interest rate swaps** | | | | | | | | |
| Fixed to variable | $ — | $200.0 | $ — | $ — | $ — | $ — | $200.0 | $0.2 |
|   Average pay rate | 7.2% | 8.5% | —% | —% | —% | —% | 7.8% | |
|   Average receive rate | 7.9% | 7.9% | —% | —% | —% | —% | 7.9% | |

(1) The fair values are based on the borrowing rates currently available for debt instruments with similar terms and maturities and market quotes of the Company's publicly traded debt.

Our long-term variable rate debt reflects borrowings under revolving credit and letter of credit facilities provided to us by a consortium of banks with a total capacity of $1.9625 billion. The interest rates charged on borrowings under these facilities are a function of the London Inter-Bank Offered Rate, or LIBOR and prime rate. As such, the interest rates charged to us for borrowings under the facilities are subject to change as LIBOR changes.

Foreign currency translation gains and losses were not material to our results of operations for the year ended December 31, 2003. We sold our management contract for a casino in a foreign country in January 2000. Although we are pursuing development opportunities in the United Kingdom, we currently have no material ownership interests in businesses in foreign countries. Accordingly, we are not currently subject to material foreign currency exchange rate risk from the effects that exchange rate movements of foreign currencies would have on our future operating results or cash flows.

**ITEM 8. Financial Statements and Supplementary Data.**

### INDEPENDENT AUDITORS' REPORT

To the Board of Directors and Stockholders of
Harrah's Entertainment, Inc.
Las Vegas, Nevada

We have audited the accompanying consolidated balance sheets of Harrah's Entertainment, Inc. and subsidiaries ("Harrah's Entertainment") as of December 31, 2003 and 2002, and the related consolidated statements of income, stockholders' equity and comprehensive income, and cash flows for each of the three years in the period ended December 31, 2003. Our audits also included the financial statement schedule listed in the Index at Item 15(a)(2). These financial statements and financial statement schedule are the responsibility of Harrah's Entertainment's management. Our responsibility is to express an opinion on the financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Harrah's Entertainment as of December 31, 2003 and 2002, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

As discussed in Note 3 to the Consolidated Financial Statements, Harrah's Entertainment changed its method of accounting for goodwill and other intangible assets to conform to Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets," in 2002 and recorded a cumulative effect of a change in accounting principle in the first quarter of 2002.

*Deloitte & Touche LLP*

Las Vegas, Nevada
March 3, 2004

# HARRAH'S ENTERTAINMENT, INC.
## CONSOLIDATED BALANCE SHEETS
### (In thousands, except share amounts)

| | December 31, 2003 | December 31, 2002 |
|---|---|---|
| *Assets* | | |
| Current assets | | |
| Cash and cash equivalents | $ 409,942 | $ 396,365 |
| Receivables, less allowance for doubtful accounts of $51,466 and $55,860 | 90,991 | 91,244 |
| Deferred income taxes (Note 9) | 68,323 | 61,659 |
| Income tax receivable | 36,166 | 43,088 |
| Prepayments and other | 55,929 | 48,764 |
| Inventories | 23,286 | 21,973 |
| Total current assets | 684,637 | 663,093 |
| Land, buildings, riverboats and equipment | | |
| Land and land improvements | 741,536 | 735,113 |
| Buildings, riverboats and improvements | 3,459,440 | 3,313,515 |
| Furniture, fixtures and equipment | 1,466,643 | 1,309,909 |
| Construction in progress | 129,566 | 79,855 |
| | 5,797,185 | 5,438,392 |
| Less: accumulated depreciation | (1,701,290) | (1,455,767) |
| | 4,095,895 | 3,982,625 |
| Assets held for sale (Note 15) | 210,311 | 281,636 |
| Goodwill (Notes 2 and 3) | 907,506 | 912,833 |
| Intangible assets (Note 3) | 315,019 | 271,227 |
| Investments in and advances to nonconsolidated affiliates (Note 14) | 8,001 | 4,894 |
| Escrow deposit for pending acquisition (Note 2) | 75,000 | – |
| Deferred costs and other (Note 5) | 282,475 | 233,741 |
| | $ 6,578,844 | $ 6,350,049 |
| *Liabilities and Stockholders' Equity* | | |
| Current liabilities | | |
| Accounts payable | $ 117,941 | $ 110,199 |
| Accrued expenses (Note 5) | 463,389 | 440,307 |
| Short-term debt | – | 60,250 |
| Current portion of long-term debt (Note 6) | 1,632 | 1,466 |
| Total current liabilities | 582,962 | 612,222 |
| Liabilities held for sale (Note 15) | 10,873 | 18,132 |
| Long-term debt (Note 6) | 3,671,889 | 3,763,066 |
| Deferred credits and other | 194,017 | 181,919 |
| Deferred income taxes (Note 9) | 330,674 | 263,661 |
| | 4,790,415 | 4,839,000 |
| Minority interests | 49,989 | 40,041 |
| Commitments and contingencies (Notes 2, 7 and 11 through 15) | | |
| Stockholders' equity (Notes 4, 13 and 14) | | |
| Common stock, $0 10 par value, authorized—360,000,000 shares, outstanding—110,889,294 and 109,708,831 shares (net of 35,078,478 and 34,416,975 shares held in treasury) | 11,089 | 10,971 |
| Capital surplus | 1,277,903 | 1,224,808 |
| Retained earnings | 466,662 | 260,297 |
| Accumulated other comprehensive income/(loss) | 151 | (415) |
| Deferred compensation related to restricted stock | (17,365) | (24,653) |
| | 1,738,440 | 1,471,008 |
| | $ 6,578,844 | $ 6,350,049 |

The accompanying Notes to Consolidated Financial Statements
are an integral part of these consolidated balance sheets.

## HARRAH'S ENTERTAINMENT, INC.
## CONSOLIDATED STATEMENTS OF INCOME
### (In thousands, except per share amounts)

| | Year Ended December 31, | | |
| | 2003 | 2002 | 2001 |
|---|---|---|---|
| **Revenues** | | | |
| Casino | $3,853,150 | $3,650,130 | $3,175,476 |
| Food and beverage | 631,035 | 608,039 | 526,690 |
| Rooms | 351,952 | 329,947 | 299,003 |
| Management fees | 72,149 | 66,888 | 64,842 |
| Other | 196,486 | 154,060 | 139,681 |
| Less: casino promotional allowances | (782,050) | (710,537) | (557,204) |
| Total revenues | 4,322,722 | 4,098,527 | 3,648,488 |
| **Operating expenses** | | | |
| Direct | | | |
| Casino | 1,974,043 | 1,786,366 | 1,495,513 |
| Food and beverage | 261,750 | 246,668 | 232,391 |
| Rooms | 65,998 | 67,915 | 77,169 |
| Property general, administrative and other | 899,885 | 853,037 | 870,863 |
| Depreciation and amortization | 317,199 | 302,794 | 281,068 |
| Write-downs, reserves and recoveries (Note 8) | 11,079 | 5,031 | 22,498 |
| Project opening costs | 7,869 | 1,816 | 13,105 |
| Corporate expense | 52,602 | 56,626 | 52,746 |
| Losses on interests in nonconsolidated affiliates (Note 14) | 1,201 | 1,964 | 4,892 |
| Amortization of intangible assets (Note 3) | 4,798 | 4,493 | 24,965 |
| Total operating expenses | 3,596,424 | 3,326,710 | 3,075,210 |
| Income from operations | 726,298 | 771,817 | 573,278 |
| Interest expense, net of interest capitalized (Note 10) | (234,419) | (240,220) | (255,801) |
| Losses on early extinguishments of debt (Note 6) | (19,074) | – | (36) |
| Other income, including interest income | 2,913 | 2,137 | 28,219 |
| Income from continuing operations before income taxes and minority interests | 475,718 | 533,734 | 345,660 |
| Provision for income taxes (Note 9) | (172,201) | (196,534) | (125,797) |
| Minority interests | (11,563) | (13,965) | (12,616) |
| Income from continuing operations | 291,954 | 323,235 | 207,247 |
| Discontinued operations, net of income tax expense of $360, $1,595 and $927 | 669 | 2,963 | 1,720 |
| Income before cumulative effect of change in accounting principle | 292,623 | 326,198 | 208,967 |
| Cumulative effect of change in accounting principle, net of income tax benefit of $2,831 (Note 3) | – | (91,169) | – |
| Net income | $ 292,623 | $ 235,029 | $ 208,967 |
| **Earnings per share—basic** | | | |
| Income from continuing operations | $   2.68 | $   2.91 | $   1.83 |
| Discontinued operations, net | 0.01 | 0.02 | 0.01 |
| Cumulative effect of change in accounting principle, net | – | (0.82) | – |
| Net income | $   2.69 | $   2.11 | $   1.84 |
| **Earnings per share—diluted** | | | |
| Income from continuing operations | $   2.64 | $   2.85 | $   1.79 |
| Discontinued operations, net | 0.01 | 0.02 | 0.02 |
| Cumulative effect of change in accounting principle, net | – | (0.80) | – |
| Net income | $   2.65 | $   2.07 | $   1.81 |
| Dividends declared per share | $   0.60 | $ – | $ – |
| Weighted average common shares outstanding | 108,972 | 111,212 | 113,540 |
| Additional shares based on average market price for period applicable to: | | | |
| Restricted stock | 454 | 631 | 697 |
| Stock options | 977 | 1,691 | 1,471 |
| Weighted average common and common equivalent shares outstanding | 110,403 | 113,534 | 115,708 |

The accompanying Notes to Consolidated Financial Statements
are an integral part of these consolidated statements.

## HARRAH'S ENTERTAINMENT, INC.
### CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY AND COMPREHENSIVE INCOME
(In thousands)
(Notes 4, 13 and 14)

| | Common Stock | | Capital Surplus | Retained Earnings | Accumulated Other Comprehensive Income/(Loss) | Deferred Compensation Related to Restricted Stock | Total | Comprehensive Income |
|---|---|---|---|---|---|---|---|---|
| | Shares Outstanding | Amount | | | | | | |
| Balance—December 31, 2000 | 115,952 | $11,595 | $1,075,313 | $224,251 | $(1,036) | $(40,405) | $1,269,718 | |
| Net income | | | | 208,967 | | | 208,967 | $208,967 |
| Unrealized gain on available-for-sale securities, less deferred tax provision of $772 | | | | | 1,289 | | 1,289 | 1,289 |
| Realization of gain on available-for-sale securities, net of tax provision of $123 | | | | | (226) | | (226) | (226) |
| Other | | | | | (1,476) | | (1,476) | (1,476) |
| Treasury stock purchases | (6,618) | (662) | | (185,120) | | | (185,782) | |
| Net shares issued under incentive compensation plans, including income tax benefit of $18,013 | 2,988 | 299 | 67,812 | | | 13,512 | 81,623 | |
| 2001 Comprehensive Income | | | | | | | | $208,554 |
| Balance—December 31, 2001 | 112,322 | 11,232 | 1,143,125 | 248,098 | (1,449) | (26,893) | 1,374,113 | |
| Net income | | | | 235,029 | | | 235,029 | $235,029 |
| Unrealized loss on available-for-sale securities, less deferred tax benefit of $239 | | | | | (442) | | (442) | (442) |
| Other | | | | | 1,476 | | 1,476 | 1,476 |
| Treasury stock purchases | (5,275) | (527) | | (222,830) | | | (223,357) | |
| Net shares issued under incentive compensation plans, including income tax benefit of $23,970 | 2,662 | 266 | 81,683 | | | 2,240 | 84,189 | |
| 2002 Comprehensive Income | | | | | | | | $236,063 |
| Balance—December 31, 2002 | 109,709 | 10,971 | 1,224,808 | 260,297 | (415) | (24,653) | 1,471,008 | |
| Net income | | | | 292,623 | | | 292,623 | $292,623 |
| Unrealized gain on available-for-sale securities, less deferred tax provision of $215 | | | | | 397 | | 397 | 397 |
| Realization of loss on available-for-sale securities, net of tax benefit of $10 | | | | | 18 | | 18 | 18 |
| Foreign currency adjustment | | | | | 151 | | 151 | 151 |
| Treasury stock purchases | (500) | (50) | | (17,887) | | | (17,937) | |
| Quarterly cash dividends (Note 4) | | | | (66,219) | | | (66,219) | |
| Net shares issued under incentive compensation plans, including income tax benefit of $15,537 | 1,680 | 168 | 53,095 | (2,152) | | 7,288 | 58,399 | |
| 2003 Comprehensive Income | | | | | | | | $293,189 |
| Balance—December 31, 2003 | 110,889 | $11,089 | $1,277,903 | $466,662 | $151 | $(17,365) | $1,738,440 | |

The accompanying Notes to Consolidated Financial Statements
are an integral part of these consolidated statements.

## HARRAH'S ENTERTAINMENT, INC.
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### (In thousands)
### (Note 10)

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| **Cash flows from operating activities** | | | |
| Net income | $ 292,623 | $ 235,029 | $ 208,967 |
| Adjustments to reconcile net income to cash flows from operating activities | | | |
| Earnings from discontinued operations, before income taxes | (1,029) | (4,558) | (2,647) |
| Cumulative effect of change in accounting principle, before income taxes | – | 94,000 | – |
| Losses on early extinguishments of debt | 19,074 | – | 36 |
| Depreciation and amortization | 342,557 | 328,479 | 327,644 |
| Write-downs, reserves and recoveries | 11,079 | 5,031 | 22,498 |
| Deferred income taxes | 104,287 | 89,886 | 102,476 |
| Other noncash items | 18,704 | 25,558 | 45,658 |
| Minority interests' share of net income | 11,563 | 13,965 | 12,616 |
| Losses on interests in nonconsolidated affiliates | 1,201 | 1,964 | 4,892 |
| Net losses/(gains) from asset sales | 94 | 1,797 | (18,457) |
| Net change in long-term accounts | (16,636) | (3,903) | (14,222) |
| Net change in working capital accounts | (46,284) | (54,840) | 97,191 |
| Cash flows provided by operating activities | 737,233 | 732,408 | 786,652 |
| **Cash flows from investing activities** | | | |
| Land, buildings, riverboats and equipment additions | (405,279) | (363,027) | (506,085) |
| Escrow payment for pending acquisition (Note 2) | (75,000) | – | – |
| Purchase of minority interest in subsidiary (Note 2) | (29,149) | – | (8,512) |
| Payments for businesses acquired, net of cash acquired | – | (162,431) | (251,873) |
| Investments in and advances to nonconsolidated affiliates | (4,334) | (64) | (5,735) |
| Proceeds from other asset sales | 4,438 | 34,712 | 28,877 |
| Increase/(decrease) in construction payables | 1,764 | (6,396) | 5,780 |
| Sale of marketable equity securities for defeasance of debt | – | – | 2,182 |
| Proceeds from sales of interests in nonconsolidated affiliates | 897 | – | 1,883 |
| Other | (14,948) | (7,162) | (15,061) |
| Cash flows used in investing activities | (521,611) | (504,368) | (748,544) |
| **Cash flows from financing activities** | | | |
| Proceeds from issuance of senior notes, net of discount and issue costs of $6,919 in 2003 and $15,328 in 2001 | 493,081 | – | 984,672 |
| Borrowings under lending agreements, net of financing costs of $15,342, $655 and $529 | 3,368,947 | 2,772,671 | 2,732,416 |
| Repayments under lending agreements | (2,526,189) | (2,728,126) | (2,967,814) |
| Borrowings under retired bank facility | 161,125 | – | – |
| Repayments under retired bank facility | (1,446,625) | – | – |
| Other short-term repayments | (60,250) | – | (184,000) |
| Early extinguishments of debt | (159,476) | (28,210) | (344,811) |
| Premiums paid on early extinguishments of debt | (16,125) | – | (7,970) |
| Scheduled debt retirements | (1,583) | (1,659) | (2,707) |
| Dividends paid | (66,219) | – | – |
| Proceeds from exercises of stock options | 34,085 | 48,695 | 55,303 |
| Purchases of treasury stock | (17,937) | (223,357) | (185,782) |
| Minority interests' distributions, net of contributions | (10,639) | (12,153) | (8) |
| Other | (178) | (1,135) | 126 |
| Cash flows (used in)/provided by financing activities | (247,983) | (173,274) | 79,425 |
| **Cash flows from assets held for sale** | | | |
| Proceeds from sale of assets held for sale | 48,640 | – | – |
| Net transfers from assets held for sale | (2,702) | 4,670 | (62,045) |
| Cash flows provided by/(used in) assets held for sale | 45,938 | 4,670 | (62,045) |
| Net increase in cash and cash equivalents | 13,577 | 59,436 | 55,488 |
| Cash and cash equivalents, beginning of year | 396,365 | 336,929 | 281,441 |
| Cash and cash equivalents, end of year | $ 409,942 | $ 396,365 | $ 336,929 |

The accompanying Notes to Consolidated Financial Statements
are an integral part of these consolidated statements.

HARRAH'S ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Dollars in thousands, unless otherwise stated)

In these footnotes, the words "Company," "Harrah's Entertainment," "we," "our" and "us" refer to Harrah's Entertainment, Inc., a Delaware corporation, and its wholly-owned subsidiaries, unless otherwise stated or the context requires otherwise.

*Note 1—Summary of Significant Accounting Policies*

BASIS OF PRESENTATION AND ORGANIZATION.   We operate 25 casinos in 12 states. As of December 31, 2003, our operations included eleven land-based casinos, ten riverboat or dockside casinos, and four casinos on Indian reservations. We view each property as an operating segment and aggregate all operating segments into one reporting segment.

PRINCIPLES OF CONSOLIDATION.   Our Consolidated Financial Statements include the accounts of Harrah's Entertainment and its subsidiaries after elimination of all significant intercompany accounts and transactions. We follow the equity method of accounting for our investments in 20% to 50% owned companies and joint ventures (see Note 14).

CASH AND CASH EQUIVALENTS.   Cash includes the minimum cash balances required to be maintained by a state gaming commission or local and state governments, which totaled approximately $24.2 million and $25.4 million at December 31, 2003 and 2002, respectively. Cash equivalents are highly liquid investments with an original maturity of less than three months and are stated at the lower of cost or market value.

ALLOWANCE FOR DOUBTFUL ACCOUNTS.   We reserve an estimated amount for receivables that may not be collected. Methodologies for estimating the allowance for doubtful accounts range from specific reserves to various percentages applied to aged receivables. Historical collection rates are considered, as are customer relationships, in determining specific reserves.

INVENTORIES.   Inventories, which consist primarily of food, beverage, retail merchandise and operating supplies, are stated at average cost.

LAND, BUILDINGS, RIVERBOATS AND EQUIPMENT.   Land, buildings, riverboats and equipment are stated at cost. Land includes land held for future development or disposition, which totaled $119.5 million and $127.8 million at December 31, 2003 and 2002, respectively. We capitalize the costs of improvements and repairs that extend the life of the asset. We expense maintenance and repairs cost as incurred. Gains or losses on the dispositions of land, buildings, riverboats or equipment are included in the determination of income. Interest expense is capitalized on internally constructed assets at our overall weighted average borrowing rate of interest. Capitalized interest amounted to $2.3 million, $3.5 million and $9.3 million in 2003, 2002 and 2001, respectively.

We depreciate our buildings, riverboats and equipment using the straight-line method over the shorter of the estimated useful life of the asset or the related lease term, as follows:

| | |
|---|---|
| Buildings and improvements | 10 to 40 years |
| Riverboats and barges | 30 years |
| Furniture, fixtures and equipment | 2 to 15 years |

We review the carrying value of land, buildings, riverboats and equipment for impairment whenever events and circumstances indicate that the recoverable carrying value of an asset may not be from the estimated future cash flows expected to result from its use and eventual disposition. In cases where undiscounted expected future cash flows are less than the carrying value, an impairment loss is

recognized equal to an amount by which the carrying value exceeds the fair value of the asset. The factors considered by management in performing this assessment include current operating results, trends and prospects, as well as the effect of obsolescence, demand, competition and other economic factors. In estimating expected future cash flows for determining whether an asset is impaired, assets are grouped at the operating unit level, which for most of our assets is the individual casino.

**GOODWILL AND OTHER INTANGIBLE ASSETS.** We have approximately $1.2 billion in goodwill and other intangible assets on our balance sheet resulting from our acquisitions of other businesses. Statement of Financial Accounting Standards ("SFAS") No. 142, "Goodwill and Other Intangible Assets," adopted on January 1, 2002, requires an annual review of goodwill and other nonamortizing intangible assets for impairment. We completed our initial assessment for impairment of goodwill and other nonamortizing intangibles and recorded an impairment charge in first quarter 2002 (see Note 3). We also completed our annual assessments for impairment in fourth quarters 2002 and 2003 and determined that, except for the goodwill associated with Harrah's Reno, goodwill and intangible assets with indefinite lives have not been further impaired. A charge of $6.3 million was recorded in fourth quarter 2003 for the impairment of Reno's remaining goodwill. Once an impairment of goodwill or other nonamortizing intangible assets has been recorded, it cannot be reversed.

With the adoption of SFAS No. 142, we no longer amortize goodwill or other intangible assets that are determined to have an indefinite life. Under the provisions of SFAS No. 142, goodwill acquired in a business combination for which the acquisition date was after June 30, 2001, should not be amortized; therefore, no goodwill related to the acquisition of Harveys Casino Resorts ("Harveys") was amortized in 2001. Prior to 2002, we amortized goodwill and other intangibles, including trademarks, on a straight-line basis over periods up to forty years. Intangible assets determined to have a finite life are amortized on a straight-line basis over the determined useful life of the asset (see Note 3). We use the interest method to amortize deferred financing charges over the term of the related debt agreement.

**TOTAL REWARDS POINT LIABILITY PROGRAM.** Our customer rewards program, Total Rewards, offers incentives to customers who gamble at our casinos throughout the United States. Prior to 2003, customers received cash-back and other offers made in the form of coupons that were mailed to the customer and were redeemable on a subsequent visit to one of our properties. The coupons generally expired thirty days after they were issued. Given the requirement of a return visit to redeem the offer and the short-term expiration date, with no ability to renew or extend the offer, we recognized the expense of these offers when the coupons were redeemed.

In fourth quarter 2002, a decision was made to change our Total Rewards program in 2003 to give our customers greater flexibility and control over the rewards they receive for playing at our casinos. Under the new program, customers are able to accumulate, or bank, reward credits over time that they may redeem at their discretion under the terms of the program. The reward credit balance will be forfeited if the customer does not earn a reward credit over the prior six-month period. As a result of the ability of the customer to bank the reward credits under the revised program, our accounting for the Total Rewards program changed, and we accrue the expense of reward credits, after consideration of estimated breakage, as they are earned. To implement this change in the program, an initial bank of reward credits was offered to our existing customers. The amount of credits offered for this initial bank was calculated based upon 2002 tracked play at our casinos. As a result of the decision to extend this initial offer, an accrual of $6.9 million was recorded in 2002 to recognize our estimate of the expense of this implementation offer. Under the current program, the value of the cost to provide reward credits is expensed as the reward credits are earned. To arrive at the estimated cost associated with reward credits, estimates and assumptions are made regarding incremental marginal costs of the

HARRAH'S ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Dollars in thousands, unless otherwise stated) (Continued)

benefits, breakage rates and the mix of goods and services for which reward credits will be redeemed. We use historical data to assist in the determination of estimated accruals. At December 31, 2003, $25.7 million was accrued for the cost of anticipated Total Rewards credit redemptions.

**SELF-INSURANCE ACCRUALS.** We are self-insured up to certain limits for costs associated with general liability, workers' compensation and employee health coverage. Insurance claims and reserves include accruals of estimated settlements for known claims, as well as accruals of actuarial estimates of incurred but not reported claims. At December 31, 2003 and 2002, we had total self-insurance accruals reflected on our balance sheets of $89.3 million and $73.8 million, respectively. In estimating those costs, we consider historical loss experience and make judgments about the expected levels of costs per claim. We also rely on independent consultants to assist in the determination of estimated accruals. These claims are accounted for based on actuarial estimates of the undiscounted claims, including those claims incurred but not reported. We believe the use of actuarial methods to account for these liabilities provides a consistent and effective way to measure these highly judgmental accruals; however, changes in health care costs, accident frequency and severity and other factors can materially affect the estimate for these liabilities. We continually monitor the potential for changes in estimates, evaluate our insurance accruals and adjust our recorded provisions.

**TREASURY STOCK.** The shares of Harrah's Entertainment common stock we hold in treasury are reflected in our Consolidated Balance Sheets and our Consolidated Statements of Stockholders' Equity and Comprehensive Income as if those shares were retired.

**REVENUE RECOGNITION.** Casino revenues consist of net gaming wins. Food and beverage and rooms revenues include the aggregate amounts generated by those departments at all consolidated casinos and casino hotels.

Casino promotional allowances consist principally of the retail value of complimentary food and beverages, accommodations, admissions and entertainment provided to casino patrons. The estimated costs of providing such complimentary services, which we classify as casino expenses through interdepartmental allocations, were as follows:

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Food and beverage | $224,437 | $219,067 | $188,836 |
| Rooms | 81,548 | 75,584 | 64,192 |
| Other | 28,499 | 23,119 | 24,021 |
| | $334,484 | $317,770 | $277,049 |

**EARNINGS PER SHARE.** In accordance with the provisions of SFAS No. 128, "Earnings Per Share," we compute our basic earnings per share by dividing Net income by the number of Weighted average common shares outstanding during the year. Our Diluted earnings per share is computed by dividing Net income by the number of Weighted average common and common equivalent shares outstanding during the year. For each of the three years ended December 31, 2003, common stock equivalents consisted solely of net restricted shares of 453,592, 631,532 and 697,130, respectively, and stock options outstanding of 977,263, 1,691,000 and 1,471,400, respectively, under our employee stock benefit plans. (See Note 13.)

**STOCK-BASED EMPLOYEE COMPENSATION.** As allowed under the provisions of SFAS No. 123, "Accounting for Stock-Based Compensation," we apply the provisions of Accounting Principles

Board Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations to account for our stock option plans and, accordingly, do not recognize compensation expense. Furthermore, no stock-based employee compensation cost is reflected in net income, as all options granted under those plans had an exercise price equal to the market value of the underlying common stock on the date of grant. Had compensation expense for the stock option plans been determined in accordance with SFAS No. 123, total stock-based employee compensation expense, net of tax effects, would have been $23.5 million, $20.2 million, and $8.0 million for the years ended 2003, 2002, and 2001, respectively, and our pro forma Net income and Earnings per share for the indicated periods would have been:

|  | 2003 | | 2002 | | 2001 | |
|---|---|---|---|---|---|---|
|  | As Reported | Pro Forma | As Reported | Pro Forma | As Reported | Pro Forma |
| Net income . . . . . . . . . . . | $292,623 | $269,086 | $235,029 | $214,828 | $208,967 | $200,978 |
| Earnings per share |  |  |  |  |  |  |
|    Basic . . . . . . . . . . . . . . | 2.69 | 2.47 | 2.11 | 1.93 | 1.84 | 1.77 |
|    Diluted . . . . . . . . . . . . | 2.65 | 2.44 | 2.07 | 1.89 | 1.81 | 1.74 |

The fair value of each option grant is estimated on the date of grant using the Black-Scholes option-pricing model with the following weighted average assumptions:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Expected dividend yield . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.8% | 0.0% | 0.0% |
| Expected stock price volatility . . . . . . . . . . . . . . . . . . . . . . . | 37.0% | 32.0% | 42.0% |
| Risk-free interest rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.5% | 3.7% | 4.3% |
| Expected average life of options (years) . . . . . . . . . . . . . . . . . | 6 | 6 | 6 |

**ADVERTISING.** The Company expenses the production costs of advertising the first time the advertising takes place. Advertising expense was $126.9 million, $115.1 million and $102.3 million for the years 2003, 2002 and 2001, respectively.

**RECLASSIFICATIONS.** We have reclassified certain amounts for prior years to conform with our presentation for 2003.

**USE OF ESTIMATES.** The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires that we make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the amounts of revenues and expenses during the reporting period. Our actual results could differ from those estimates.

*Note 2—Acquisitions*

In the three-year period ended December 31, 2003, we acquired one casino company, a thoroughbred racetrack facility and the remaining interest in a nonconsolidated subsidiary. We are accounting for each of the acquisitions as a purchase. Accordingly, the purchase price is allocated to the underlying assets acquired and liabilities assumed based upon their estimated fair values at the date of acquisition. We determine the estimated fair values based on independent appraisals, discounted cash flows, quoted market prices and estimates made by management. For each transaction, the allocation of the purchase price was completed within one year from the date of the acquisition. To the

HARRAH'S ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Dollars in thousands, unless otherwise stated) (Continued)

extent that the purchase price exceeded the fair value of the net identifiable tangible and intangible assets acquired, such excess was allocated to goodwill. For acquisitions completed prior to June 30, 2001, goodwill was amortized for periods of up to forty years. With the adoption of SFAS No. 142 in 2002, we no longer amortize goodwill or intangible assets that are determined to have an indefinite life.

Under the provisions of SFAS No. 142, goodwill acquired in a business combination for which the acquisition date was after June 30, 2001, should not be amortized; therefore, no goodwill related to the Harveys acquisition was amortized in 2001. We accounted for the Harveys acquisition under the provisions of SFAS No. 141, "Business Combinations."

The table below summarizes our acquisition transactions completed in the three-year period ending December 31, 2003.

| Company | Date Acquired | Total Purchase Price(a) | Goodwill Assigned | Number of Casinos | Geographic Location |
|---------|---------------|-------------------------|-------------------|-------------------|---------------------|
| Harveys Casino Resorts . . . . | July 2001 | $712 million | $265 million | 4 | Central City, Colorado(b) Council Bluffs, Iowa (2 properties) Lake Tahoe, Nevada |
| JCC Holding Company(c) . . | June 2002 and December 2002 | $149 million | – | 1 | New Orleans, Louisiana |
| Louisiana Downs, Inc. . . . . . | December 2002 | $94 million | $36 million | 1(d) | Bossier City, Louisiana |

(a) Total purchase price includes the market value of debt assumed determined as of the acquisition date and assets that were subsequently sold.

(b) This property was sold in 2003.

(c) Acquired additional 14% interest in June 2002 and the remaining 37% interest in December 2002.

(d) Acquired a thoroughbred racetrack that was expanded to include slot machines in 2003.

**HARVEYS CASINO RESORTS.** On July 31, 2001, we completed our acquisition of Harveys Casino Resorts ("Harveys"). We paid approximately $294 million for the equity interests in Harveys, assumed approximately $350 million in outstanding debt and paid approximately $18 million in acquisition costs. We also assumed a $50 million contingent liability, which was dependent on the results of a referendum that was decided by the voters in Pottawattamie County, Iowa, in November 2002. The referendum, which re-approved gaming at racetracks and on riverboats for another eight years, passed and we paid an additional $50 million in acquisition costs in fourth quarter 2002. We financed the acquisition, and retired Harveys assumed debt, with borrowings under our established debt programs. The purchase included the Harveys Resort & Casino in Lake Tahoe, Nevada, the Harveys Casino Hotel and the Bluffs Run Casino, both in Council Bluffs, Iowa, and the Harveys Wagon Wheel Hotel/Casino in Central City, Colorado ("Harveys Colorado").

In June 2002, the Iowa Supreme Court issued an opinion that has the effect of reducing the gaming tax rate on gaming revenues earned by casinos at racetracks operating in the state, including our Bluffs Run Casino. Casinos at racetracks are taxed at a higher rate (34% in 2003) than the casinos on riverboats operating in Iowa (20%). The Court ruled this disparity was unconstitutional. The State appealed the Iowa Supreme Court's decision to the United States Supreme Court and in June 2003, the United States Supreme Court overturned the ruling by the Iowa Supreme Court on U.S. constitutional grounds; however, in February 2004, the Iowa Supreme Court ruled that the state law that permits the disparity violates the Iowa Constitution. We followed the instructions of the Iowa

Racing and Gaming Commission to pay taxes at the 20% rate for Bluffs Run. However, given the uncertainty of this situation, we continued to accrue gaming taxes at the higher rate and have accrued approximately $24.9 million in state gaming taxes that we may not have to pay. An additional payment based on a multiple of the calculated annual savings may be due to Iowa West Racing Association ("Iowa West"), the entity holding the pari-mutuel and gaming license for the Bluffs Run Casino and with whom we have a management agreement to operate that property. Any additional payment that may be due to Iowa West would increase goodwill attributed to the Bluffs Run property.

In second quarter 2003, we sold Harveys Colorado. Harveys Colorado has been presented in our Consolidated Financial Statements as Discontinued operations since 2002, and our 2001 results were reclassified to reflect that property as Discontinued operations. See Note 15 for a discussion of our sale of Harveys Colorado.

We acquired Harveys to further enhance our geographic distribution and to strengthen our access to target customers. The results of Harveys' operations have been included in our Consolidated Financial Statements since the date of acquisition.

**JAZZ CASINO COMPANY.** On June 7, 2002, we acquired additional shares of the common stock of JCC Holding Company, which, together with its subsidiary, Jazz Casino Company LLC (collectively, "JCC"), owns and operates the Harrah's casino in New Orleans, Louisiana. The acquisition of these shares increased our ownership in JCC from 49% to 63% and required a change of our accounting treatment for our investment in JCC from the equity method to consolidation of JCC in our financial statements. We began consolidating JCC in our financial results on June 7, 2002. On December 10, 2002, we acquired all remaining shares of JCC's stock to increase our ownership to 100%.

We paid $72.4 million ($10.54 per share) for the additional ownership interest in JCC, acquired approximately $45.8 million of JCC's debt, assumed approximately $28.2 million of JCC's Senior Notes, which we subsequently retired, and incurred approximately $2.4 million of acquisition costs. We financed the acquisition and retired JCC's debt with funds from various sources, including cash flows from operations and borrowings under established debt programs.

We acquired the remaining ownership interest in JCC in order to streamline the decision-making process, which has allowed us to take steps to improve business at the property more quickly.

**LOUISIANA DOWNS.** On December 20, 2002, we acquired a controlling interest in Louisiana Downs, Inc. ("Louisiana Downs") a thoroughbred racetrack in Bossier City, Louisiana. The agreement gave Harrah's a 95% ownership interest in a company that now owns both Louisiana Downs and Harrah's Shreveport. In May 2003, approximately 900 slot machines were put into service and Louisiana Downs became the only land-based gaming facility in northern Louisiana. We expect to open a new, permanent facility with approximately 1,400 slot machines during second quarter 2004.

We paid approximately $94.0 million, including $29.3 million in short-term notes that were paid in full in January 2003 and $15.0 million in equity interest in Harrah's Shreveport, for the interest in Louisiana Downs and approximately $0.5 million of acquisition costs. We financed the acquisition with funds from various sources, including cash flows from operations and borrowings under established debt programs. The results of Louisiana Downs' operations were included in our Consolidated Financial Statements since the date of acquisition.

**HARRAH'S EAST CHICAGO—BUYOUT OF MINORITY PARTNERS.** In second quarter 2003, we paid approximately $28.8 million to former partners in the Harrah's East Chicago property to settle

HARRAH'S ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Dollars in thousands, unless otherwise stated) (Continued)

outstanding litigation with the partners relating to a buyout in 1999 of the partners' interest in the property and to terminate the contractual rights of the partners to repurchase an 8.55% interest in the property. The two remaining minority partners in our East Chicago property owned, in aggregate, 0.45% of this property. In December 2003 and January 2004, we acquired these ownership interests for aggregate consideration of approximately $0.8 million. As a result of these transactions, the East Chicago property is now wholly owned.

In addition to these completed transactions, we have announced the following planned acquisitions.

**HORSESHOE.**  On September 11, 2003, we announced that we had signed a definitive agreement to acquire Horseshoe Gaming Holding Corporation ("Horseshoe Gaming") for $1.45 billion, including assumption of debt. A $75 million escrow payment was made in 2003, and under certain circumstances, this amount will be forfeited if the acquisition does not close. We expect to finance the acquisition through working capital, existing credit facilities and/or, depending on market conditions, the issuance of new debt. The purchase includes casinos in Hammond, Indiana; Tunica, Mississippi; and Bossier City, Louisiana. We also announced our intention to sell our Harrah's brand casino in Shreveport to avoid overexposure in that market, and in January 2004, we announced that we have an agreement, subject to regulatory approvals, to sell that property to another gaming company. After consideration of the sale of Harrah's Shreveport, the Horseshoe acquisition will add a net 107,100 square feet of casino space, more than 4,360 slot machines and 138 table games to our existing portfolio. This acquisition will give Harrah's rights to the Horseshoe brand in all of the United States, except in Nevada. The acquisition, which is subject to regulatory approvals, is expected to close in first half of 2004.

**BINION'S HORSESHOE HOTEL AND CASINO.**  Pursuant to two separate transactions that we announced in January and February 2004, we will acquire certain intellectual property assets from Horseshoe Club Operating Company, to secure the rights to the Horseshoe brand in Nevada and to the World Series of Poker brand and tournament, while MTR Gaming Group, Inc. will acquire the remaining assets of the Binion's Horseshoe Hotel and Casino in Las Vegas, Nevada, including the right to use the name "Binion's" at the property, from Horseshoe Club Operating Company. We will operate the hotel and casino jointly with MTR Gaming on an interim basis. We expect to complete each of these transactions during the first quarter of 2004.

**HARRAH'S SHREVEPORT AND LOUISIANA DOWNS.**  Subsequent to the end of 2003, we reached an agreement with the minority owners of the company that owns Louisiana Downs and Harrah's Shreveport to purchase their ownership interest in that company. The agreement is subject to customary approvals and is expected to be consummated by the end of first quarter 2004. Any excess of the cost to purchase the minority ownership above the capital balances will be assigned to goodwill.

*Note 3—Goodwill and Other Intangible Assets*

We adopted SFAS No. 142, "Goodwill and Other Intangible Assets," effective January 1, 2002. SFAS No. 142 provides new guidance regarding the recognition and measurement of intangible assets, eliminates the amortization of certain intangibles and requires annual assessments for impairment of intangible assets that are not subject to amortization.

As a result of our implementation review of the goodwill and other intangible assets arising from our prior acquisitions, we determined that impairment charges of $91.2 million, net of tax benefits of $2.8 million, were required. These charges, which were recorded in first quarter 2002 and are reported in our Consolidated Statements of Income as a change in accounting principle, relate to goodwill and

48

the trademark acquired in our 1999 acquisition of Rio Hotel and Casino, Inc. ("Rio"). Since the acquisition of Rio, competition had intensified in the market and Rio had greatly reduced its emphasis on international high-end table games play, a significant component of its business at the time of the acquisition. We determine the fair value of an operating unit as a function, or multiple, of earnings before interest, taxes, depreciation and amortization ("EBITDA"), a common measure used to value and buy or sell cash intensive businesses such as casinos. The calculated multiple for Rio indicated that the fair value of the property, based on an EBITDA indicator, fell short of the carrying value, and recognition of an impairment of $86.0 million of goodwill was appropriate. The fair value of the Rio trademark was assessed by applying a "relief from royalty" methodology, which ascribed a value to the trademark derived as the present value of a percentage of forecasted future revenues. Because the Rio had not sustained the level of revenues assumed in the original computation to assign a value to the trademark, future revenue assumptions were reassessed and it was determined that the fair value of the trademark was $5.2 million, net of tax benefits of $2.8 million, less than the carrying value. Rio's tangible assets were assessed for impairment applying the provisions of SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," and our analysis indicated that the carrying value of the tangible assets was not impaired.

Based on our annual assessment for impairment as of September 30, 2002, we determined that goodwill and intangible assets with indefinite lives had not been further impaired. However, based on our annual assessment for impairment of as September 30, 2003, it was determined that the remaining goodwill associated with Harrah's Reno was impaired, and a fourth quarter 2003 charge of $6.3 million was recorded. Recent operating trends reflected the weak market conditions in the Reno area and increased levels of competition from Indian casinos in the Northern California area. We determined the fair value of Reno as a multiple of EBITDA, and the calculated EBITDA for Reno indicated that the fair value of that operating unit was less than the carrying value. Reno has no remaining intangible assets that will be subject to the annual impairment assessment. Reno's tangible assets were assessed for impairment applying the provisions of SFAS No. 144, and our analysis indicated that the carrying value of the tangible assets was not impaired.

The following tables set forth changes in goodwill for the years ended December 31, 2002 and December 31, 2003.

| | |
|---|---:|
| Balance at December 31, 2001(a) | $935,196 |
| Additions or adjustments | 63,682 |
| Impairment losses | (86,045) |
| Balance at December 31, 2002(a) | 912,833 |
| Additions or adjustments | 987 |
| Impairment losses | (6,314) |
| Balance at December 31, 2003 | $907,506 |

(a) Reflect reclassification of Assets held for sale

49

HARRAH'S ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Dollars in thousands, unless otherwise stated) (Continued)

The following table provides the gross carrying value and accumulated amortization for each major class of intangible assets.

| | December 31, 2003 | | | December 31, 2002 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Amortizing intangible assets: | | | | | | |
| Contract rights | $63,590 | $ 6,572 | $ 57,018 | $63,000 | $3,853 | $ 59,147 |
| Customer relationships | 13,100 | 5,023 | 8,077 | 13,100 | 2,944 | 10,156 |
| | $76,690 | $11,595 | 65,095 | $76,100 | $6,797 | 69,303 |
| Nonamortizing intangible assets: | | | | | | |
| Trademarks | | | 146,624 | | | 139,624 |
| Gaming rights | | | 103,300 | | | 62,300 |
| | | | 249,924 | | | 201,924 |
| Total | | | $315,019 | | | $271,227 |

The aggregate amortization expense for the years ended December 31, 2003 and 2002 for those assets that will continue to be amortized under provisions of SFAS No. 142 was $4.8 million and $4.5 million, respectively. Estimated annual amortization expense for those assets for the years ending December 31, 2004, 2005, 2006, 2007 and 2008 is $4.9 million, $4.8 million, $4.5 million, $3.8 million and $3.5 million, respectively.

With the adoption of SFAS No. 142 at the beginning of 2002, we ceased amortization of goodwill and other intangible assets that were determined to have an indefinite useful life. The information below depicts our results for the year ended December 31, 2001, on a pro forma basis, as if SFAS No. 142 had been implemented at the beginning of that period.

(In thousands, except per share amounts)

| | | |
|---|---|---|
| Net income | $208,967 | |
| Add back: Goodwill amortization | 19,581 | |
| Add back: Trademark amortization | 3,080 | |
| Adjusted net income | $231,628 | |
| | | |
| Basic earnings per share: | | |
| Net income | $ | 1.84 |
| Goodwill amortization | | 0.17 |
| Trademark amortization | | 0.03 |
| Adjusted net income | $ | 2.04 |
| | | |
| Diluted earnings per share: | | |
| Net income | $ | 1.81 |
| Goodwill amortization | | 0.17 |
| Trademark amortization | | 0.02 |
| Adjusted net income | $ | 2.00 |

*Note 4—Stockholders' Equity*

In addition to its common stock, Harrah's Entertainment has the following classes of stock authorized but unissued:

Preferred stock, $100 par value, 150,000 shares authorized

Special stock, $1.125 par value, 5,000,000 shares authorized–

Series A Special Stock, 2,000,000 shares designated

Harrah's Entertainment's Board of Directors has authorized that one special stock purchase right (a "Right") be attached to each outstanding share of common stock. The Rights are not separable from the shares. These Rights are exercisable only if a person or group acquires 15% or more of Harrah's Entertainment common stock or announces a tender offer for 15% or more of the common stock. Each Right entitles stockholders to buy one two-hundredth of a share of Series A Special Stock of the Company at an initial price of $130 per Right. If a person acquires 15% or more of the Company's outstanding common stock, each Right entitles its holder to purchase common stock of the Company having a market value at that time of twice the Right's exercise price. Under certain conditions, each Right entitles its holder to purchase stock of an acquiring company at a discount. Rights held by the 15% holder will become void. The Rights will expire on October 5, 2006, unless earlier redeemed by the Board at one cent per Right.

During the past three years, our Board of Directors has authorized plans whereby we have purchased shares of the Company's common stock in the open market from time to time as market conditions and other factors warranted. The table below summarizes the plans in effect during the last three years.

| Plan Authorized | Number of Shares Authorized | Number of Shares Purchased as of December 31, 2003 | Average Price Per Share |
|---|---|---|---|
| July 2001 | 6.0 million | 6.0 million | $37.15 |
| July 2002 | 2.0 million | 1.4 million | 39.24 |
| November 2002 | 3.0 million | 0.5 million | 35.87 |

The November 2002 authorization was to expire December 31, 2003, but it has been extended until December 31, 2004. The repurchases were funded through available operating cash flows and borrowings from our established debt programs.

Under the terms of our employee stock benefit programs, we have reserved shares of Harrah's Entertainment common stock for issuance under the 2001 Executive Stock Incentive and 2001 Broad-based Incentive Plans. (See Note 13 for a description of the plans.) The 2001 Executive Stock Incentive Plan is an equity compensation plan approved by our stockholders and the 2001 Broad-based Incentive Plan is an equity compensation plan not approved by our stockholders. The shares held in reserve for issuance or grant under the Harrah's Entertainment, Inc. 1990 Stock Option Plan and Harrah's Entertainment, Inc. 1990 Restricted Stock Plan (collectively, "Harrah's Former Plans") were transferred to the 2001 Executive Stock Incentive Plan in 2001. As of December 31, 2003, 1,914,884 shares were authorized and unissued under the 2001 Executive Stock Incentive Plan and 23,772 shares were authorized and unissued under the 2001 Broad-based Incentive Plan. No additional shares will be authorized under the 2001 Broad-based Incentive Plan. Of the 1,914,884 shares available for grant under the 2001 Executive Stock Incentive Plan, up to 7,487 of these shares are available for grants as an award other than an option.

In July and November 2003, the Company declared quarterly cash dividends of 30 cents per share, payable on August 27, 2003, to shareholders of record as of the close of business on August 13, 2003, and payable on November 26, 2003, to shareholders of record on November 12, 2003.

HARRAH'S ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Dollars in thousands, unless otherwise stated) (Continued)

*Note 5—Detail of Certain Balance Sheet Accounts*

Deferred costs and other consisted of the following as of December 31:

|  | 2003 | 2002 |
|---|---|---|
| Cash surrender value of life insurance (Note 13) | $ 79,642 | $ 65,109 |
| Casino Reinvestment Development Authority investment bonds and funds on deposit | 38,935 | 35,384 |
| Deferred finance charges, net of amortization of $6,185 and $5,573 | 27,180 | 17,557 |
| Deferred contract costs | 22,288 | 23,371 |
| Other | 114,430 | 92,320 |
|  | $282,475 | $233,741 |

Accrued expenses consisted of the following as of December 31:

|  | 2003 | 2002 |
|---|---|---|
| Payroll and other compensation | $106,421 | $136,582 |
| Insurance claims and reserves | 89,349 | 73,783 |
| Accrued interest payable | 45,084 | 44,638 |
| Accrued taxes | 67,180 | 39,696 |
| Other accruals | 155,355 | 145,608 |
|  | $463,389 | $440,307 |

*Note 6—Debt*

Long-term debt consisted of the following as of December 31:

|  | 2003 | 2002 |
|---|---|---|
| Credit facilities | | |
| 2.3%-3.0% at December 31, 2003, maturities to 2008 | $ 947,800 | $1,285,500 |
| Secured Debt | | |
| 7.1%, maturity 2028 | 93,622 | 94,900 |
| 5.5%-7.3%, maturities to 2033 | 607 | 785 |
| Unsecured Senior Notes | | |
| 5.375%, maturity 2013 | 496,504 | – |
| 7.125%, maturity 2007 | 498,780 | 498,425 |
| 7.5%, maturity 2009 | 498,926 | 498,713 |
| 8.0%, maturity 2011 | 496,079 | 495,525 |
| Unsecured Senior Subordinated Notes | | |
| 7.875%, maturity 2005 | 590,524 | 750,000 |
| Other Unsecured Borrowings | | |
| Commercial Paper, maturities to 2004 | 50,000 | 139,700 |
| Capitalized Lease Obligations | | |
| 7.6%-10.0%, maturities to 2006 | 679 | 984 |
|  | 3,673,521 | 3,764,532 |
| Current portion of long-term debt | (1,632) | (1,466) |
|  | $3,671,889 | $3,763,066 |

As of December 31, 2003, aggregate annual principal maturities for the four years subsequent to 2004 were: 2005, $614.6 million; 2006, $54.2 million; 2007, $605.5 million; and 2008, $819.6 million.

**CREDIT AGREEMENT.** On April 29, 2003, we entered into an agreement for new credit facilities (the "Credit Agreement") for up to $1.9625 billion in borrowings. This Credit Agreement replaced the $1.857 billion credit and letter of credit facilities that were scheduled to mature in April 2003 ($332 million) and April 2004 ($1.525 billion). The Credit Agreement matures on April 23, 2008, and consists of a five-year revolving credit facility for up to $1.0625 billion and a five-year term reducing facility for up to $900 million. The Credit Agreement contains a provision that would allow an increase in the borrowing capacity to $2 billion, if mutually acceptable to the Company and the lenders. Interest on the Credit Agreement is based on our debt ratings and leverage ratio and is subject to change. As of December 31, 2003, the Credit Agreement bore interest based upon 105 basis points over LIBOR and bore a facility fee for borrowed and unborrowed amounts of 25 basis points. At our option, we may borrow at the prime rate under the new Credit Agreement. As of December 31, 2003, $947.8 million in borrowings were outstanding under the Credit Agreement with an additional $66.5 million committed to back letters of credit. After consideration of these borrowings, but before consideration of amounts borrowed under the commercial paper program, $948.2 million of additional borrowing capacity was available to the Company as of December 31, 2003.

**INTEREST RATE SWAP AGREEMENTS.** The Company may use interest rate swaps to manage the mix of our debt between fixed and variable rate instruments. We account for these interest rate swaps in accordance with SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," and all amendments thereto. SFAS No. 133 requires that all derivative instruments be recognized in the financial statements at fair value. Any changes in fair value are recorded in the income statement or in other comprehensive income, depending on whether the derivative is designated and qualifies for hedge accounting, the type of hedge transaction and the effectiveness of the hedge. The differences to be paid or received under the terms of interest rate swap agreements are accrued as interest rates change and recognized as an adjustment to interest expense for the related debt. Changes in the variable interest rates to be paid or received pursuant to the terms of interest rate swap agreements will have a corresponding effect on future cash flows.

Interest rate swap agreements contain a credit risk that the counterparties may be unable to meet the terms of the agreements. We minimize that risk by evaluating the creditworthiness of our counterparties, which are limited to major banks and financial institutions, and we do not anticipate nonperformance by the counterparties.

As of December 31, 2003, we were a party to two interest rate swaps for a total notional amount of $200 million. These interest rate swaps serve to manage the mix of our debt between fixed and variable rate instruments by effectively converting fixed rates associated with long-term debt obligations to floating rates. The major terms of the interest rate swaps are as follows.

| Effective Date | Type of Hedge | Fixed Rate Received | Variable Rate Paid | Notional Amount (In millions) | | Maturity Date |
|---|---|---|---|---|---|---|
| | | | | 2003 | 2002 | |
| Dec. 29, 2003 | Fair value | 7.875% | 6.968% | $ 50 | $ – | Dec. 15, 2005 |
| Dec. 29, 2003 | Fair value | 7.875% | 6.972% | 150 | – | Dec. 15, 2005 |

The Company's interest rate swaps qualify for the "shortcut" method allowed under SFAS No. 133, which allows for an assumption of no ineffectiveness. As such, there is no income statement impact from changes in the fair value of the hedging instruments. The net effect of the above swaps to 2003 interest expense was immaterial.

**HARRAH'S ENTERTAINMENT, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, unless otherwise stated) (Continued)**

Subsequent to the end of 2003, we entered into two additional swap agreements for a total notional amount of $300 million, $100 million of which will expire in 2005 and $200 million of which will expire in 2007. These interest rate swaps also qualify for the "shortcut" method and serve to manage the mix of our debt between fixed and variable rate instruments by effectively converting fixed rates associated with long-term debt obligations to floating rates.

**COMMERCIAL PAPER.**   To provide the Company with cost-effective borrowing flexibility, we have a $200 million commercial paper program that is used to borrow funds for general corporate purposes. Although the debt instruments are short-term in tenor, they are classified as long-term debt because the commercial paper is backed by our Credit Agreement, and we have committed to keep available capacity under our Credit Agreement in an amount equal to or greater than amounts borrowed under this program. At December 31, 2003, $50 million was outstanding under this program.

**ISSUANCE OF NEW DEBT.**   In addition to our Credit Agreement, we have issued debt and entered into credit agreements to provide the Company with cost-effective borrowing flexibility and to replace short-term, floating-rate debt with long-term, fixed-rate debt. The table below summarizes the face value of debt obligations entered into during the last three years and outstanding at December 31, 2003.

| Debt | Issued | Matures | Face Value Outstanding at December 31, 2003 |
|---|---|---|---|
| | | | (In millions) |
| Commercial Paper | 2003 | 2004 | $ 50.0 |
| 5.375% Senior Notes | December 2003 | 2013 | 500.0 |
| 8.0% Senior Notes | January 2001 | 2011 | 500.0 |
| 7.125% Senior Notes | June 2001 | 2007 | 500.0 |

**EXTINGUISHMENTS OF DEBT.**   Funds from the new debt discussed above, as well as proceeds from our Credit Agreement, were used to retire certain of our outstanding debt, in particular those debt obligations assumed in our acquisition transactions, to reduce our effective interest rate and/or lengthen maturities. The following table summarizes the debt obligations, in addition to our previous credit and letter of credit facilities that we have retired over the last three years:

| Issuer | Date Retired | Debt Extinguished | Face Value Retired |
|---|---|---|---|
| | | | (In millions) |
| Harrah's Operating Co. | December 2003 | Senior Subordinated Notes due 2005 | $147.1 |
| Harrah's Operating Co. | August 2003 | Senior Subordinated Notes due 2005 | 12.4 |
| JCC | December 2002 | Senior Notes due 2008 | 28.2 |
| Harveys | September 2001 | 10.625% Senior Subordinated Notes due 2006 | 150.0 |
| Showboat | August 2001 | 13% Senior Subordinated Notes due 2009 | 2.1 |
| Harveys | July 2001 | Credit facility due 2004 | 192.0 |

54

In July 2003, our Board of Directors authorized the Company to retire, from time to time through cash purchases, portions of our outstanding debt in open market purchases, privately negotiated transactions or otherwise. These repurchases will be funded through available cash from operations, borrowings from our Credit Agreement and our new Senior Notes. Such repurchases will depend on prevailing market conditions, the Company's liquidity requirements, contractual restrictions and other factors. As of December 31, 2003, $159.5 million of our 7⅞% Senior Subordinated Notes had been retired under this authorization.

Charges of $19.1 million representing premiums paid and write-offs of unamortized deferred financing costs associated with the early retirement of portions of our 7⅞% Senior Subordinated Notes and of our previous credit and letter of credit facilities were recorded in 2003. In compliance with SFAS No. 145, these charges no longer qualify for presentation as extraordinary items and are, therefore, included in income from continuing operations on our Consolidated Statements of Income.

PARENT COMPANY GUARANTEE OF SUBSIDIARY DEBT. Harrah's Operating Company, Inc. ("HOC"), a 100% owned subsidiary and the principal asset of Harrah's Entertainment, is the issuer of certain debt securities that have been guaranteed by Harrah's Entertainment. Due to the comparability of HOC's consolidated financial information with that of Harrah's Entertainment, complete separate financial statements and other disclosures regarding HOC have not been presented. Management has determined that such information is not material to holders of HOC's debt securities. Harrah's Entertainment has no independent assets or operations, its guarantee of HOC's debt securities is full and unconditional and its only other subsidiary is minor. There are no significant restrictions on Harrah's Entertainment's ability to obtain funds from its subsidiaries by dividends or loans. In addition, the amount of consolidated retained earnings representing undistributed earnings of 50-percent-or-less owned persons accounted for under the equity method is less than 0.5 percent and there are no significant restrictions on the payment of dividends by the Company.

FAIR MARKET VALUE. Based on the borrowing rates available as of December 31, 2003, for debt with similar terms and maturities and market quotes of our publicly traded debt, the fair value of our long-term debt at December 31 was as follows:

| | December 31, | | | |
|---|---|---|---|---|
| | 2003 | | 2002 | |
| | Carrying Value | Market Value | Carrying Value | Market Value |
| (In millions) | | | | |
| Outstanding debt . . . . . . . . . . . . . . . . | $(3,673.5) | $(3,977.8) | $(3,764.5) | $(4,031.6) |
| Interest rate swaps (used for hedging purposes) . . . . . . . . . . . . . . . . . . . . | 0.2 | 0.2 | – | – |

*Note 7—Leases*

We lease both real estate and equipment used in our operations and classify those leases as either operating or capital leases following the provisions of SFAS No. 13, "Accounting for Leases." At December 31, 2003, the remaining lives of our operating leases ranged from one to forty-two years, with various automatic extensions totaling up to sixty years.

HARRAH'S ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Dollars in thousands, unless otherwise stated) (Continued)

Rental expense associated with operating leases is charged to expense in the year incurred and was included in the Consolidated Statements of Income as follows:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Noncancelable |  |  |  |
| Minimum | $42,358 | $34,407 | $22,521 |
| Contingent | 6,248 | 7,032 | 5,601 |
| Sublease | (201) | (288) | (602) |
| Other | 17,558 | 42,125 | 34,921 |
|  | $65,963 | $83,276 | $62,441 |

Our future minimum rental commitments as of December 31, 2003, were as follows:

|  | Noncancelable Operating Leases |
|---|---|
| 2004 | $ 42,966 |
| 2005 | 36,204 |
| 2006 | 34,636 |
| 2007 | 33,073 |
| 2008 | 30,612 |
| Thereafter | 450,908 |
| Total minimum lease payments | $628,399 |

In addition to these minimum rental commitments, certain of these operating leases provide for contingent rentals based on a percentage of revenues in excess of specified amounts.

*Note 8—Write-downs, Reserves and Recoveries*

Our operating results include various pretax charges to record asset impairments, contingent liability reserves, project write-offs and recoveries at time of sale of previously recorded reserves for asset impairment. The components of Write-downs, reserves and recoveries were as follows:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Impairment of goodwill | $ 6,315 | $ — | $ — |
| Impairment of long-lived assets | 2,469 | 1,501 | 8,203 |
| Write-off of abandoned assets and other costs | 3,218 | 6,917 | 8,484 |
| Settlement of sales tax contingency | (923) | (6,464) | — |
| Charge for structural repairs at Reno | — | 5,000 | — |
| Termination of contracts | — | 168 | 4,060 |
| Recoveries from previously impaired assets and reserved amounts | — | (2,091) | (571) |
| Reserves for New Orleans casino | — | — | 2,322 |
|  | $11,079 | $ 5,031 | $22,498 |

We account for the impairment of long-lived assets to be held and used by evaluating the carrying value of the long-lived assets in relation to the operating performance and future undiscounted cash

flows of the underlying operating unit when indications of impairment are present. Long-lived assets to be disposed of are evaluated in relation to the estimated fair value of such assets less costs to sell.

*Note 9—Income Taxes*

Our federal and state income tax provision/(benefit) allocable to our Consolidated Statements of Income and our Consolidated Balance Sheets line items was as follows:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Income from continuing operations before income taxes and minority interests | $172,201 | $196,534 | $125,797 |
| Discontinued operations | 360 | 1,595 | 927 |
| Cumulative effect of change in accounting principle | – | (2,831) | – |
| Stockholders' equity | | | |
| Unrealized gain/(loss) on available-for-sale securities | 215 | (239) | 772 |
| Compensation expense for tax purposes in excess of amounts recognized for financial reporting purposes | (15,537) | (23,970) | (18,013) |
| Other | – | 800 | (800) |
| | $157,239 | $171,889 | $108,683 |

Income tax expense attributable to Income from continuing operations before income taxes and minority interests consisted of the following:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| United States | | | |
| Current | | | |
| Federal | $128,958 | $145,012 | $ 15,439 |
| State | 15,221 | 23,369 | 7,882 |
| Deferred | 29,715 | 28,153 | 102,476 |
| Other countries | | | |
| Current | – | – | – |
| Deferred | (1,693) | – | – |
| | $172,201 | $196,534 | $125,797 |

57

HARRAH'S ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Dollars in thousands, unless otherwise stated) (Continued)

The differences between the statutory federal income tax rate and the effective tax rate expressed as a percentage of Income from continuing operations before income taxes and minority interests were as follows:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Statutory tax rate | 35.0% | 35.0% | 35.0% |
| Increases/(decreases) in tax resulting from: | | | |
| State taxes, net of federal tax benefit | 2.4 | 2.6 | 1.5 |
| Goodwill amortization | 0.5 | – | 1.8 |
| Tax credits | (0.4) | (0.3) | (0.5) |
| Political contributions | 0.1 | 0.1 | 0.1 |
| Officers' life insurance | (1.0) | 0.2 | 0.3 |
| Meals and entertainment | 0.1 | 0.3 | 0.3 |
| Minority interests in partnership earnings | (0.9) | (0.9) | (1.3) |
| Other | 0.4 | (0.2) | (0.8) |
| Effective tax rate | 36.2% | 36.8% | 36.4% |

The components of our net deferred tax balance included in our Consolidated Balance Sheets were as follows:

|  | 2003 | 2002 |
|---|---|---|
| Deferred tax assets | | |
| Compensation programs | $ 59,495 | $ 55,566 |
| Bad debt reserve | 18,912 | 20,094 |
| Self-insurance reserves | 8,758 | 6,051 |
| Deferred income | 502 | 468 |
| Project opening costs | 9,750 | 20,819 |
| Net operating losses | 18,008 | 16,316 |
| Other | 41,226 | 29,074 |
| Valuation allowance | (14,211) | (14,211) |
|  | 142,440 | 134,177 |
| Deferred tax liabilities | | |
| Property | (283,406) | (219,352) |
| Management contracts | (19,983) | (20,947) |
| Intangibles | (90,519) | (75,109) |
| Investments in nonconsolidated affiliates | (10,883) | (20,771) |
|  | (404,791) | (336,179) |
| Net deferred tax liability | $(262,351) | $(202,002) |

58

*Note 10—Supplemental Cash Flow Information*

The increase in Cash and cash equivalents due to the changes in long-term and working capital accounts was as follows:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Long term accounts | | | |
| Deferred costs and other | $ (71,068) | $ (36,738) | $ 69,055 |
| Deferred credits and other | 54,432 | 32,835 | (83,277) |
| Net change in long-term accounts | $ (16,636) | $ (3,903) | $ (14,222) |
| Working capital accounts | | | |
| Receivables | $ (8,005) | $ 14,295 | $ 14,853 |
| Inventories | (1,311) | 869 | 3,371 |
| Prepayments and other | 50,971 | 81,765 | 26,504 |
| Accounts payable | 5,910 | (2,308) | (16,988) |
| Accrued expenses | (93,849) | (149,461) | 69,451 |
| Net change in working capital accounts | $ (46,284) | $ (54,840) | $ 97,191 |

**SUPPLEMENTAL DISCLOSURE OF CASH PAID FOR INTEREST AND TAXES.** The following table reconciles our Interest expense, net of interest capitalized, as reported in the Consolidated Statements of Income, to cash paid for interest.

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Interest expense, net of interest capitalized | $234,419 | $240,220 | $255,801 |
| Adjustments to reconcile to cash paid for interest | | | |
| Net change in accruals | (9,201) | (6,825) | (33,869) |
| Amortization of deferred finance charges | (6,185) | (5,573) | (4,769) |
| Net amortization of discounts and premiums | (1,141) | (1,596) | (913) |
| Cash paid for interest, net of amount capitalized | $217,892 | $226,226 | $216,250 |
| Cash payments for income taxes, net of refunds | $114,289 | $145,873 | $(27,974) |

*Note 11—Commitments and Contingencies*

**CONTRACTUAL COMMITMENTS.** We continue to pursue additional casino development opportunities that may require, individually and in the aggregate, significant commitments of capital, up-front payments to third parties, guarantees by Harrah's Entertainment of third-party debt and development completion guarantees.

We may guarantee all or part of the debt incurred by Indian tribes, with which we have entered into a management contract, to fund development of casinos on the Indian lands. For all existing guarantees of Indian debt, we have obtained a first lien on certain personal property (tangible and intangible) of the casino enterprise. There can be no assurance, however, that the value of such property would satisfy our obligations in the event these guarantees were enforced. Additionally, we have received limited waivers from the Indian tribes of their sovereign immunity to allow us to pursue our rights under the contracts between the parties and to enforce collection efforts as to any assets in which a security interest is taken. The aggregate outstanding balance as of December 31, 2003, of

HARRAH'S ENTERTAINMENT, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Dollars in thousands, unless otherwise stated) (Continued)

Indian debt that we have guaranteed was $112.9 million. The outstanding balance of all of our debt guarantees at December 31, 2003 is $120.8 million. Our maximum obligation under all of our debt guarantees is $152.9 million. Our obligations under these debt guarantees extend through January 2008.

Some of our guarantees of the debt for casinos on Indian lands were modified during 2003, triggering the requirements under Financial Accounting Standards Board Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others," to recognize a liability for the estimated fair value of those guarantees. Liabilities, representing the fair value of our guarantees, and corresponding assets, representing the portion of our management fee receivable attributable to our agreements to provide the related guarantees, were recorded and are being amortized over the lives of the related agreements. We estimate the fair value of the obligation by considering what premium would have been required by us or by an unrelated party. The amounts recognized represent the present value of the premium in interest rates and fees that would have been charged to the tribes if we had not provided the guarantees. The unamortized balance of the liability for the guarantees and of the related assets at December 31, 2003, was $7.0 million.

Excluding debt guarantees and guarantees related to New Orleans (see Note 14), as of December 31, 2003, we had commitments and contingencies of $285.4 million, including construction-related commitments.

The agreements under which we manage casinos on Indian lands contain provisions required by law which provide that a minimum monthly payment be made to the tribe. That obligation has priority over scheduled payments of borrowings for development costs and over the management fee earned and paid to the manager. In the event that insufficient cash flow is generated by the operations of the Indian-owned properties to fund this payment, we must pay the shortfall to the tribe. Subject to certain limitations as to time, such advances, if any, would be repaid to us in future periods in which operations generate cash flow in excess of the required minimum payment. These commitments will terminate upon the occurrence of certain defined events, including termination of the management contract. As of December 31, 2003, the aggregate monthly commitment for the minimum guaranteed payments pursuant to these contracts, which extend for periods of up to 83 months from December 31, 2003, is $1.2 million. The maximum exposure for the minimum guaranteed payments to the tribes is unlikely to exceed $26.7 million as of December 31, 2003.

SEVERANCE AGREEMENTS.   As of December 31, 2003, the Company has severance agreements with 34 of its senior executives, which provide for payments to the executives in the event of their termination after a change in control, as defined. These agreements provide, among other things, for a compensation payment of 1.5 to 3.0 times the executive's average annual compensation, as defined, as well as for accelerated payment or accelerated vesting of any compensation or awards payable to the executive under any of Harrah's Entertainment's incentive plans. The estimated amount, computed as of December 31, 2003, that would be payable under the agreements to these executives based on the compensation payments and stock awards aggregated approximately $103.7 million. The estimated amount that would be payable to these executives does not include an estimate for the tax gross-up payment, provided for in the agreements, that would be payable to the executive if the executive becomes entitled to severance payments which are subject to a federal excise tax imposed on the executive.

SELF-INSURANCE.   We are self-insured for various levels of general liability, workers' compensation and employee medical coverage. Insurance claims and reserves include accruals of